# Exhibit 1
## [Proposed] First Amended Complaint

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

NANCY R., pseudonymously,

      Plaintiff,

vs.

PLAZA HOTELS, LLC;
STEVE KETTER;
MICHAEL A. WILEY;
OKC AIRPORT ES, LLC;
ESH STRATEGIES FRANCHISE, LLC;
NATHA, LLC;
JALIYAN HOSPITALITY, INC;
SUPER 8 WORLDWIDE, INC;
RAJ KRUPA HOTEL, LLC;
DAYS INN WORLDWIDE, INC;
CHAND & SAAJ HOSPITALITY, INC;
RAMADA WORLDWIDE, INC;
YASH ENTERPRISES, LLC;
HOWARD JOHNSON INTERNATIONAL, INC;
NOOR HOTEL, LLC;
AMBICA, LLC;
OM, LLC;
INDRA, LLC; AND
G6 HOSPITALITY FRANCHISING, LLC,

      Defendants.

Case No. : 5:25-cv-462

**Judge Charles Goodwin**

**[PROPOSED] FIRST AMENDED COMPLAINT**

**Jury Trial Demanded**

Plaintiff Nancy R., by and through her attorneys, Michael C. Kane, Esq., Bradley J. Myers,

Esq., and Joel S. Hengstler, Esq. of The702Firm, Geoffrey C. Parker, Esq. and Jonathan Hilton,

Esq. of Hilton Parker LLC, and Fletcher D. Handley, Jr. of Handley Law Center states as follows:

### PARTIES

1.    Plaintiff Nancy R. ("**Nancy**") is a natural person.

2.    Defendant Plaza Hotels, LLC ("**Plaza**") is an Oklahoma limited liability company

which, at all relevant times, owned and operated the Plaza Inn Hotel ("the Plaza") located at 3200

S I-35 Service Road, Oklahoma City, OK 73129.

3.      Defendant Steve Ketter ("**Ketter**") is a natural person residing, on reference, in Canadian County, Oklahoma.  Ketter may be served at his residence at 5101 S. Choctaw Ave, El Reno, OK 73036.  On information and belief, Ketter personally managed the day-to-day operation of the Plaza at all relevant times.

4.      Defendant Michael A. Wiley ("**Wiley**") is a natural person residing, on reference, in Oklahoma County, Oklahoma.  Wiley may be served at his residence at 11025 N. County Line Rd., Yukon OK 73099.  On information and belief, Wiley personally managed the day-to-day operation of the Plaza at all relevant times.

5.      Defendant OKC AIRPORT ES, LLC ("**OKC ES**") is a Texas limited liability company that owned and operated the Extended Stay America Oklahoma City Airport ("the Extended Stay") located at 4820 W Reno Avenue, Oklahoma City, OK 73127 at all relevant times.

6.      Defendant ESH STRATEGIES FRANCHISE, LLC ("**ESA**") is a Delaware limited liability company which, at all relevant times was the franchisor that set—and monitored compliance with—the brand standards for the Extended Stay America Oklahoma City Airport ("the Extended Stay") located at 4820 W Reno Avenue, Oklahoma City, OK 73127.

7.      Defendant NATHA, LLC ("**Natha**") is an Oklahoma limited liability company that owned and operated the Super 8 by Wyndham Oklahoma Airport Fairgrounds West ("the Super 8 OKC Airport") located at 311 S Meridian Avenue, Oklahoma City, OK 73108 at all relevant times.

8.      Defendant JALIYAN HOSPITALITY, INC ("**Jaliyan**") is an Oklahoma corporation that owned and operated the Super 8 by Wyndham Oklahoma City ("the Super 8 Prospect") by located at 3852 S Prospect Avenue, Oklahoma City, OK 73129 at all relevant times.

9.      Defendant SUPER 8 WORLDWIDE, INC ("**Super 8**") is a South Dakota limited liability company that was the franchisor that set—and monitored compliance with—the brand

standards for the Super 8 by Wyndham Oklahoma Airport Fairgrounds West ("the Super 8 Airport") located at 311 S Meridian Avenue, Oklahoma City, OK 73108  and the Super 8 by Wyndham Oklahoma City ("the Super 8 Prospect Ave") located at 3852 S Prospect Avenue, Oklahoma City, OK 73129 at all relevant times.

10.     Defendant RAJ KRUPA HOTEL, LLC ("**Raj Krupa**") is an Oklahoma limited liability company that owned and operated the Days Inn by Wyndham Oklahoma City/Moore ("the Days Inn") located at 8217 S I-35 Service Road, Oklahoma City, OK 73149 at all relevant times.

11.     Defendant DAYS INN WORLDWIDE, INC ("**Days Inn**") is a Delaware corporation that was the franchisor that set—and monitored compliance with—the brand standards for the Days Inn by Wyndham Oklahoma City/Moore ("the Days Inn") located at 8217 S I-35 Service Road, Oklahoma City, OK 73149 at all relevant times.

12.     Defendant CHAND & SAAJ HOSPITALITY, INC ("**C&S**") is an Oklahoma corporation that owned and operated the Ramada by Wyndham Oklahoma City Airport North ("the Ramada") located at 2200 S. Meridian Avenue, Oklahoma City, OK 73108 at all relevant times.

13.     Defendant RAMADA WORLDWIDE, INC ("**Ramada**") is a Delaware corporation that was the franchisor that set—and monitored compliance with—the brand standards for the Ramada by Wyndham Oklahoma City Airport North ("the Ramada") located at 2200 S. Meridian Avenue, Oklahoma City, OK 73108 at all relevant times.

14.     Defendant YASH ENTERPRISES, LLC ("**Yash**") is an Oklahoma corporation that owned and operated the Howard Johnson by Wyndham Oklahoma City Airport/Fairgrounds ("the Howard Johnson") located at 400 S Meridian Ave, Oklahoma City, OK 73108 at all relevant times.

15.     Defendant HOWARD JOHNSON INTERNATIONAL, INC ("**Howard Johnson**") is a Delaware corporation that was the franchisor that set—and monitored compliance

with—the brand standards for the Howard Johnson by Wyndham Oklahoma City Airport/Fairgrounds ("the Howard Johnson") located at 400 S Meridian Ave, Oklahoma City, OK 73108 at all relevant times.

16. Defendants NOOR HOTEL, LLC ("**Noor**"), AMBICA, LLC ("**Ambica**"), OM, LLC ("**Om**"), and INDRA, LLC ("**Indra**," and collectively, "**the Motel 6 Franchisees**") are Oklahoma limited liability companies. At all relevant times, each owned 25% of the Motel 6 Oklahoma City Bricktown ("the Motel 6") located at 1800 E Reno Avenue, Oklahoma City, OK 73117. On information and belief, Noor, Ambica, Om, and Indra together performed and equally shared in day-to-day management of the Motel 6.

17. Defendant G6 HOSPITALITY FRANCHISING, LLC ("**Motel 6**") is a Delaware limited liability company was the franchisor that set—and monitored compliance with—the brand standards for the Motel 6 Oklahoma City Bricktown ("the Motel 6") located at 1800 E Reno Avenue, Oklahoma City, OK 73117 at all relevant times.

18. Defendants **ESA**, **Super 8**, **Days Inn**, **Ramada**, **Howard Johnson**, and **Motel 6** are hereinafter sometimes referred to collectively as the "**Franchisor Defendants**." Defendants **OKC ES**, **Natha**, **Jaliyan, Raj Krupa**, **C&S**, **Yash**, **Noor**, **Ambica**, **Om**, and **Indra** are hereinafter sometimes referred to collectively as the "**Franchisee Defendants**."

19. Defendants acted through their agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers and at all times relevant to this action.

INTRODUCTION
<u>Pimpology</u>

20.     One doesn't have to be chained up to be trapped in prostitution.  As most people recognize, women trapped in prostitution nearly always want to escape it.[1]

21.     Despite this, in the popular imagination "sex trafficking" is something completely different that only happens to sympathetic women. In popular depictions of sex trafficking, the victim is nearly always a respectable girl from a good home who has been kidnapped off the street—usually in a foreign country—and who has been forced to sell her body by means of brutal physical violence.

22.     But, "[t]his popular image of sex traffickers and the victims of sex trafficking is almost completely wrong . . .  About the only thing Hollywood gets right is the brutal men, and even that is more complicated."[2]

23.     Most victims of sex trafficking aren't cuddly, and many are not obviously victims. Few trafficking victims cry for help, because few see themselves as needing help.  Most are street savvy and tough as nails.  Many are flaky or personally difficult.  Nearly all have a wealth of past traumas, and it is usually those past traumas that make them vulnerable to exploitation.

24.     No little girl dreams of becoming a prostitute.  Most girls who do become prostitutes are coerced into it, and even those who aren't coerced at first usually suffer coercion later.[3]  Nearly half are still children when they turn their first trick.[4]

---

[1] Moran, Rachel & Farley, Melissa. (2019). Consent, Coercion, and Culpability: Is Prostitution Stigmatized Work or an Exploitive and Violent Practice Rooted in Sex, Race, and Class Inequality?. Archives of Sexual Behavior. 48. 10.1007/s10508-018-1371-8.

[2] BRIAN JOSEPH, VEGAS CONCIERGE: SEX TRAFFICKING, HIP HOP, AND CORRUPTION IN AMERICA XII (2024).

[3] *See* Jody Raphael, Jessica Ashley Reichert & Mark Powers, *Pimp Control and Violence: Domestic Sex Trafficking of Chicago Women and Girls*, 20 WOMEN & CRIMINAL JUSTICE 89, 96 (2010) (coercion increases greatly with time).

[4] Melissa Farley et al., *Prostitution and Trafficking in Nine Countries: An Update on Violence and Posttraumatic Stress Disorder*, JOURNAL OF TRAUMA PRACTICE, Vol. 2, Issue 3-4 at 40 (2004) (42% of prostitutes in the U.S. started as children).

25.     Individual risk factors for both "consensual" prostitution and sex trafficking overlap almost totally, including in both cases PTSD, trauma, childhood abuse and neglect, substance abuse, poverty and housing instability, foster care or dysfunctional family dynamics.[5]

26.     As those familiar with "the Life" know, "most hoes don't even like sex."[6] Rather, they are usually in desperate situations and dealing with unresolved traumas that make them susceptible to manipulation and coercion by traffickers—commonly called pimps—who seek them out and purport to provide them with the love, care, and security that they've been deprived of.

27.     Regardless of how they got into the sex trade, most women who work as prostitutes are not working for themselves. Figures vary, but studies of prostitution in the U.S. find that 80-90% of prostitutes are controlled by pimps.[7]

28.     The great majority of pimps use threats and physical violence to keep their "stable" of girls hardworking and loyal.[8]

29.     But physical violence is not the pimp's only tool of coercion.  As Ken Ivy, a Milwaukee pimp, explains in his startlingly explicit book *Pimpology: The 48 Laws of the Game*, pimps are also master manipulators, ready to ferret out the weaknesses and pressure points left by a girl's past traumas and use them to create dependence:

---

[5] Gerassi, Lara. "From Exploitation to Industry: Definitions, Risks, and Consequences of Domestic Sexual Exploitation and Sex Work Among Women and Girls." *Journal Of Human Behavior In The Social Environment* vol. 25,6 (2015): 591-605. doi:10.1080/10911359.2014.991055.

[6] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 77 (2008).

[7] Farley, Melissa et al., *Online Prostitution and Trafficking,* ALBANY LAW REVIEW, 1039 (2014), *available at* albanylawreview.org/article/70164-onlineprostitution-and-trafficking. (collecting studies)

[8] *See* Jody Raphael, Jessica Ashley Reichert & Mark Powers, *Pimp Control and Violence: Domestic Sex Trafficking of Chicago Women and Girls*, 20 WOMEN & CRIMINAL JUSTICE 89, 96 (2010) (finding over 75% of pimp-controlled prostitutes said their pimps physically abused them, and under half said they could leave without physical harm.)

> Most hoes have low self-esteem for a reason.  A pimp looks for that
> weakness, and if it isn't on the surface, he brings that motherfucker
> out of them. . . .  Weakness is the best trait a person can find in
> someone they want to control.  You have to tear someone's ego
> down to nothing before they will start looking to you for salvation.[9]

30.    Still, even non-violent pimps leverage the ever-present threat of other pimps'
violence to coerce women they suspect of being independent sex workers—"renegades," in the
language of the Life—into "choosing up" and becoming *their* girls.

31.    In his book, Mr. Ivy—a self-proclaimed non-violent pimp—recalls taking control
of a naïve sex worker who made the mistake of acknowledging his catcalls by threatening her:
"A solo ho without a pimp will soon be under pimp arrest or worse.  It's in your best interest to
choose a pimp.  It's in your best interest to choose Pimpin' Ken."[10]

32.    It is standard practice for pimps to take all, or nearly all, of the money earned by
the women and girls they control.  The pimps then use the money to pay for their victims' needs,
but only as and when it suits them. This creates total dependence, both practical and psychological,
on the pimp.[11]

33.    To quote Ken Ivy again, "The more someone depends on you, the more power you
have over them. To master someone completely, they have to depend on you for everything."[12]

34.    Common control techniques include retaining control of victims' identification
documents, telling stories about the horrible fates suffered by girls who disobeyed other pimps,
and threatening to have CPS separate victims from their children if they disobey.

---

[9] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 22 (2008) ("Law 5: Prey on the Weak").
[10] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 79 (2008).
[11] *See* Johnson, Matthew and Dank, Meredith, *The Hustle: Economics of the Underground Commercial Sex Industry*, URBAN INSTITUTE (2014), *available at* https://apps.urban.org/features/theHustle/index.html; *see also* PIMPOLOGY 20 ("Law 4: Keep a Ho in Arrears . . . To master someone completely, they have to depend on you for everything.")
[12] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 20 (2008).

35.     Other methods of coercion include withholding food, sleep deprivation, and induced substance abuse/drug addiction. Courts have long recognized these tactics to be methods of coercion used in human trafficking.

36.     As Justice William J. Brennan explained, "drug addiction or the weakness resulting from a lack of food, sleep, or medical care . . . would not reappear with such depressing regularity [in trafficking cases] if they were ineffective." *United States v. Kozminski*, 487 U.S 931, 957 (Brennan, J., concurring) (collecting cases).

37.     Traffickers use substances to keep their victims too physically incapacitated to resist and to create a physical reliance on the trafficker out of fear of withdrawal.[13] Most sex trafficking victims—up to 84% according to one study—report their trafficker used substances to exploit them during their victimization period.[14]

38.     Of course, pimps use carrots as well as sticks.  Extravagant promises of comfortable retirement are nearly universal, as are shorter-term promises of nice clothes, jewelry, and the like. But follow-through on even the short-term promises is rare, and retirement is all but unheard of.

39.     Still, many victims cling to their pimps' fraudulent promises out of a desperate need for something to hope for when all other happy endings seem closed to them.

40.     All told, very few prostitutes who find themselves answering to a pimp feel able to leave without suffering some disastrous combination of physical, emotional, reputational, and financial consequences. On reference, for more than half of all prostitutes these potential consequences rise to the level of "serious harm" as defined in 18 U.S.C. § 1591(e)(5).

---

[13] Langton, L. Planty, M. G., Banks, D., Witwer, A. R., Woods, D. Vermeer, M. J. D., & Jackson, B. A. (2022). Sex Trafficking and Substance Use: Identifying High-Priority Needs within the Criminal Justice System. *Rand Health Quarterly,* 9(4), 14.

[14] Eastwood-Paticchio, Emma, *Addicted to You: Drug Addiction as a Means of Coercion*, HUMAN TRAFFICKING INSTITUTE (30 January 2019), *available at* https://traffickinginstitute.org/addicted-to-you-drug-addiction-as-a-means-of-coercion/ (noting prevalence of induced substance use in various human trafficking surveys and reports).

41.    For most women living it, the life of a pimp-controlled prostitute is a hellish prison from which escape seems not just impossible, but unthinkable.  Contrary to the popular image, pimp-controlled prostitution is what sex trafficking looks like in America today.

42.    Fortunately, federal law recognizes this complex reality.   The Trafficking Victims Protection Reauthorization Act ("TVPRA"), at 18 U.S.C. § 1591, defines a human trafficker as:

> Whoever knowingly . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing, or . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act.

43.    "Coercion," as used in the statute's definition of human trafficking, includes:

> threats of serious harm to or physical restraint against any person; [or] any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm or physical restraint against any person

44.    "Serious harm," as used in the statute's definition of coercion, means:

> Any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

45.    Reading the TVPRA's criminal provision together with its incorporated definitions, human trafficking means using (or recklessly disregarding the use of) force, fraud, or threats of "any harm" that would be "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person *of the same background and in the same circumstances* . . . to continue performing commercial sexual activity."

46.     Contrary to the comfortable myth spread by those who benefit from prostitution occurring on their properties, there is no way to welcome "consensual prostitution" without welcoming sex trafficking.

47.     The vast majority of American prostitutes—on reference and belief, at least three-quarters—are victims of human trafficking within the meaning of the TVPRA.

48.     In recent years, many American law enforcement agencies have "overhauled their approach to prostitutes, trying to be more respectful and compassionate in their interactions with them while still enforcing prostitution laws, recognizing all prostitutes are victims, and putting a greater focus on identifying and arresting their pimps."[15]

49.     However, few people other than police, prosecutors, and victim advocates think of the average prostitute as a human trafficking victim, but that failure isn't because most people are ignorant of the relevant facts.  After all, the phrase "pimp slap" didn't enter the lexicon because people think pimps are cuddly and supportive.

50.     Rather, most people fail to see prostitutes as victims because judgmental attitudes toward prostitutes—and dismissive attitudes toward their suffering—are deeply rooted in popular culture.  In other words, most people know prostitutes are usually coerced, they just don't care.

<u>Trafficking in the Hotel Industry: Room for Trafficking</u>

51.     By their nature, hotels tend to be located in close proximity to event spaces, airports and highways.  They offer temporary, anonymous, private, and cost-effective lodgings that are convenient for busy travelers.

52.     The same factors also make them prime venues for human trafficking.

---

[15] BRIAN JOSEPH, VEGAS CONCIERGE: SEX TRAFFICKING, HIP HOP, AND CORRUPTION IN AMERICA 35 (2024).

53.     According to a 2018 Polaris Project report, three quarters (75%) of sex trafficking victims surveyed had spent time in a hotel during their trafficking, and four fifths of victims who spent time in a hotel (i.e. 60% of all victims) had engaged in commercial sex inside of a hotel.[16]

54.     Similarly, as of 2020, among all active federal prosecutions for human trafficking involving a completed sex act, over three quarters (77%) involved commercial sex at a hotel.

55.     Therefore, on information and belief, hotel employees encounter victims of sex trafficking more than members of the general public.

56.     Hotel staff can, and should, easily observe and identify the following indicators of in-call escort services involving trafficking victims:

    a.    Paying for stays in cash or with pre-paid credit cards

    b.    Extended stays with few possessions

    c.    Reservations for a single night that are extended day by day

    d.    Frequent requests for new towels, washcloths, and/or linens

    e.    Excessive condoms in trash cans

    f.    Excessive foot traffic in/out of rooms

    g.    One person checking in with multiple women in tow

    h.    Verbal or physical abuse of women

    i.    Restricted or controlled communications

    j.    Restricted movement or evidence of constant monitoring

    k.    No control of money, cell phone, or identification documents

    l.    Women exhibiting fearful, anxious, or submissive behavior

    m.    Dresses inappropriate to the setting and/or climate

    n.    Lack of knowledge of current or past whereabouts

    o.    Signs of poor hygiene, malnourishment, or fatigue[17]

---

[16] Brittany Anthony et al., *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking*, Polaris Project, 16 (2018) *available at* https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking.pdf
[17] *Id.* at 71.

57.     Nearly all of these red flags were present at every hotel in which Plaintiff stayed.

58.     The hotel industry is aware this problem runs rampant behind its guestroom doors.

59.     Since 2015, hundreds of civil sex trafficking lawsuits have been filed against both local hotel franchisees and the hotel franchisors themselves.

60.     In response to these lawsuits, several hotel companies and franchisors—like Wyndham, Motel 6, ESA, for example—have mandated anti-trafficking training programs for all employees.

61.     No Room for Trafficking, launched by the American Hotel and Lodging Association (AHLA) and partnered with the Polaris Project, is a popular—and free—anti-trafficking initiative used by many employers in the hotel industry.

62.     On reference, the No Room for Trafficking training program highlights the following behaviors, and others, as potential signs of human trafficking: paying in cash or prepaid card one day at a time; wearing heavy makeup, lingerie, and little clothing; carrying little luggage; displaying signs of drug use or sleep deprivation; discarding condoms; use of Backpage.com; and heavy foot traffic to room by different men.

63.     Indicators of sex trafficking emphasized in this industry-standard training program overlap with behaviors exhibited by Plaintiff in each Defendant hotel.

64.     On information and belief, Defendant Hotels provide their employees with anti-trafficking training programs substantially similar to No Room For Trafficking.

65.     On reference, No Room for Trafficking identifies safety concerns to guests and reputational and financial problems as a result of negative publicity as "Risks [that trafficking poses] to the Business". This section of the training also recognizes legal troubles that could arise out of laws finding hotels liable for the trafficking that occurs on their properties.

66.    It is natural to wonder why the hotel brands and chains who boast of their anti-trafficking trainings, act as chairmen on the AHLA board, and donate to survivor funds are simultaneously some of the most common defendants in civil sex trafficking cases.

67.    In other words, if hotel employees are equipped to recognize instances of trafficking, why do they continuously fail to intervene?

68.    In a report analyzing the hotel sector's vulnerability to trafficking[18], authors identified the following as barriers to implementing an "anti-trafficking culture" in hotels:

        a.    Profit prioritization (occupancy rates trump safety concerns);

        b.    Customer- and sales-orientation (over moral and ethical decisions);

        c.    The franchisee-franchisor business model; and

        d.    Weak operational practices.

69.    These barriers mean that chain hotels' have trafficking trainings that operate on the level of appearance, only.  They take care of the reputational risks to the business but do nothing to address safety concerns or make employees more likely to actually intervene.

70.    In other words, most hotel employees are now aware of, and can identify the signs of sex trafficking, they just choose to—and are tacitly or explicitly encouraged to—do nothing about it as long as the room is being paid for.

---

[18] Paraskevas, Alexandros & Brookes, Maureen. (2018). Human trafficking in hotels: an 'invisible' threat for a vulnerable industry. *International Journal of Contemporary Hospitality Management*. 30. 00-00. 10.1108/IJCHM-04-2017-0213

**BACKGROUND**

<u>Nancy's Trafficking Begins: Engaged to Encaged</u>

71.    After escaping an abusive relationship as a teenager, experiencing homelessness, and briefly being incarcerated, Nancy believed her life was finally on an upward trajectory. She had found a fiancé, a job, a home for her children, and her sobriety.

72.    All of that changed when her fiancé committed suicide in 2020. While she was beside herself with grief, she allowed the abusive father of one of her kids to pick her up and take her to a hotel, where he plied her with drugs.

73.    By early 2021, Nancy was homeless, penniless, and at risk of losing her children. It was in that vulnerable state that Nancy met "Domino" at the Plaza Inn in Oklahoma City, and her nightmarish reality of being sex trafficked through a series of Oklahoma hotels began.

74.    Domino, a member of the "Bounty Hunters" subset of the Bloods gang, was the main pimp at the Plaza Inn in Oklahoma City. Gang members like Domino are frequent perpetrators of human trafficking.

75.    Domino used a variety of coercive methods to force Nancy to engage in commercial sex.  He used threats, physical violence, and intimidation against Nancy if she was not having sex with enough clients to fill his pockets.

76.     Domino also kept complete financial control over Nancy.  After clients left, he would collect all of Nancy's earnings, sometimes leaving her stranded with no money to pay the hotel bill or to call a ride elsewhere.

77.    However, he did supply her with one thing – drugs. Traffickers often use induced substance abuse as a coercive method to force their victims to engage in survival sex in order to support their addiction and to keep them in a physical state that makes them unable to leave.

78.    Through these control tactics, he forced her into a state of total dependence on him for shelter, safety, and illicit substances.

79.    On several occasions in each Defendant hotel, employees would have been unable to miss signs of Domino's control over, and trafficking of, Nancy.

80.    However, hotel employees chose to ignore the bruises Domino left on Nancy and his frequent comings and goings—while never staying long or reserving a room—through the hotel lobbies in line of sight from the front desk.

81.    As a result, he continued to traffic Nancy for sex from early 2021 to the beginning of 2022. And even after his arrest in 2022, he continued to exert control over Nancy through members of his affiliated gang.

82.    This would continue until Nancy met her now-husband. Shortly after, she moved out of Oklahoma and received treatment for her addiction.

83.    Nancy is now sober and happily married, but she continues to suffer the aftereffects of her victimization.  For example, she often can't remember where she ate for lunch, but she can vividly remember the colors of the walls inside many of Defendants' hotels, and the sight of white towels causes her physical illness.

### In(n) Calls: Nancy's Trafficking in Oklahoma City

84.    After meeting Domino, Nancy was sex trafficked in a dozen or more hotels in Oklahoma from 2021 through 2022.  The conduct of seven of these hotels was particularly notable: the Plaza, the Extended Stay, the Motel 6, the Super 8 OKC Airport, the Super 8 Prospect Ave, the Days Inn, and the Howard Johnson.

85.    She performed "in calls" at each of the above-mentioned locations. An "in call" is a type of escort service where a customer comes a sex worker's location—usually a hotel room—for commercial sex.

86.    At these hotels, Domino required her to meet a daily quota of 10 johns.

87.    There was a regular flow of men who were not guests of the hotel going in and out of Nancy's room every day she was at each of these hotels.

88.    At the time of Nancy's trafficking in 2021 and 2022, all Defendants knew and should have known their businesses were conducive venues for sex trafficking, and that sex trafficking regularly occurred on their premises.

89.    Hotel staff can, and should, observe and identify the following indicators of in-call escort services and potential human trafficking:

        a.    Paying for stays in cash or with pre-paid credit cards
        b.    Extended stays with few possessions
        c.    Reservations for a single night that are extended day by day
        d.    Frequent requests for new towels, washcloths, and/or linens
        e.    Excessive condoms in trash cans
        f.    Excessive foot traffic in/out of rooms
        g.    One person checking in with multiple women in tow
        h.    Verbal or physical abuse of women
        i.    Restricted or controlled communications
        j.    Restricted movement or evidence of constant monitoring
        k.    No control of money, cell phone, or identification documents
        l.    Women exhibiting fearful, anxious, or submissive behavior
        m.    Dresses inappropriate to the setting and/or climate
        n.    Lack of knowledge of current or past whereabouts
        o.    Signs of poor hygiene, malnourishment, or fatigue

90.    A combination of these indicators was present at every hotel in which Nancy stayed.

91.    On most occasions when Nancy stayed at one of the Defendant Hotels in Oklahoma City, she would:

a.    Check in wearing heels and inadequate clothing with little luggage;

b.    Initially rent rooms through her own Priceline account or someone else's, often using a fake, paper temporary Oklahoma IDs ;

c.    Have rooms put in her name, even if someone else showed their ID to the front desk staff;

d.    Extend her stay day-by-day or a few days at a time, paying with cash or even, in some cases, making the john pay at the front desk;

e.    Escort johns from the hotel lobby to her room;

f.    Ask for new/additional towels and linens frequently; and

g.    Dispose of used condoms and condom wrappers in the hotel trash.

92.    Each hotel's front desk staff would have witnessed dozens of instances of Nancy escorting a man, who had not checked in as a guest, through the lobby to her room, followed by him heading back downstairs, sometimes within a period of 10 minutes.

93.    Nancy usually met johns in the hotel lobby or by the elevator to ensure they got in, make them feel secure, and walk them up to her room. Each time she did this, she was obviously dressed for sex work.

94.    At the following hotels, Nancy johns had to walk through the interior lobby and past the front desk to access her room: the Extended Stay, the Super 8 OKC Airport, and the Super 8 Prospect Ave.

95.    At the Plaza, the Motel 6, the Days Inn, the Howard Johnson, and the Extended Stay, Nancy had conversations and interactions with hotel staff that explicitly referenced Nancy engaging in acts of commercial sex on the premises.

Plaza Inn Hotel

96.     Nancy met Domino at the Plaza Inn Hotel in 2021.

97.     While Domino was Nancy's pimp, he resided at the Plaza.

98.     On one occasion, Nancy had sex with Michael Wiley, one of the owners of the Plaza, in exchange for a room.

99.     Other girls controlled by Domino and his associates also had sex with Michael Wiley in exchange for rooms on multiple occasions.

100.    It was well known among the many sex workers who frequented the Plaza that Michael Wiley liked to trade rooms for sex.

101.    Wiley would also give Nancy a room when she said she had a client coming and then allow her to pay for the room *after* she saw the client.

102.    Wiley met Domino and knew that he was Nancy's pimp and was forcing her to engage in commercial sex acts by threatening her with physical abuse and drug withdrawal.  On information and belief, Ketter—the Plaza's other owner—was aware of the same facts either because Wiley told him or because he encountered Domino during his visits to the Plaza.

103.    The Plaza was known for being a criminal hotspot for drugs, prostitution, and violent crime by locals and Oklahoma news outlets.

104.    In 2022 Oklahoma City officials filed a lawsuit requesting a judge to declare the Plaza a public nuisance.  In the first eight months of that year, police had responded to calls involving at least 10 assaults, two shootings, eight attempted suicides, three stabbings, 13 thefts, four acts of vandalism, and 11 overdoses.

105.    The Plaza was forced to permanently close just months later after failing to address and reduce safety concerns.

106.    By forming a business relationship with Nancy's trafficker, engaging in commercial sex with Nancy, and profiting from related room rentals, the employees and owner of the Plaza effectively facilitated, and benefitted from, Nancy's trafficking.

<u>Extended Stay America</u>

107.    At the Extend Stay, Nancy saw approximately 350 men over the course of a single 20-day stay.

108.    The staff at the Extended Stay were aware that Nancy and numerous other guests were pimp-controlled prostitutes engaged in commercial sex on the premises, and they actively facilitated such activities.

109.    There was always someone at the front desk, and both Nancy and johns had to pass through the lobby to get to the elevator and hotel rooms.

110.    According to a contemporaneous 2021 Tripadvisor review, even guests with card keys had to be buzzed in by staff to enter the hotel after dark.  The same would logically have been true of many of the approximately 350 johns Domino made Nancy see there.

111.    The Extended Stay's back door was usually locked because the locking system was consistently broken, so entry was usually only possible through the front past the front desk.  There were side doors, but because the stairs and elevator were both located in the middle of the hotel, it was necessary to walk past the front desk to go upstairs from any entrance.

112.    Nancy could never get a room on the "nicer" first floor.  She usually worked on the second floor, and sometimes on the third floor.

113.    Pimps and prostitutes frequently loitered in the lobby, either waiting to collect money or waiting for johns to arrive.

114.    The Extended Stay staff allowed johns to get keys to Nancy's room when she was not present and when their names were not on the reservation.

115.    Nancy sometimes waited by the elevator or in the lobby while another girl was seeing a client in their room.

116.    On one occasion, Nancy chased a john through the lobby wearing nothing but a slip dress shouting "give me my money" after he had stolen from her.  Employees at the Extended Stay witnessed this but did not intervene.

117.    Domino regularly visited the Extended Stay, via the lobby, to collect money, deliver drugs, and make sure his girls were not talking to other pimps.

118.    Despite his frequent visits, Domino never stayed at the Extended Stay.

119.    During visits, Domino would count the number of condoms in the hotel room to make sure that enough clients were being seen.

120.    He would get angry, make threats, and even resort to physical violence if he was unsatisfied with the number of clients that Nancy and other girls saw.

121.    During one altercation at the Extended Stay, Domino punched Nancy in the face. The resulting bruise on the side of her face was clearly visible to employees at the Extended Stay, as shown in a photograph taken at the Extended Stay shortly after the altercation.

122.    On at least one occasion, Nancy had a conversation with an Extended Stay hotel employee where she asked, while dressed in unusually revealing attire, for an extra room key because she had "a date coming".

123.    Employees at the Extended Stay clearly understood that she was engaging in commercial sex acts.

124.    Housekeeping at the Extended Stay lived on site and sometimes purchased drugs from Domino and the many other pimps working in the Extended Stay.

125.    Sex trafficking was so common at the Extended Stay that during March and April of 2022, several traffickers repeatedly patrolled the second and third floor corridors with an AK-47-style rifle to guard the women they kept prisoner, to scare off other pimps, and to frighten women trying to operate as "renegades" into leaving or "choosing up" with the patrollers.

126.    These patrolling men were captured on OKC ES security cameras walking the halls with the AK-47 on multiple occasions.

127.    Because most prostitutes are victims of coercion, and because staff at the "prostitution-riddled" Extended Stay were more familiar with the sex trade than most, they knew or had constructive knowledge Nancy was being trafficked.

128.    Employees at the Extended Stay also knew that the high prevalence of pimps on their property meant that "renegades" (i.e. prostitutes working for themselves rather than under the control of a pimp) could not safely operate there due to the risk of being "knocked" (forcibly recruited) by a pimp.  They thus knew or had constructive knowledge Nancy was being trafficked.

129.    Moreover, employees at the Extended Stay knew that Nancy was a victim of coercion because they witnessed Domino's frequent visits, his oppressive conduct in public areas during those visits, and Nancy's subsequent bruises.

130.    Based on the ESH Strategies Franchise, LLC. ("ESH") Franchise Disclosure Document ("FDD") for the year 2021, the operative franchise agreement between ESH and OKC ES provided:

> a.    OKC ES must purchase all signage, linens, interior design elements, and electronic equipment from a limited selection of Approved Suppliers selling a limited selection of Extended Stay-designed and/or -approved products.

b.  OKC ES must either use an ESH-approved third-party management company or else put its proposed general manager(s) through a lengthy ESH-run and ESH-evaluated manager training program, which the general manager(s) must complete to ESH's satisfaction. Moreover, OKC ES's management of the Hotel is subject to ESH's approval. ESH can withdraw their approval of a Manager or Management Company and require OKC ES to hire a different Management Company at any time.

c.  OKC ES must participate in use ESH's designated Reservation Service as its method for arranging/selling room reservations electronically. This Reservation Service "means the voice, internet, and other systems and related services that [ESH] uses to book reservations for System Hotels on a centralized basis."

d.  OKC ES must use an ESH-approved supplier for their property management system (HotelKey) and revenue management software, their centralized reservation system, and their credit card payment processing services. ESH only approves one supplier for each of these systems/services.

e.  ESH has the right to physically and/or electronically enter and inspect the Hotel and operations, books, records, accounts, and systems without notice to OKC ES as a part of ESH's Quality Assurance Program

    i.  If the result of any inspection is not satisfactory, then OKC ES will pay a "Re-inspection Fee" to cover the next surprise inspection and may be required to send its employees for remedial training by ESH.

    ii. ESH considers "unsolicited feedback received from [OKC ES]'s guests in ESH's final quality assurance score. Upon information and belief, this unsolicited feedback includes reviews made by guests on third-party websites including Tripadvisor.

f.  OKC ES "acknowledges that [ESH] or a third-party provider may monitor and review stored data and other files without restriction." ESH has the ultimate right to independently access OKC ES's databases, particularly the property management system, which takes reservations, assigns rooms at check-in, tracks room charges and activity, records accounts receivable, prints housekeeping and financial reports, and scans drivers' licenses, as well as recording notes about guests as "Stay Remarks."

    i.  As a result, ESH had access to detailed about OKC ES's operations, including the ratio of rooms rented online versus in-person at the hotel's front desk and the amounts expended on additional linens and other cleaning and maintenance services likely to be linked to human trafficking.

    ii.  Given the lawless nature of the OKC ES's clientele, ESH certainly also had access to innumerable Stay Remarks recording instances of pimping (i.e. trafficking) and other crimes at the Extended Stay. On information and belief, it had access to at least one Stay Remark recording suspicions that Nancy was being pimped (trafficked) by Domino or his affiliates.

    iii.  The OKC ES location was (and still is) home to an unusual amount of human trafficking even for a low-budget hotel. On information and belief, ESH realized this because it consistently encountered an unusually high number of in-person cash reservations and an unusually high expenditure on laundry services when inspecting OKC ES's books.

g.    ESH exclusively owns all of OKC ES's "Data" and "Guest Data."

    i.  Data includes, but is not limited to, Operating Revenue and reservation data.

    ii.  Guest Data refers to the following information: guests' personally identifiable information (their name, birthdate, mailing addresses, phone numbers, and email addresses); information about their consumer preferences; stay and aggregated information; and other similar or related information

h.    OKC ES must additionally comply with the much more detailed brand standards laid out in the (confidential) Brand Standards document. These requirements are in OKC ES and ESH's exclusive knowledge, but upon information and belief they include:

    i.  Specific requirements that OKC ES record and inform ESH of evidence of criminal activity, particularly evidence indicative of sex trafficking like excessive used condoms left behind, excessive requests for linens, and excessive foot traffic to particular rooms.

    ii.  Sex trafficking awareness training requirements.

    iii.  Suggested pay rates and terms of employment for each job title defined by ESH in its training program.

    iv.  A requirement that the Motel 6 Franchisees use a specified vendor for guest wireless internet access services, thereby giving Motel 6 unfettered access to all guest internet usage records, including the full list of websites visited by persons associated with each individual reservation.

131.    On information and belief, OKC ES performed its above-specified duties under the operative franchise agreement in full, and ESH exercised its above-specified rights to access information and to direct the operations of OKC ES's location in full.

<u>Motel 6</u>

132.    In early 2022, Nancy stayed at the Motel 6—owned and operated jointly by Defendants Noor, Ambica, Om, and Indra (collectively "the Motel 6 Franchisees")—on at least six occasions and saw at least sixty johns.

133.    At least 2 front desk employees at the Motel 6 were not only aware that Nancy was engaging in commercial sex its hotel rooms, they also facilitated it.

134.    The front desk staff, specifically a young Black woman and a man of South Asian descent, would notify Nancy when a john arrived.

135.    Front desk staff would also notify her when they suspected guests wanted to buy sex or when a bus full of people arrived at the Greyhound station across the street.

136.    After being informed, Nancy and other sex workers would advertise commercial sex to bus passengers right outside of the hotel office.

137.    Nancy noticed that the room rate for the same room would change daily. On information and belief, employees of the Motel 6 changed the rate she was charged was based on the number of johns the employees thought she'd seen on a given day.

138.    In this way, the Motel 6 was directly, and knowingly, profiting from Nancy's trafficking.

139.    The man of South Asian descent working the front desk also purchased commercial sex acts with Nancy and the other women she was forced to work with.

140.    After engaging in commercial sex with them, this man would take girls to the casino in Oklahoma City.

141.    A homeboy of Domino's often visited the Motel 6 to take all of Nancy's money, give her drugs, and keep her "on a leash."

142.    Because the employees of the Motel 6 knew that Nancy was engaging in commercial sex acts with high frequency, they should have also deduced that she was being sex trafficked.

143.    Additionally, employees at the Motel 6 knew that Nancy was a victim of coercion because they witnessed Domino's homeboy's frequent monitoring visits and recognized those visits for what they were—a manifestation of coercive control.

144.    Additionally, given their direct involvement with illegal sex work, it is likely that employees at the Motel 6 knew that the great majority of prostitutes, especially at locations like the Motel 6, are under the coercive control of pimps.  They therefore rented Nancy rooms while knowing, or at least recklessly disregarding, the fact Nancy would be coerced into commercial sex.

145.    Based on the G6 Hospitality Franchising, LLC ("Motel 6") Franchise Disclosure Document ("FDD") for the year 2021, the operative franchise agreement between Motel 6 and the Motel 6 Franchisees provided:

       a.    The Motel 6 Franchisees must purchase all signage, uniforms, furniture, linens, interior design elements, and electronic equipment from a limited selection of Approved Vendors selling a limited selection of Motel 6-designed and/or -approved products.

       b.    The Motel 6 Franchisees must their proposed general manager(s) through a lengthy Motel 6-run and Motel 6-evaluated manager training program, which the general manager(s) must complete to Motel 6's satisfaction—effectively giving Motel 6 total discretionary control over the management of The Motel 6 Franchisees' hotel location.

       c.    The Motel 6 Franchisees must use Motel 6's proprietary Reservation System as its sole method for arranging/selling room reservations.

d.      The Motel 6 Franchisees must use Motel 6's sole approved Property Management Software (HotelKey) which: interfaces with the Reservation System; records room reservation traffic, occupancy rate information, and pricing information; and transmits this information to Motel 6 nightly.

e.      The Motel 6 Franchisees must use Motel 6's exclusive credit card processing system.

f.      The Motel 6 Franchisees acknowledge and agree that Motel 6 "is the sole owner of all customer or guest data and information that is entered, compiled by and or used in conjunction with" any part of the above-mandated computer system and software.

      i.    The Motel 6 FDD also purports to prohibit franchisees from recording guests' personally identifiable information and payment information, whether in the HotelKey system "or otherwise." However, this term cannot be read literally.

      ii.    Despite the FDD's contrary representation, the HotelKey software is, according to its website, intended to record guests' personal and payment information and to permit employees to take notes on guest interactions and preferences called "Stay Remarks."

      iii.    It would be absurd to require each franchisee to use a wholly separate, likely idiosyncratic property management system to record guests' identifiable information while simultaneously recording all non-identifiable information about their reservations in Hotel Key.

      iv.    On information and belief, the Motel 6 Franchisees did, in fact, record all guest personal and payment information and notes in the Hotel Key system or in software integrated with the Hotel Key system, and Motel 6 intended them to do this.

      v.    Motel 6 thus had nightly access to all information obtained by the Motel 6 Franchisees regarding every guest at the Motel 6.

g.      The Motel 6 Franchisees must "make such arrangements" as Motel 6 may require in order to permit it "to access each night during the Initial Term, from Franchisee's Computer System, information on the occupancy, average daily room rate, rooms sold, Gross Room Revenues, and such other data and information attributable to the Motel as Franchisor may require."

h.      The Motel 6 Franchisees must use Motel 6's proprietary Revenue Management System, G6ROW, which provides real-time rate and inventory management and uses the data submitted by the Motel 6 Franchisees to recommend what prices the Motel 6 Franchisees should charge for each room to achieve the optimum mix of price and occupancy rate.

i.    The Motel 6 Franchisees "acknowledge that [Motel 6], its affiliates, and their agents shall have the right, in their reasonable discretion, to enter upon the premises of the Motel at any time for the purpose of conducting inspections or evaluations based under the Standards." If the result of any inspection is not satisfactory, then the Motel 6 Franchisees must pay a "Re-inspection Fee" to cover the next inspection.

      i.    Given the cavalier attitude of the Motel 6's staff toward sex trafficking and the regularity with which they helped likely trafficking victims to find johns so they could pay for their rooms, it is likely that Motel 6-affiliated inspectors witnessed such behavior on multiple occasions and Motel 6 nevertheless chose to continue its venture with the Motel 6 Franchisees.

      ii.    On information and belief, Motel 6-affiliated inspectors saw such behavior on multiple occasions and reported it to Motel 6.

j.    Motel 6 may—and, on information and belief, did—monitor third-party review websites for negative reviews of the Motel 6 Franchisees' location and refer such reviews to the Motel 6 Franchisees for handling. If The Motel 6 Franchisees fails to handle any such referred negative review within the specified time, Motel 6 may negotiate with the guest itself and charge The Motel 6 Franchisees a "Research and Response Fee" in addition to requiring indemnification for payments to the guest.

k.    The Motel 6 Franchisees must additionally comply with the much more detailed brand standards laid out in the (confidential) operating and Brand Standards Manual. These requirements are in The Motel 6 Franchisees and Motel 6's exclusive knowledge, but upon information and belief they include:

      i.    Specific requirements that the Motel 6 Franchisees record and inform Motel 6 of evidence of criminal activity, particularly evidence indicative of sex trafficking like excessive used condoms left behind, excessive requests for linens, and excessive foot traffic to particular rooms.

      ii.    Suggested pay rates and terms of employment for each job title defined by Motel 6 in its training program.

      iii.    A requirement that the Motel 6 Franchisees use a specified vendor for guest wireless internet access services, thereby giving Motel 6 unfettered access to all guest internet usage records, including the full list of websites visited by persons associated with each individual reservation,

146.    On information and belief, the Motel 6 Franchisees jointly performed their above-specified duties under the operative franchise agreement in full, and Motel 6 exercised its above-specified rights to access information and to direct the operations of the Motel 6 Franchisees' hotel location in full.

### Super 8 OKC Airport

147.    Nancy stayed at the Super 8 OKC Airport—owned and operated by Defendant Natha—for one week in August 2022.

148.    Nancy reserved the room with a prepaid card and extended it with cash multiple times.

149.    Nancy frequently escorted clients directly from the lobby to the room because they were wary of police stings and being robbed.

150.    She would meet them in the lobby in unusually revealing clothes that clearly indicated she was engaged in sex work.

151.    At this time, Nancy and another girl were forced to engage in sex acts to pay off a drug debt to Mexican traffickers.

152.    Like Domino, they assigned Nancy a daily quota of 10 clients.

153.    While paying of this debt they were assigned a handler who arranged clients for them, collected money, and gave them drugs.

154.    Some clients would enter the hotel lobby, purchase sex from Nancy, and exit through the lobby in a matter of 7 minutes.

155.    Condoms from these johns were left in the trash can of her room.

156.    Because Nancy paid with a prepaid card, wore inadequate clothing, purchased and left an excessive number of condoms at the hotel, had excessive foot traffic in/out of her room in

a short period of time, and was monitored at all times by a suspicious-looking male handler, and because each of these is an indicator of potential human trafficking, the Super 8 OKC Airport's employees had both actual and constructive knowledge of Nancy's trafficking.

<u>Super 8 Prospect Ave.</u>

157.    Nancy spent a total of 2 weeks at the Super 8 Prospect Ave. owned and operated by Defendant Jaliyan.

158.    The Super 8 Prospect Ave. was full of drug addicts, and the staff were accustomed to criminal activity by guests and were happy to rent rooms to nearly anyone.

159.    The hotel was so rundown that Nancy awoke one morning to mushrooms growing out of the floor under the vent.

160.    Nancy shared a room with other sex workers.

161.    Nancy engaged in commercial sex with multiple men a night, leaving behind an abundance of used condoms and towels.

162.    Rather than viewing the unusually high number of towels that Nancy requested as a potential sign of sex trafficking, the employees at the Super 8 Prospect Ave saw an opportunity for financial gain. If she used too many towels on one visit, they would raise Nancy's deposit by up to $25 the next time she checked in.  In this way, the Super 8 Prospect Ave directly profited from Nancy's trafficking.

163.    Because Nancy exhibited clear signs of providing "in-call" escort services under the control of a pimp and because the Super 8 Prospect Ave's employees knew (as most people know) that most prostitutes are victims of coercion, the Super 8 Prospect Ave had both actual and constructive knowledge that Nancy was a victim of sex trafficking.

164. Based on the Super 8 Worldwide, Inc. ("Super 8") Franchise Disclosure Document ("FDD") for the year 2019, the operative franchise agreements between Super 8 and Natha, and between Super 8 and Jaliyan, both provided:

a. Natha/Jaliyan must purchase all signage, uniforms, furniture, linens, interior design elements, and electronic equipment from a limited selection of Approved Vendors selling a limited selection of Super 8-designed and/or -approved products.

b. Natha/Jaliyan must either use a Super 8-approved third-party management company or else put its proposed general manager(s) through a lengthy Super 8-run and Super 8-evaluated manager training program, which the general manager(s) must complete to Super 8's satisfaction—effectively giving Super 8 total discretionary control over the management of Natha/Jaliyan's hotel location.

c. Natha/Jaliyan must use Super 8's exclusive Central Reservation System as its sole method for arranging/selling room reservations electronically.

d. Natha/Jaliyan must use one of two Super 8-approved Property Management Systems, both of which: interface with the Central Reservation System; record all room reservations and house all information and notes regarding individual guests; record and schedule all property management tasks; and interface with the Super 8-approved credit card processing system.

e. Natha/Jaliyan must use Super 8's exclusive credit card processing system.

f. Super 8 may "independently access your [Natha/Jaliyan's] electronic information and data, and collect and use this electronic information and data in any matter we [Super 8] choose, without compensation to you." Super 8 therefore knew every fact recorded in Natha/Jaliyan's Property Management System, including all guest-related facts like names, contact information, restrictions, and notes, including notes about Nancy. On information and belief, all Wyndham franchisor subsidiaries share or otherwise have access to such information, meaning all Wyndham franchisor subsidiary defendants obtained the notes about Nancy.

g. Natha/Jaliyan may opt-in to Super 8's Hotel Revenue Management Agreement, under which Natha/Jaliyan must pay Super 8 a fee and permit Super 8 to unilaterally modify its room pricing, inventory, and restrictions (without advance notice) in exchange for Super 8 assisting Natha/Jaliyan with pricing its rooms for maximum profitability and performing monthly performance reviews with recommendations for improvement.

     i.   On information and belief, both Natha and Jaliyan were at all relevant times opted-in to the Super 8 Hotel Revenue Management Agreement.

     ii.   As a result, Super 8 received detailed updates on Natha/Jaliyan's operations at least monthly, including: the ratio of rooms rented online versus in-person at the hotel's front desk and the amounts expended on additional linens and other cleaning and maintenance services likely to be linked to human trafficking.

     iii.   The Jaliyan Super 8 location was home to an unusual amount of human trafficking even for a low-budget motel. On information and belief, Super 8 realized this because it consistently encountered an unusually high number of in-person cash reservations and an unusually high expenditure on laundry services during each monthly review. Additionally, on information and belief, Super 8 realized this because it regularly saw revenue attributed to surcharges for extra linens.

     iv.   The Natha Super 8 location was also home to a significant amount of human trafficking. On information and belief, Super 8 realized this because it consistently encountered significant numbers of in-person cash reservations and high expenditures on laundry services during each monthly review.

h.    Natha/Jaliyan must use one of Super 8's approved vendors to set up and provide guest Wi-Fi services.

     i.   The Wi-Fi services provided by the approved vendors directly interface with both approved Property Management System options.

     ii.   Thus, on information and belief, Super 8 has unfettered access to all guest internet usage records, including the full list of websites visited by persons associated with each individual reservation.

     iii.   It is a standard practice for pimps, including Domino, to post ads for commercial sex with the women they control on websites like Backpage.com using hotel Wi-Fi, and to force the women they control to do the same for themselves. Super 8 thus almost certainly knew that Domino, specifically, was operating as a trafficker from Natha/Jaliyan hotel rooms, and it certainly knew that numerous traffickers were operating from Natha/Jaliyan hotel rooms.

     iv.   On information and belief, Super 8 receives a kickback from the approved Wi-Fi services provider each time a guest purchase hotel Wi-Fi, including each time Domino purchased Wi-Fi or forced Nancy to purchase Wi-Fi to be used for the purpose of trafficking Nancy.

      i.      Natha/Jaliyan "will permit our [Super 8's] representatives to perform quality assurance inspections of the Facility at any time with or without advance notice." If the result of any inspection is not satisfactory, then Natha/Jaliyan will pay a "Reinspection Fee" to cover the next surprise inspection and may be required to send its employees for remedial training by Super 8.

      j.      Super 8 may—and, on information and belief, did—monitor third-party review websites for negative reviews of the Natha/Jaliyan location and refer such reviews to Natha/Jaliyan for handling. If Natha/Jaliyan fails to handle any such referred negative review within three days to the guest's satisfaction, Super 8 may negotiate with the guest itself and charge Natha/Jaliyan a "Customer Care Fee" in addition to requiring indemnification for payments to the guest.

      k.      Natha/Jaliyan must additionally comply with the much more detailed brand standards laid out in the (confidential) Standards of Operation and Design Manual. These requirements are in Natha/Jaliyan and Super 8's exclusive knowledge, but upon information and belief they include:

            i.      Specific requirements that Natha/Jaliyan record and inform Super 8 of evidence of criminal activity, particularly evidence indicative of sex trafficking like excessive used condoms left behind, excessive requests for linens, and excessive foot traffic to particular rooms.

            ii.      Suggested pay rates and terms of employment for each job title defined by Super 8 in its training program.

165.    On information and belief, Natha/Jaliyan performed its above-specified duties under the operative franchise agreement in full, and Super 8 exercised its above-specified rights to access information and to direct the operations of Natha/Jaliyan's location in full.

<u>Days Inn</u>

166.    Nancy often went to the Days Inn—owned and operated by Defendant Raj Krupa—to see clients. She also stayed at the Days Inn on multiple occasions totaling approximately four weeks over the duration of her trafficking.

167.    Nancy communicated with the front desk employees about her sex work. She would specifically say, "I have a client coming" or "I have a trick coming" to excuse her inability to pay for her room immediately, and staff would allow her to come back and pay after seeing the client.

168.    On multiple occasions, departing clients even told the front desk staff that Nancy would be back out to pay soon.

169.    Front desk staff were satisfied with these arrangements.

170.    It is likely that front desk employees recorded these delayed payment arrangements as notes on Nancy's guest profile so that the next shift of front desk employees would know payment was still forthcoming.

171.    On information and belief, they recorded sufficient information in these notes to make it clear to the reader that Nancy was engaged in sex work to pay for her room.

172.    Nancy also repeatedly asked the front desk staff directly for more towels.

173.    On several occasions, Nancy shared a pair of rooms with other sex workers under the control of Yogi or his associates.  The group would designate one room as the working room as one room as the waiting/sleeping room.

174.    They would frequently move back and forth between rooms when it was their turn to engage in commercial sex with a client, and their moves would be captured by surveillance cameras.

175.    On one occasion when the group had checked in under Nancy's true name and had already stayed for approximately a week, maintenance came to the room because Nancy and her fellow victims had flushed so many used condoms that they clogged the septic system for the entire hotel.

176.    The maintenance worker was upset by this, but the women were not kicked out of the hotel for this incident.  Nevertheless, Domino thought that the incident had drawn too much attention, so he made the group check out and check in again under the name of a different girl.

177.    When the group left, Domino forgot his handgun in the room's microwave.  An employee at the Days Inn called Nancy to complain about the gun, but they then permitted Domino to personally retrieve the gun from the front desk.

178.    On another occasion at the Days Inn, a client physically assaulted Nancy and dangled her off a balcony.

179.    The Days Inn was also notable for how badly pimps were able to treat "renegades" on the premises.  A "renegade" is a sex worker who is not controlled by a pimp or a trafficker.

180.    At the Days Inn, traffickers were permitted to stand outside of renegades' hotel rooms to scare off clients and intimidate and starve the renegades into working for them.

181.    Sex trafficking is still prevalent at this location today.

182.    Because Nancy explicitly discussed her sex work with hotel employees, and because Days Inn employees witnessed firsthand (and chose to permit) the intimidation used by pimps to prevent sex workers at the Days Inn from working for themselves and to force them to "choose up," the Days Inn knew, and should have known, that Nancy and all other sex workers at the Days Inn were being trafficked.

183.    Based on the Days Inn Worldwide, Inc. ("Days Inn") Franchise Disclosure Document ("FDD") for the year 2021, the operative franchise agreement between Days Inn and Raj Krupa provided:

> a.    Raj Krupa must purchase all signage, uniforms, furniture, linens, interior design elements, and electronic equipment from a limited selection of Approved Vendors selling a limited selection of Days Inn-designed and/or -approved products.

b.    Raj Krupa must either use a Days Inn-approved third-party management company or else put its proposed general manager(s) through a lengthy Days Inn-run and Days Inn-evaluated manager training program, which the general manager(s) must complete to Days Inn's satisfaction—effectively giving Days Inn total discretionary control over the management of Raj Krupa's hotel location.

c.    Raj Krupa must put all employees through a set of Days Inn-created trainings that depends on each employee's job title, but that universally includes trainings related to guest safety and human trafficking recognition and intervention.

  i.    Raj Krupa employees must complete these trainings and related evaluations to Days Inn's satisfaction, effectively giving Days Inn discretionary control over all employment decisions at Raj Krupa's hotel location.

  ii.    By assigning specific trainings to specific job titles, Days Inn effectively mandates that Raj Krupa adopt Days Inn's preferred scheme of job titles and responsibilities.

d.    Raj Krupa must use Days Inn's exclusive Central Reservation System as its sole method for arranging/selling room reservations electronically.

e.    Raj Krupa must use one of two Days Inn-approved Property Management Systems, both of which: interface with the Central Reservation System; record all room reservations and house all information and notes regarding individual guests; record and schedule all property management tasks; and interface with the Days Inn-approved credit card processing system.

f.    Raj Krupa must use Days Inn's exclusive credit card processing system.

g.    Raj Krupa must "take all commercially reasonable steps to assure the timely and accurate collection, recording, processing and transmittal of the Guest Information to the" above-described Central Reservation System, Property Management Systems, and credit card processing system.

h.    Days Inn may "independently access your [Raj Krupa's] electronic information and data, and collect and use this electronic information and data in any matter we [Days Inn] choose, without compensation to you." Days Inn therefore knew every fact recorded in Raj Krupa's Property Management System, including all guest-related facts like names, contact information, restrictions, and notes, including notes about Nancy. On information and belief, all Wyndham franchisor subsidiaries share or otherwise have access to such information, meaning all Wyndham franchisor subsidiary defendants obtained the notes about Nancy.

i.    Raj Krupa may opt-in to Days Inn's Hotel Revenue Management Agreement, under which Raj Krupa must pay Days Inn a fee and permit Days Inn to unilaterally modify its room pricing, inventory, and restrictions (without advance notice) in exchange for Days Inn assisting Raj Krupa with pricing its rooms for maximum profitability and performing monthly performance reviews with recommendations for improvement.

    i.    On information and belief, Raj Krupa was at all relevant times opted-in to the Days Inn Hotel Revenue Management Agreement.

    ii.   As a result, Days Inn received detailed updates on Raj Krupa's operations at least monthly, including: the ratio of rooms rented online versus in-person at the hotel's front desk and the amounts expended on additional linens and other cleaning and maintenance services likely to be linked to human trafficking.

    iii.  The Raj Krupa Days Inn location was (and still is) home to an unusual amount of human trafficking even for a low-budget motel. On information and belief, Days Inn realized this because it consistently encountered an unusually high number of in-person cash reservations and an unusually high expenditure on laundry services during each monthly review.

j.    Raj Krupa must use Days Inn's exclusive vendor to set up and provide guest Wi-Fi services.

    i.    The Wi-Fi services provided by the exclusive vendor directly interface with both approved Property Management System options.

    ii.   Thus, on information and belief, Days Inn has unfettered access to all guest internet usage records, including the full list of websites visited by persons associated with each individual reservation.

    iii.  It is a standard practice for pimps, including Domino, to post ads for commercial sex with the women they control on websites like Backpage.com using hotel Wi-Fi, and to force the women they control to do the same for themselves. Days Inn thus almost certainly knew that Domino, specifically, was operating as a trafficker from Raj Krupa hotel rooms, and it certainly knew that numerous traffickers were operating from Raj Krupa hotel rooms.

    iv.   On information and belief, Days Inn receives a kickback from the approved Wi-Fi services provider each time a guest purchase hotel Wi-Fi, including each time Domino purchased Wi-Fi or forced Nancy to purchase Wi-Fi to be used for the purpose of trafficking Nancy.

k.    Raj Krupa "will permit our [Days Inn's] representatives to perform quality assurance inspections of the Facility at any time with or without advance notice."  If the result of any inspection is not satisfactory, then Raj Krupa will pay a "Reinspection Fee" to cover the next surprise inspection and may be required to send its employees for remedial training by Days Inn.

l.    Days Inn may—and, on information and belief, did—monitor third-party review websites for negative reviews of the Raj Krupa location and refer such reviews to Raj Krupa for handling.  If Raj Krupa fails to handle any such referred negative review within three days to the guest's satisfaction, Days Inn may negotiate with the guest itself and charge Raj Krupa a "Customer Care Fee" in addition to requiring indemnification for payments to the guest.

m.    Raj Krupa must additionally comply with the much more detailed brand standards laid out in the (confidential) Standards of Operation and Design Manual.  These requirements are in Raj Krupa and Days Inn's exclusive knowledge, but upon information and belief they include:

   i.    Specific requirements that Raj Krupa record and inform Days Inn of evidence of criminal activity, particularly evidence indicative of sex trafficking like excessive used condoms left behind, excessive requests for linens, and excessive foot traffic to particular rooms.

   ii.   Suggested pay rates and terms of employment for each job title defined by Days Inn in its training program.

184.    On information and belief, Raj Krupa performed its above-specified duties under the operative franchise agreement in full, and Days Inn exercised its above-specified rights to access information and to direct operations at Raj Krupa's hotel location in full.

185.    The Days Inn FDD further reveals that by early 2021 Wyndham was already a defendant in approximately 40 civil cases arising out of its alleged involvement in or profiting from human trafficking, and that it had already recorded an accrual of several million dollars in relation to these claims.  The FDD further explains that Wyndham "records an accrual for legal contingencies when it determines, after consultation with outside counsel, that it is probable that a liability has been incurred."  In other words, by early 2021, Days Inn's parent had already

determined that it was likely liable for human trafficking in at least some instances, which determination necessarily includes a realization that there was sex trafficking on its properties.

Ramada

186.    During her trafficking, Nancy stayed at the Ramada, owned and operated by Defendant C&S, for at least a week.

187.    Nancy saw at least 50 johns at the Ramada.

188.    Domino visited the Ramada on at least one occasion to collect Nancy's earnings.

189.    On one occasion, Nancy had to walk past the front desk and through the front door wearing nothing but a negligee that was inappropriate attire for the daytime.

190.    Clients entered through the front door of the hotel to get to Nancy's room.

191.    On at least one evening when Nancy was staying at the Ramada, she ran out of condoms and bought more from the store in the lobby.

192.    The store only sold 3-packs of condoms, and Nancy saw many more men that night, so she had to return to the lobby multiple times to purchase additional condoms.

193.    There was no self-checkout, so Nancy bought the condoms from front desk staff.

194.    Because the hotel employees clearly recognized Nancy as a prostitute, because employees at the Ramada (like most people) knew most prostitutes are victims of coercion, because Ramada employees knew Nancy was seeing far more clients than an independent sex worker would, and because Ramada employees would've seen Domino doing the rounds to collect money from Nancy, they knew or should have known Nancy was being trafficked.

195.    On information and belief, the front desk staff recorded Nancy's condom purchases and other information leading to their suspicion that Nancy was being trafficked as notes on her profile in the Ramada's computerized property management system.

196.     Based on the Ramada Worldwide, Inc. ("Ramada") Franchise Disclosure

Document ("FDD") for the year 2021, the operative franchise agreement between Ramada and

C&S provided:

   a.   C&S must purchase all signage, uniforms, furniture, linens, interior design elements, and electronic equipment from a limited selection of Approved Vendors selling a limited selection of Ramada-designed and/or -approved products.

   b.   C&S must either use a Ramada-approved third-party management company or else put its proposed general manager(s) through a lengthy Ramada-run and Ramada-evaluated manager training program, which the general manager(s) must complete to Ramada's satisfaction—effectively giving Ramada total discretionary control over the management of C&S's hotel location.

   c.   C&S must put all employees through a set of Ramada-created trainings that depends on each employee's job title, but that universally includes trainings related to guest safety and human trafficking recognition and intervention.

        i.   C&S employees must complete these trainings and related evaluations to Ramada's satisfaction, effectively giving Ramada discretionary control over all employment decisions at C&S's hotel location.

        ii.  By assigning specific trainings to specific job titles, Ramada effectively mandates that C&S adopt Ramada's preferred scheme of job titles and responsibilities.

   d.   C&S must use the Ramada's exclusive Central Reservation System as its sole method for arranging/selling room reservations electronically.

   e.   C&S must use one of two Ramada-approved Property Management Systems, both of which: interface with the Central Reservation System; record all room reservations and house all information and notes regarding individual guests; record and schedule all property management tasks; and interface with the Ramada-approved credit card processing system.

   f.   C&S must use Ramada's exclusive credit card processing system.

   g.   Ramada may "independently access your [C&S's] electronic information and data, and collect and use this electronic information and data in any matter we [Ramada] choose," without compensation to you." Ramada therefore knew every fact recorded in C&S's Property Management System, including all guest-related facts like names, contact information, restrictions, and notes, including notes about Nancy. On information and

belief, all Wyndham franchisor subsidiaries share or otherwise have access to such information, meaning all Wyndham franchisor subsidiary defendants obtained the notes about Nancy.

h.     C&S may opt-in to Ramada's Hotel Revenue Management Agreement, under which C&S must pay Ramada a fee and permit Ramada to unilaterally modify its room pricing, inventory, and restrictions (without advance notice) in exchange for Ramada assisting C&S with pricing its rooms for maximum profitability and performing monthly performance reviews with recommendations for improvement.

    i.     On information and belief, C&S was at all relevant times opted-in to the Ramada Hotel Revenue Management Agreement.

    ii.     As a result, Ramada received detailed updates on C&S's operations at least monthly, including: the ratio of rooms rented online versus in-person at the hotel's front desk and the amounts expended on additional linens and other cleaning and maintenance services likely to be linked to human trafficking.

    iii.     The C&S location was (and still is) home to an unusual amount of human trafficking even for a low-budget motel.  On information and belief, Ramada realized this because it consistently encountered an unusually high number of in-person cash reservations and an unusually high expenditure on laundry services during each monthly review.

i.     C&S must use Ramada's exclusive vendor to set up and provide guest Wi-Fi services.

    i.     The Wi-Fi services provided by the exclusive vendor directly interface with both approved Property Management System options.

    ii.     Thus, on information and belief, Ramada has unfettered access to all guest internet usage records, including the full list of websites visited by persons associated with each individual reservation.

    iii.     It is a standard practice for pimps, including Domino, to post ads for commercial sex with the women they control on websites like Backpage.com using hotel Wi-Fi.  Ramada thus almost certainly knew that Domino, specifically, was operating as a trafficker from C&S hotel rooms, and it certainly knew that numerous traffickers were operating from C&S hotel rooms.

    iv.     On information and belief, Ramada receives a kickback from the approved Wi-Fi services provider each time a guest purchase hotel Wi-Fi, including each time Domino purchased Wi-Fi and used it for the purpose of trafficking Nancy.

j.   C&S "will permit our [Ramada's] representatives to perform quality assurance inspections of the Facility at any time with or without advance notice." If the result of any inspection is not satisfactory, then C&S will pay a "Reinspection Fee" to cover the next surprise inspection and may be required to send its employees for remedial training by Ramada.

k.   Ramada may—and, on information and belief, did—monitor third-party review websites for negative reviews of the C&S location and refer such reviews to C&S for handling. If C&S fails to handle any such referred negative review within three days to the guest's satisfaction, Ramada may negotiate with the guest itself and charge C&S a "Customer Care Fee" in addition to requiring indemnification for payments to the guest.

l.   C&S must additionally comply with the much more detailed brand standards laid out in the (confidential) Standards of Operation and Design Manual. These requirements are in C&S and Ramada's exclusive knowledge, but upon information and belief they include:

   i.   Specific requirements that C&S record and inform Ramada of evidence of criminal activity, particularly evidence indicative of sex trafficking like excessive used condoms left behind, excessive requests for linens, and excessive foot traffic to particular rooms.

   ii.  Suggested pay rates and terms of employment for each job title defined by Ramada in its training program.

197.   On information and belief, C&S performed its above-specified duties under the operative franchise agreement in full, and Ramada exercised its above-specified rights to access information and to direct the operations of C&S's location in full.

198.   The Ramada FDD further reveals that by early 2021 Wyndham was already a defendant in approximately 40 civil cases arising out of its alleged involvement in or profiting from human trafficking, and that it had already recorded an accrual of several million dollars in relation to these claims. The FDD further explains that Wyndham "records an accrual for legal contingencies when it determines, after consultation with outside counsel, that it is probable that a liability has been incurred." In other words, by early 2021, Ramada's parent had already determined that it was likely liable for human trafficking in at least some instances, which determination necessarily includes a realization that there was sex trafficking at its properties.

Howard Johnson

199.    Nancy stayed at the Howard Johnson—owned and operated by Defendant Yash—on two occasions: once for 3 days and once for a single evening.

200.    Nancy saw approximately 20 johns over the course of these stays.

201.    Once, Domino assaulted Nancy at the hotel when he came to collect money.

202.    Domino was mad because Nancy was below her quota and her prepaid card ran out.

203.    She walked through the hotel with bruises on her arms that the hotel staff she interacted with would have seen.  She has pictures of these bruises at the hotel.

204.    Domino then took her money and abandoned her at the hotel without a ride.

205.    Nancy—with visible bruises—asked the front desk if she could wait until her next client came to pay her outstanding deposit.

206.    The front desk staff understood that she meant a sex work client.  They refused her offer and asked her to leave.

207.    Instead of calling social services or law enforcement due to the bruises or the nature of her work, hotel staff kicked her out onto the street.

208.    Eventually, Nancy had to leave her suitcase and "turn a trick" off the street to get money for a ride.

209.    Nancy showed clear signs of physical abuse and was easily identifiable as a prostitute, so Howard Johnson employees had actual and constructive knowledge that Nancy was a victim of sex trafficking.

210.    Based on the Howard Johnson International, Inc. ("Howard Johnson") Franchise Disclosure Document ("FDD") for the year 2021, the operative franchise agreement between Howard Johnson and Yash provided:

a.    Yash must purchase all signage, uniforms, furniture, linens, interior design elements, and electronic equipment from a limited selection of Approved Vendors selling a limited selection of Howard Johnson-designed and/or -approved products.

b.    Yash must either use a Howard Johnson-approved third-party management company or else put its proposed general manager(s) through a lengthy Howard Johnson-run and Howard Johnson-evaluated manager training program, which the general manager(s) must complete to Howard Johnson's satisfaction—effectively giving Howard Johnson total discretionary control over the management of Yash's hotel location.

c.    Yash must put all employees through a set of Howard Johnson-created trainings that depends on each employee's job title, but that universally includes trainings related to guest safety and human trafficking recognition and intervention.

i.    Yash employees must complete these trainings and related evaluations to Howard Johnson's satisfaction, effectively giving Howard Johnson discretionary control over all employment decisions at Yash's hotel location.

ii.    By assigning specific trainings to specific job titles, Howard Johnson effectively mandates that Yash adopt Howard Johnson's preferred scheme of job titles and responsibilities.

d.    Yash must use the Howard Johnson's exclusive Central Reservation System as its sole method for arranging/selling room reservations electronically.

e.    Yash must use one of two Howard Johnson-approved Property Management Systems, both of which: interface with the Central Reservation System; record all room reservations and house all information and notes regarding individual guests; record and schedule all property management tasks; and interface with the Howard Johnson-approved credit card processing system.

f.    Yash must use Howard Johnson's exclusive credit card processing system.

g.    Howard Johnson may "independently access your [Yash's] electronic information and data, and collect and use this electronic information and data in any matter we [Howard Johnson] choose, without compensation to you." Howard Johnson therefore knew every fact recorded in Yash's Property Management System, including all guest-related facts like names, contact information, restrictions, and notes, including notes about Nancy. On information and belief, all Wyndham franchisor subsidiaries share or otherwise have access to such information, meaning all Wyndham franchisor subsidiary defendants obtained the notes about Nancy.

h.   Yash may opt-in to Howard Johnson's Hotel Revenue Management Agreement, under which Yash must pay Howard Johnson a fee and permit Howard Johnson to unilaterally modify its room pricing, inventory, and restrictions (without advance notice) in exchange for Howard Johnson assisting Yash with pricing its rooms for maximum profitability and performing monthly performance reviews with recommendations for improvement.

    i.   On information and belief, Yash was at all relevant times opted-in to the Howard Johnson Hotel Revenue Management Agreement.

    ii.   As a result, Howard Johnson received detailed updates on Yash's operations at least monthly, including: the ratio of rooms rented online versus in-person at the hotel's front desk and the amounts expended on additional linens and other cleaning and maintenance services likely to be linked to human trafficking.

    iii.   The Yash location was (and still is) home to an unusual amount of human trafficking even for a low-budget motel.  On information and belief, Howard Johnson realized this because it consistently encountered an unusually high number of in-person cash reservations and an unusually high expenditure on laundry services during each monthly review.

i.   Yash must use Howard Johnson's exclusive vendor to set up and provide guest Wi-Fi services.

    i.   The Wi-Fi services provided by the exclusive vendor directly interface with both approved Property Management System options.

    ii.   Thus, on information and belief, Howard Johnson has unfettered access to all guest internet usage records, including the full list of websites visited by persons associated with each individual reservation.

    iii.   It is a standard practice for pimps, including Domino, to post ads for commercial sex with the women they control on websites like Backpage.com using hotel Wi-Fi.  Howard Johnson thus almost certainly knew that Domino, specifically, was operating as a trafficker from Yash hotel rooms, and it certainly knew that numerous traffickers were operating from Yash hotel rooms.

    iv.   On information and belief, Howard Johnson receives a kickback from the approved Wi-Fi services provider each time a guest purchase hotel Wi-Fi, including each time Domino purchased Wi-Fi and used it for the purpose of trafficking Nancy.

j.   Yash "will permit our [Howard Johnson's] representatives to perform quality assurance inspections of the Facility at any time with or without advance notice." If the result of any inspection is not satisfactory, then Yash will pay a "Reinspection Fee" to cover the next surprise inspection and may be required to send its employees for remedial training by Howard Johnson.

k.   Howard Johnson may—and, on information and belief, did—monitor third-party review websites for negative reviews of the Yash location and refer such reviews to Yash for handling. If Yash fails to handle any such referred negative review within three days to the guest's satisfaction, Howard Johnson may negotiate with the guest itself and charge Yash a "Customer Care Fee" in addition to requiring indemnification for payments to the guest.

l.   Yash must additionally comply with the much more detailed brand standards laid out in the (confidential) Standards of Operation and Design Manual. These requirements are in Yash and Howard Johnson's exclusive knowledge, but upon information and belief they include:

   i.   Specific requirements that Yash record and inform Howard Johnson of evidence of criminal activity, particularly evidence indicative of sex trafficking like excessive used condoms left behind, excessive requests for linens, and excessive foot traffic to particular rooms.

   ii.  Suggested pay rates and terms of employment for each job title defined by Howard Johnson in its training program.

211.   On information and belief, Yash performed its above-specified duties under the operative franchise agreement in full, and Howard Johnson exercised its above-specified rights to access information and to direct the operations of Yash's location in full.

212.   The Howard Johnson FDD further reveals that by early 2021 Wyndham was already a defendant in approximately 40 civil cases arising out of its alleged involvement in or profiting from human trafficking, and that it had already recorded an accrual of several million dollars in relation to these claims. The FDD further explains that Wyndham "records an accrual for legal contingencies when it determines, after consultation with outside counsel, that it is probable that a liability has been incurred." In other words, by early 2021, Howard Johnson's parent had already determined that it was likely liable for human trafficking in at least some

instances, which determination necessarily includes a realization that human trafficking was occurring on its properties.

<u>Guest Reviews of the Defendant Hotels</u>

213.    We now turn to the story told by public-facing guest reviews of Defendants' properties found on Tripadvisor and Yelp.

214.    Relevant reviews of the Extended Stay include:

        a.    One guest awarded 1 out of 5 stars, describing the Extended Stay as the "Worst I've Ever Seen" due to the "Pimps and prostitutes everywhere."

        b.    Another guest awarded 2 out of 5 stars, citing "a condom left beneath one bed."

        c.    Another guest awarded 1 out of 5 stars, claiming there were "strange men hanging around the back door. Creepy!"

        d.    Another guest awarded 2 out of 5 stars on account of the "shady people hanging around the area all the time"

        e.    Another guest awarded 1 out 5 stars, saying, "I found a used condom sticking to the bathroom wall."

        f.    Another guest awarded 2 out of 5 stars, claiming, "Let's just say the pillars of the community don't stay here."

215.    All the Extended Stay reviews quoted above were left before or during Nancy's trafficking.

216.    Relevant reviews of the Motel 6 include:

        a.    One guest awarded 1 out of 5 stars, stating, "this place looked like a hookers paradise."

        b.    Another guest awarded 2 out of 5 stars, saying, "if u like to hang out with drug dealers, prostitutes, Your in the right place here at motel 6…This place is the women that like to be prostitutes." The guest then tells a story of one late night when the police had to "break a fight up, between a pimp and his prostitutes."

        c.    Another guest awarded 2 out of 5 stars, stating, "There are vagrants and homeless everywhere…there are, what appears to me, are

hookers working out of this motel." A Motel 6 affiliated account even responded to this comment, thanking the reviewer for the feedback and asking for a chance to "improve" in the future.

d.    Another guest awarded 1 out of 5 stars, claiming, "this is a crack hoe motel. Be warned… Noisey AF due to the line of toothless hookers whacked out."

e.    Another guest awarded 1 out of 5 stars in a review titled "DISGUSTING AND DISGUSTED," where she mentions seeing a chair in her room that had "fresh stains from sexual acts being performed there."

217.    All the Motel 6 reviews quoted above were left before or during Nancy's trafficking.

218.    Relevant reviews of the Super 8 OKC Airport include:

a.    One guest awarded 1 out of 5 stars, complaining that "Homeless people, prostitutes, and drug dealers were sitting in front of my room the whole night!" They also noticed that "a new car showed up every few minutes to buy drugs or leave with a prostitute." The General Manager at Super 8 responded to the review and apologized for the negative experience.

b.    Another guest awarded 2 out of 5 stars, mentioning the "hookers loitering around".

c.    Another guest awarded 2 out of 5 stars, saying they "also saw hookers hanging around the area!"

d.    Another guest awarded 1 out of 5 stars, stating "Location awful, prostitute's outside, shady guests."

e.    Another guest awarded 4 out of 5 stars, mentioning "The following morning I woke up to a bra hanging from my door handle. Don't know if the whole motel was unsafe or if I was put in a room where prostitutes normally stay."

219.    All the Super 8 OKC Airport reviews quoted above were left before or during Nancy's trafficking.

220.    Relevant reviews of the Super 8 Prospect Ave include:

a.    One guest awarded 1 out of 5 stars, stating there were "even saw a few hookers roaming the halls."

      b.     Another guest awarded 3 out of 5 stars, claiming, "The prostitutes behind the building was a bit much."

221.    The Super 8 Prospect Ave reviews quoted above were left before or during Nancy's trafficking.

222.    A relevant review of the Days Inn awarded 2 out of 5 stars, stating "as we were trying to find a place to park a prostitute came out of a room and walked over to a car parked in a handicapped parking space and left."

223.    The Days Inn review quoted above was left before Nancy's trafficking.

224.    Relevant reviews of the Howard Johnson include:

      a.     One guest awarded 1 out of 5 stars, saying, "Don't stay there… there were prostitutes around the building." Tommy N., the General Manager of this Howard Johnson hotel, responded to the comment and apologized.

      b.     Another guest awarded 1 out of 5 stars, citing, "some very fishy transactions going on in the parking lot, appeared to be drugs or sex."

225.    Each of the Howard Johnson reviews quoted above was left before or during Nancy's trafficking.

226.    It is the standard procedure for hotels to check their reviews on third-party websites. As individually explained above, each Franchisor Defendants demanded the right to charge Franchisee Defendants a fee for not addressing negative reviews on these sites. On information and belief, the Franchisor Defendants were aware of the multiple negative reviews referencing prevalent prostitution—and in most cases pimping (trafficking)—taking place on each Franchisee Defendant's property before Nancy was trafficked in each location.

227.    Because most sex workers are coerced to engage in commercial sex acts, and because Defendants were aware of the high prevalence of commercial sex acts occurring in their hotels, Defendants were aware that trafficking must be occurring on their properties.

## Count I: 18 U.S.C. § 1595 ("TVPRA")

228.    Plaintiff incorporates each foregoing and subsequent allegation.

229.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

230.    Through their acts and omissions described above, Plaza, Ketter, Wiley, the Franchisee Defendants, and the Franchisor Defendants each trafficked Plaintiff within the meaning of 18 U.S.C. § 1591(a)(1), and they are thus directly liable under 18 U.S.C. § 1595.

231.    For example, each Defendant "harbor[ed]," "provide[d]," and—in Wiley's case— "patronize[d]" Nancy while knowing or in reckless disregard of the fact that she would be coerced into commercial sex.

232.    Through their acts and omissions described above, Plaza, Ketter, Wiley, the Franchisee Defendants, and the Franchisor Defendants each trafficked Plaintiff within the meaning of 18 U.S.C. § 1591(a)(2), and they are thus directly liable under 18 U.S.C. § 1595.

233.    Through their acts and omissions described above, Plaza, Ketter, Wiley, the Franchisee Defendants and the Franchisor Defendants each benefit[ted] financially from Plaintiff's sex trafficking due to their participation in a venture that they knew or should have known earned money from sex trafficking, and they are thus liable as beneficiaries under 18 U.S.C. § 1595.

234.    Specifically, Nancy's allegations above establish that the Plaza, Ketter, and Wiley participated in a venture together, in the form of the commercial venture known as the Plaza Inn, which each knew had engaged in acts of human trafficking, both generally and with respect to Nancy.

235.    Nancy's allegations above also establish that the Plaza, Ketter, and Wiley participated in a venture with Domino, in the form of room rentals to Domino, which each knew had engaged in acts of human trafficking, both generally and with respect to Nancy.

236.    Nancy's allegations above also establish that the Franchisee Defendants and their respective Franchisor Defendants each participated in ventures together, in the forms of the franchisee-franchisor relationships for each defendant hotel, which each participant knew had engaged in acts of human trafficking, both generally and with respect to Nancy.

237.    Finally, Nancy's allegations above establish that that the Franchisee Defendants and their respective Franchisor Defendants each participated in ventures together with Domino, in the forms room rentals and WiFi sales to Domino, which each participant knew had engaged in acts of human trafficking, both generally and with respect to Nancy.

238.    In addition to their direct liability, under the facts described above, the Franchisor Defendants are liable for the acts of their respective Franchisee Defendants because, in the alternative: (1) Each Franchisee Defendant was acting as the agent of its respective Franchisor Defendant with respect to all relevant employment, training, and operational decisions; and (2) Each Franchisor Defendant is a joint employer of the employees of its respective Franchisee Defendants.

239.    Plaintiff has suffered substantial permanent physical and psychological injuries as the result of being trafficked and sexually exploited, and she is therefore entitled to bring an action against each Defendant for damages under 18 U.S.C. § 1595.

### COUNT II: 21 OK STAT § 21-748.2(B) ("OKLAHOMA SEX TRAFFICKING")

240.    Plaintiff incorporates each foregoing and subsequent allegation.

241.    Plaintiff is a "person aggrieved by" trafficking under 21 OK Stat § 21-748(B).

242.    Defendants committed acts of human trafficking under 21 OK Stat § 21-748(B) by variously recruiting, enticing, providing, obtaining, and in all cases harboring Plaintiff for purposes of engaging Plaintiff in a commercial sex act.

243.    Defendants further committed acts of human trafficking under 21 OK Stat § 21-748(B) by benefitting (in the form of room rentals, fees for towels, condom purchases etc…) from participating in ventures that engaged in acts of trafficking for commercial sex.

244.    Plaintiff is therefore entitled to bring an action for damages as a result of her trafficking against Defendants under 21 OK Stat § 21-748.2(B).

245.    Plaintiff's claim is timely because it was filed within three years of accrual as permitted 12 OK Stat § 12-95(A)(2) for any "action upon a liability created by statute other than a forfeiture or penalty."

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.    Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; and all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.    Disgorgement of profits and/or restitution;

c.    Punitive damages, attorneys' fees, and expenses;

d.    The costs of this action;

e.    Pre- and post-judgment interest; and

f.    Any other relief the Court or jury deems appropriate.

DATED this 28th day of May, 2025.

/s/ *Geoffrey C. Parker, Esq.*

GEOFFREY C. PARKER, ESQ.
*Pro Hac Vice* – OH #0096049
Hilton Parker LLC
7658 Slate Ridge Blvd.
Reynoldsburg, OH 43068
Tel:  (614) 992-2277
Fax:  (614) 927-5980
Email:  gparker@hiltonparker.com

MICHAEL C. KANE, ESQ.
*Pro Hac Vice* – NV #10096
THE702FIRM INJURY ATTORNEYS
400 South 7th Street, Suite 400
Las Vegas, Nevada 89101
Tel:  (702) 776-3333
Fax:  (702) 505-9787
Email:  service@the702firm.com

FLETCHER D. HANDLEY, JR.
OBA
Handley Law Center
PO Box 310
El Reno, OK 73036
Tel: (405) 295-1924
Email: fdh@handleylaw.com

*Attorneys for Plaintiff Nancy R.*

## **DEMAND FOR JURY TRIAL**

Plaintiff Nancy R., by and through her attorneys of record, hereby demands a jury trial of all issues in the above matter.

DATED this 28th day of May, 2025.

/s/ *Geoffrey C. Parker, Esq.*

GEOFFREY C. PARKER, ESQ.
*Pro Hac Vice* – OH #0096049
Hilton Parker LLC
7658 Slate Ridge Blvd.
Reynoldsburg, OH 43068
Tel:  (614) 992-2277
Fax:  (614) 927-5980
Email:  gparker@hiltonparker.com

MICHAEL C. KANE, ESQ.
*Pro Hac Vice* – NV #10096
THE702FIRM INJURY ATTORNEYS
400 South 7th Street, Suite 400
Las Vegas, Nevada 89101
Tel:  (702) 776-3333
Fax:  (702) 505-9787
Email:  service@the702firm.com

FLETCHER D. HANDLEY, JR.
OBA
Handley Law Center
PO Box 310
El Reno, OK 73036
Tel: (405) 295-1924
Email: fdh@handleylaw.com

*Attorneys for Plaintiff Nancy R.*