**USPS CERTIFIED MAIL**



9214 8901 4298 0426 5019 08

*CERTIFIED MAIL*

Jonathan Hilton
Hilton Parker LLC
7658 Slate Ridge Boulevard
Reynoldsburg, OH 43068

## See Important Information Enclosed



0012399819000011
Indra LLC
c/o Prakesh Patel
8004 NW 124th St.
Oklahoma City, OK 73142

AO440(Rev.12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

## Western District of Oklahoma

| | |
|---|---|
| Nancy R., pseudonymously, | ) |
| | ) |
| | ) |
| | ) |
| Plaintiff(s), | ) |
| | ) |
| v. | )    Case No. 5:25-cv-462 |
| Plaza Hotels, LLC.; et al., | ) |
| | ) |
| | ) |
| | ) |
| Defendant(s). | ) |

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Indra LLC
c/o Ramesh Patel
11935 N. I-35 Service Rd.
Oklahoma City, OK, 73131

    A lawsuit has been filed against you.

    Within 21 days after service of this summons on you (not counting the day you received it) - or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12(a)(2) or (3) - you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Geoffrey Parker
Hilton Parker LLC
7658 Slate Ridge Blvd.
Reynoldsburg, OH 43068

    If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

*Signed and sealed by the Clerk of the Court or Deputy Clerk.*

AO 440 (Rev. 02/09)  Summons in a Civil Action (Page 2)

Civil Action No.  5:25-cv-462

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4(l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*
_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:



CJ25 1850 -
Bunner

# IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

NANCY R., pseudonymously,

Plaintiff,

vs.

PLAZA HOTELS, LLC;
STEVE KETTER;
MICHAEL WILEY;
OKC AIRPORT ES, LLC;
ESH STRATEGIES FRANCHISE, LLC;
KAJAL HOSPITALITY, LLC;
JALIYAN HOSPITALITY, INC;
SUPER 8 WORLDWIDE, INC;
RAJ KRUPA HOTEL, LLC;
DAYS INNS WORLDWIDE, INC;
CHAND & SAAJ HOSPITALITY, INC;
RAMADA WORLDWIDE, INC;
YASH ENTERPRISES, INC;
HOWARD JOHNSON INTERNATIONAL,
INC;
NOOR HOTEL, LLC;
AMBICA, LLC;
OM, LLC;
INDRA, LLC; AND
G6 HOSPITALITY FRANCHISING, LLC,

Defendants.

Case No.

# CJ - 2025 - 1850

### FILED IN DISTRICT COURT
### OKLAHOMA COUNTY

MAR 1 9 2025

### RICK WARREN
### COURT CLERK

42_____

## PETITION

COMES NOW the Plaintiff, NANCY R., by and through her attorneys, Michael C. Kane, Esq., Bradley J. Myers, Esq., and Joel S. Hengstler, Esq. of The702 Firm, Geoffrey C. Parker, Esq. and Jonathan Hilton, Esq. of Hilton Parker LLC, and Fletcher D. Handley, Jr. of The Handley Law Center states as follows:

1

## PARTIES

1.     Plaintiff Nancy R. ("**Nancy**") is a natural person.

2.     Defendant Plaza Hotels, LLC ("**Plaza**") is an Oklahoma limited liability company which, at all relevant times, owned and operated the Plaza Inn Hotel ("the Plaza") located at 3200 S I-35 Service Road, Oklahoma City, OK 73129.

3.     Defendant Steve Ketter ("**Ketter**") is a natural person residing, on reference, in Canadian County, Oklahoma.  Ketter may be served at his residence at 5101 S. Choctaw Ave, El Reno, OK 73036.  On information and belief, Ketter personally managed the day-to-day operation of the Plaza at all relevant times.

4.     Defendant Michael Wiley ("**Wiley**") is a natural person residing, on reference, in Oklahoma County, Oklahoma.  Wiley may be served at his residence at 1701 Wildhorse Dr., Edmond, OK 73003.  On information and belief, Wiley personally managed the day-to-day operation of the Plaza at all relevant times.

5.     Defendant OKC AIRPORT ES, LLC ("**OKC ES**") is a Texas limited liability company that owned and operated the Extended Stay America Oklahoma City Airport ("the Extended Stay") located at 4820 W Reno Avenue, Oklahoma City, OK 73127 at all relevant times.

6.     Defendant ESH STRATEGIES FRANCHISE, LLC ("**ESH**") is a Delaware limited liability company which, at all relevant times was the franchisor that set—and monitored compliance with—the brand standards for the Extended Stay America Oklahoma City Airport ("the Extended Stay") located at 4820 W Reno Avenue, Oklahoma City, OK 73127.

7.     Defendant KAJAL HOSPITALITY, LLC ("**Kajal**") is an Oklahoma limited liability company that owned and operated the Super 8 by Wyndham Oklahoma Airport Fairgrounds West ("the Super 8 Airport") located at 311 S Meridian Avenue, Oklahoma City, OK 73108 at all relevant times.

8.     Defendant JALIYAN HOSPITALITY, INC ("**Jaliyan**") is an Oklahoma corporation that owned and operated the Super 8 by Wyndham Oklahoma City ("the Super 8 Prospect") by located at 3852 S Prospect Avenue, Oklahoma City, OK 73129 at all relevant times.

9.     Defendant SUPER 8 WORLDWIDE, INC ("**Super 8**") is a South Dakota limited liability company that was the franchisor that set—and monitored compliance with—the brand standards for the Super 8 by Wyndham Oklahoma Airport Fairgrounds West ("the Super 8 Airport") located at 311 S Meridian Avenue, Oklahoma City, OK 73108  and the Super 8 by Wyndham Oklahoma City ("the Super 8 Prospect Ave") located at 3852 S Prospect Avenue, Oklahoma City, OK 73129 at all relevant times.

10.     Defendant RAJ KRUPA HOTEL, LLC ("**Raj Krupa**") is an Oklahoma limited liability company that owned and operated the Days Inns by Wyndham Oklahoma City/Moore ("the Days Inns") located at 8217 S I-35 Service Road, Oklahoma City, OK 73149 at all relevant times.

11.     Defendant DAYS INNS WORLDWIDE, INC ("**Days Inns**") is a Delaware corporation that was the franchisor that set—and monitored compliance with—the brand standards for the Days Inns by Wyndham Oklahoma City/Moore ("the Days Inns") located at 8217 S I-35 Service Road, Oklahoma City, OK 73149 at all relevant times.

12.     Defendant CHAND & SAAJ HOSPITALITY, INC ("**C&S**") is an Oklahoma corporation that owned and operated the Ramada by Wyndham Oklahoma City Airport North ("the Ramada") located at 2200 S. Meridian Avenue, Oklahoma City, OK 73108 at all relevant times.

13.     Defendant RAMADA WORLDWIDE, INC ("**Ramada**") is a Delaware corporation that was the franchisor that set—and monitored compliance with—the brand standards for the

3

Ramada by Wyndham Oklahoma City Airport North ("the Ramada") located at 2200 S. Meridian Avenue, Oklahoma City, OK 73108 at all relevant times.

14.     Defendant YASH ENTERPRISES, INC (**"Yash"**) is an Oklahoma corporation that owned and operated the Howard Johnson by Wyndham Oklahoma City Airport/Fairgrounds ("the Howard Johnson") located at 400 S Meridian Ave, Oklahoma City, OK 73108 at all relevant times.

15.     Defendant HOWARD JOHNSON INTERNATIONAL, INC (**"Howard Johnson"**) is a Delaware corporation that was the franchisor that set—and monitored compliance with—the brand standards for the Howard Johnson by Wyndham Oklahoma City Airport/Fairgrounds ("the Howard Johnson") located at 400 S Meridian Ave, Oklahoma City, OK 73108 at all relevant times.

16.     Defendants NOOR HOTEL, LLC (**"Noor"**), AMBICA, LLC (**"Ambica"**), OM, LLC (**"Om"**), and INDRA, LLC (**"Indra"**) are Oklahoma limited liability companies. At all relevant times, each owned 25% of the Motel 6 Oklahoma City Bricktown ("the Motel 6 Bricktown") located at 1800 E Reno Avenue, Oklahoma City, OK 73117.  On information and belief, Noor, Ambica, Om, and Indra together performed and equally shared in day-to-day management of the Motel 6 Bricktown.

17.     Defendant G6 HOSPITALITY FRANCHISING, LLC (**"Motel 6"**) is a Delaware limited liability company was the franchisor that set—and monitored compliance with—the brand standards for the Motel 6 Oklahoma City Bricktown ("the Motel 6 Bricktown") located at 1800 E Reno Avenue, Oklahoma City, OK 73117 at all relevant times.

18.     Defendants **ESH**, **Super 8**, **Days Inns**, **Ramada**, **Howard Johnson**, and **Motel 6** are hereinafter sometimes referred to collectively as the "**Franchisor Defendants.**"  Defendants

ES, Kajal, Jaliyan, Raj Krupa, C&S, Yash, Noor, Ambica, Om, and **Indra** are hereinafter sometimes referred to collectively as the "**Franchisee Defendants**."

19.        Defendants acted through their agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers and at all times relevant to this action.

INTRODUCTION
Pimpology

20.        One doesn't have to be chained up to be trapped in prostitution. As most people recognize, women trapped in prostitution nearly always want to escape it.[1]

21.        Despite this, in the popular imagination "sex trafficking" is something completely different that only happens to sympathetic women. In popular depictions of sex trafficking, the victim is nearly always a respectable girl from a good home who has been kidnapped off the street—usually in a foreign country—and who has been forced to sell her body by means of brutal physical violence.

22.        But, "[t]his popular image of sex traffickers and the victims of sex trafficking is almost completely wrong . . . About the only thing Hollywood gets right is the brutal men, and even that is more complicated."[2]

23.        Most victims of sex trafficking aren't cuddly, and many are not obviously victims. Few trafficking victims cry for help, because few see themselves as needing help. Most are street savvy and tough as nails. Many are flaky or personally difficult. Nearly all have a wealth of past traumas, and it is usually those past traumas that make them vulnerable to exploitation.

---

[1] Moran, Rachel & Farley, Melissa. (2019). Consent, Coercion, and Culpability: Is Prostitution Stigmatized Work or an Exploitive and Violent Practice Rooted in Sex, Race, and Class Inequality?. Archives of Sexual Behavior. 48. 10.1007/s10508-018-1371-8.

[2] BRIAN JOSEPH, VEGAS CONCIERGE: SEX TRAFFICKING, HIP HOP, AND CORRUPTION IN AMERICA XII (2024).

5

24.     No little girl dreams of becoming a prostitute.  Most girls who do become prostitutes are coerced into it, and even those who aren't coerced at first usually suffer coercion later.[3] Nearly half are still children when they turn their first trick.[4]

25.     Individual risk factors for both "consensual" prostitution and sex trafficking overlap almost totally, including in both cases PTSD, trauma, childhood abuse and neglect, substance abuse, poverty and housing instability, foster care or dysfunctional family dynamics.[5]

26.     As those familiar with "the Life" know, "most hoes don't even like sex."[6] Rather, they are usually in desperate situations and dealing with unresolved traumas that make them susceptible to manipulation and coercion by traffickers—commonly called pimps—who seek them out and purport to provide them with the love, care, and security that they've been deprived of.

27.     Regardless of how they got into the sex trade, most women who work as prostitutes are not working for themselves. Figures vary, but studies of prostitution in the U.S. find that 80-90% of prostitutes are controlled by pimps.[7]

28.     The great majority of pimps use threats and physical violence to keep their "stable" of girls hardworking and loyal.[8]

---

[3] *See* Jody Raphael, Jessica Ashley Reichert & Mark Powers, *Pimp Control and Violence: Domestic Sex Trafficking of Chicago Women and Girls*, 20 WOMEN & CRIMINAL JUSTICE 89, 96 (2010) (coercion increases greatly with time).

[4] Melissa Farley et al., *Prostitution and Trafficking in Nine Countries: An Update on Violence and Posttraumatic Stress Disorder*, JOURNAL OF TRAUMA PRACTICE, Vol. 2, Issue 3-4 at 40 (2004) (42% of prostitutes in the U.S. started as children).

[5] Gerassi, Lara. "From Exploitation to Industry: Definitions, Risks, and Consequences of Domestic Sexual Exploitation and Sex Work Among Women and Girls." *Journal Of Human Behavior In The Social Environment* vol. 25,6 (2015): 591-605. doi:10.1080/10911359.2014.991055.

[6] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 77 (2008).

[7] Farley, Melissa et al., *Online Prostitution and Trafficking*, ALBANY LAW REVIEW, 1039 (2014), *available at* albanylawreview.org/article/70164-onlineprostitution-and-trafficking. (collecting studies)

[8] *See* Jody Raphael, Jessica Ashley Reichert & Mark Powers, *Pimp Control and Violence: Domestic Sex Trafficking of Chicago Women and Girls*, 20 WOMEN & CRIMINAL JUSTICE 89, 96 (2010) (finding over 75% of pimp-controlled prostitutes said their pimps physically abused them, and under half said they could leave without physical harm.)

29.    But physical violence is not the pimp's only tool of coercion.  As Ken Ivy, a Milwaukee pimp, explains in his startlingly explicit book *Pimpology: The 48 Laws of the Game*, pimps are also master manipulators, ready to ferret out the weaknesses and pressure points left by a girl's past traumas and use them to create dependence:

> Most hoes have low self-esteem for a reason.  A pimp looks for that weakness, and if it isn't on the surface, he brings that motherfucker out of them. . . .  Weakness is the best trait a person can find in someone they want to control.  You have to tear someone's ego down to nothing before they will start looking to you for salvation.[9]

30.    Still, even non-violent pimps leverage the ever-present threat of other pimps' violence to coerce women they suspect of being independent sex workers—"renegades," in the language of the Life—into "choosing up" and becoming *their* girls.

31.    In his book, Mr. Ivy—a self-proclaimed non-violent pimp—recalls taking control of a naïve sex worker who made the mistake of acknowledging his catcalls by threatening her: "A solo ho without a pimp will soon be under pimp arrest or worse.  It's in your best interest to choose a pimp.  It's in your best interest to choose Pimpin' Ken."[10]

32.    It is standard practice for pimps to take all, or nearly all, of the money earned by the women and girls they control.  The pimps then use the money to pay for their victims' needs, but only as and when it suits them. This creates total dependence, both practical and psychological, on the pimp.[11]

---

[9] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 22 (2008) ("Law 5: Prey on the Weak").
[10] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 79 (2008).
[11] *See* Johnson, Matthew and Dank, Meredith, *The Hustle: Economics of the Underground Commercial Sex Industry*, URBAN INSTITUTE (2014), *available at* https://apps.urban.org/features/theHustle/index.html; *see also* PIMPOLOGY 20 ("Law 4: Keep a Ho in Arrears . . . To master someone completely, they have to depend on you for everything.")

33.     To quote Ken Ivy again, "The more someone depends on you, the more power you have over them. To master someone completely, they have to depend on you for everything."[12]

34.     Common control techniques include retaining control of victims' identification documents, telling stories about the horrible fates suffered by girls who disobeyed other pimps, and threatening to have CPS separate victims from their children if they disobey.

35.     Other methods of coercion include withholding food, sleep deprivation, and induced substance abuse/drug addiction. Courts have long recognized these tactics to be methods of coercion used in human trafficking.

36.     As Justice William J. Brennan explained, "drug addiction or the weakness resulting from a lack of food, sleep, or medical care . . . would not reappear with such depressing regularity [in trafficking cases] if they were ineffective." *United States v. Kozminski*, 487 U.S 931, 957 (Brennan, J., concurring) (collecting cases).

37.     Traffickers use substances to keep their victims too physically incapacitated to resist and to create a physical reliance on the trafficker out of fear of withdrawal.[13] Most sex trafficking victims—up to 84% according to one study—report their trafficker used substances to exploit them during their victimization period.[14]

38.     Of course, pimps use carrots as well as sticks. Extravagant promises of comfortable retirement are nearly universal, as are shorter-term promises of nice clothes, jewelry, and the like. But follow-through on even the short-term promises is rare, and retirement is all but unheard of.

---

[12] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 20 (2008).

[13] Langton, L. Planty, M. G., Banks, D., Witwer, A. R., Woods, D. Vermeer, M. J. D., & Jackson, B. A. (2022). Sex Trafficking and Substance Use: Identifying High-Priority Needs within the Criminal Justice System. *Rand Health Quarterly, 9*(4), 14.

[14] Eastwood-Paticchio, Emma, *Addicted to You: Drug Addiction as a Means of Coercion*, HUMAN TRAFFICKING INSTITUTE (30 January 2019), *available at* https://traffickinginstitute.org/addicted-to-you-drug-addiction-as-a-means-of-coercion/ (noting prevalence of induced substance use in various human trafficking surveys and reports).

8

39.     Still, many victims cling to their pimps' fraudulent promises out of a desperate need for something to hope for when all other happy endings seem closed to them.

40.     All told, very few prostitutes who find themselves answering to a pimp feel able to leave without suffering some disastrous combination of physical, emotional, reputational, and financial consequences. On reference, for more than half of all prostitutes these potential consequences rise to the level of "serious harm" as defined in 18 U.S.C. § 1591(e)(5).

41.     For most women living it, the life of a pimp-controlled prostitute is a hellish prison from which escape seems not just impossible, but unthinkable. Contrary to the popular image, pimp-controlled prostitution is what sex trafficking looks like in America today.

42.     Fortunately, federal law recognizes this complex reality. The Trafficking Victims Protection Reauthorization Act ("TVPRA"), at 18 U.S.C. § 1591, defines a human trafficker as:

> Whoever knowingly . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing, or . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act.

43.     "Coercion," as used in the statute's definition of human trafficking, includes:

> threats of serious harm to or physical restraint against any person; [or] any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm or physical restraint against any person

44.     "Serious harm," as used in the statute's definition of coercion, means:

> Any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

45.    Reading the TVPRA's criminal provision together with its incorporated definitions, human trafficking means using (or recklessly disregarding the use of) force, fraud, or threats of "any harm" that would be "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person *of the same background and in the same circumstances* . . . to continue performing commercial sexual activity."

46.    Contrary to the comfortable myth spread by those who benefit from prostitution occurring on their properties, there is no way to welcome "consensual prostitution" without welcoming sex trafficking.

47.    The vast majority of American prostitutes—on reference and belief, at least three-quarters—are victims of human trafficking within the meaning of the TVPRA.

48.    In recent years, many American law enforcement agencies have "overhauled their approach to prostitutes, trying to be more respectful and compassionate in their interactions with them while still enforcing prostitution laws, recognizing all prostitutes are victims, and putting a greater focus on identifying and arresting their pimps."[15]

49.    However, few people other than police, prosecutors, and victim advocates think of the average prostitute as a human trafficking victim, but that failure isn't because most people are ignorant of the relevant facts.  After all, the phrase "pimp slap" didn't enter the lexicon because people think pimps are cuddly and supportive.

50.    Rather, most people fail to see prostitutes as victims because judgmental attitudes toward prostitutes—and dismissive attitudes toward their suffering—are deeply rooted in popular culture.  In other words, most people know prostitutes are usually coerced, they just don't care.

---

[15] BRIAN JOSEPH, VEGAS CONCIERGE: SEX TRAFFICKING, HIP HOP, AND CORRUPTION IN AMERICA 35 (2024).

<u>Trafficking in the Hotel Industry: Room for Trafficking</u>

51.    By their nature, hotels tend to be located in close proximity to event spaces, airports and highways.  They offer temporary, anonymous, private, and cost-effective lodgings that are convenient for busy travelers.

52.    The same factors also make them prime venues for human trafficking.

53.    According to a 2018 Polaris Project report, three quarters (75%) of sex trafficking victims surveyed had spent time in a hotel during their trafficking, and four fifths of victims who spent time in a hotel (i.e. 60% of all victims) had engaged in commercial sex inside of a hotel.[16]

54.    Similarly, as of 2020, among all active federal prosecutions for human trafficking involving a completed sex act, over three quarters (77%) involved commercial sex at a hotel.

55.    Therefore, on information and belief, hotel employees encounter victims of sex trafficking more than members of the general public.

56.    Hotel staff can, and should, easily observe and identify the following indicators of in-call escort services involving trafficking victims:

    a.    Paying for stays in cash or with pre-paid credit cards
    b.    Extended stays with few possessions
    c.    Reservations for a single night that are extended day by day
    d.    Frequent requests for new towels, washcloths, and/or linens
    e.    Excessive condoms in trash cans
    f.    Excessive foot traffic in/out of rooms
    g.    One person checking in with multiple women in tow
    h.    Verbal or physical abuse of women
    i.    Restricted or controlled communications
    j.    Restricted movement or evidence of constant monitoring

---

[16] Brittany Anthony et al., *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking*, Polaris Project, 16 (2018) *available at* https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking.pdf

k.     No control of money, cell phone, or identification documents

l.     Women exhibiting fearful, anxious, or submissive behavior

m.     Dresses inappropriate to the setting and/or climate

n.     Lack of knowledge of current or past whereabouts

o.     Signs of poor hygiene, malnourishment, or fatigue[17]

57.     Nearly all of these red flags were present at every hotel in which Plaintiff stayed.

58.     The hotel industry is aware this problem runs rampant behind its guestroom doors.

59.     Since 2015, hundreds of civil sex trafficking lawsuits have been filed against both local hotel franchisees and the hotel franchisors themselves.

60.     In response to these lawsuits, several hotel companies and franchisors—like Wyndham, Motel 6, ESH, for example—have mandated anti-trafficking training programs for all employees.

61.     No Room for Trafficking, launched by the American Hotel and Lodging Association (AHLA) and partnered with the Polaris Project, is a popular—and free—anti-trafficking initiative used by many employers in the hotel industry.

62.     On reference, the No Room for Trafficking training program highlights the following behaviors, and others, as potential signs of human trafficking: paying in cash or prepaid card one day at a time; wearing heavy makeup, lingerie, and little clothing; carrying little luggage; displaying signs of drug use or sleep deprivation; discarding condoms; use of Backpage.com; and heavy foot traffic to room by different men.

63.     Indicators of sex trafficking emphasized in this industry-standard training program overlap with behaviors exhibited by Plaintiff in each Defendant hotel.

64.     On information and belief, Defendant Hotels provide their employees with anti-trafficking training programs substantially similar to No Room For Trafficking.

---

[17] *Id.* at 71.

12

65.    On reference, No Room for Trafficking identifies safety concerns to guests and reputational and financial problems as a result of negative publicity as "Risks [that trafficking poses] to the Business". This section of the training also recognizes legal troubles that could arise out of laws finding hotels liable for the trafficking that occurs on their properties.

66.    It is natural to wonder why the hotel brands and chains who boast of their anti-trafficking trainings, act as chairmen on the AHLA board, and donate to survivor funds are simultaneously some of the most common defendants in civil sex trafficking cases.

67.    In other words, if hotel employees are equipped to recognize instances of trafficking, why do they continuously fail to intervene?

68.    In a report analyzing the hotel sector's vulnerability to trafficking[18], authors identified the following as barriers to implementing an "anti-trafficking culture" in hotels:

        a.    Profit prioritization (occupancy rates trump safety concerns);

        b.    Customer- and sales-orientation (over moral and ethical decisions);

        c.    The franchisee-franchisor business model; and

        d.    Weak operational practices.

69.    These barriers mean that chain hotels' have trafficking trainings that operate on the level of appearance, only.  They take care of the reputational risks to the business but do nothing to address safety concerns or make employees more likely to actually intervene.

70.    In other words, most hotel employees are now aware of, and can identify the signs of sex trafficking, they just choose to—and are tacitly or explicitly encouraged to—do nothing about it as long as the room is being paid for.

---

[18] Paraskevas, Alexandros & Brookes, Maureen. (2018). Human trafficking in hotels: an 'invisible' threat for a vulnerable industry. *International Journal of Contemporary Hospitality Management*. 30. 00-00. 10.1108/IJCHM-04-2017-0213

BACKGROUND

Nancy's Trafficking Begins: Engaged to Encaged

71.    After escaping an abusive relationship as a teenager, experiencing homelessness, and briefly being incarcerated, Nancy believed her life was finally on an upward trajectory. She had found a fiancé, a job, a home for her children, and her sobriety.

72.    All of that changed when her fiancé committed suicide in 2020. While she was beside herself with grief, she allowed the abusive father of one of her kids to pick her up and take her to a hotel, where he plied her with drugs.

73.    By early 2021, Nancy was homeless, penniless, and at risk of losing her children. It was in that vulnerable state that Nancy met "Domino" at the Plaza Inn in Oklahoma City, and her nightmarish reality of being sex trafficked through a series of Oklahoma hotels began.

74.    Domino, a member of the "Bounty Hunters" subset of the Bloods gang, was the main pimp at the Plaza Inn in Oklahoma City. Gang members like Domino are frequent perpetrators of human trafficking.

75.    Domino used a variety of coercive methods to force Nancy to engage in commercial sex. He used threats, physical violence, and intimidation against Nancy if she was not having sex with enough clients to fill his pockets.

76.    Domino also kept complete financial control over Nancy. After clients left, he would collect all of Nancy's earnings, sometimes leaving her stranded with no money to pay the hotel bill or to call a ride elsewhere.

77.    However, he did supply her with one thing – drugs. Traffickers often use induced substance abuse as a coercive method to force their victims to engage in survival sex in order to support their addiction and to keep them in a physical state that makes them unable to leave.

78.     Through these control tactics, he forced her into a state of total dependence on him for shelter, safety, and illicit substances.

79.     On several occasions in each Defendant hotel, employees would have been unable to miss signs of Domino's control over, and trafficking of, Nancy.

80.     However, hotel employees chose to ignore the bruises Domino left on Nancy and his frequent comings and goings—while never staying long or reserving a room—through the hotel lobbies in line of sight from the front desk.

81.     As a result, he continued to traffic Nancy for sex from early 2021 to the beginning of 2022. And even after his arrest in 2022, he continued to exert control over Nancy through members of his affiliated gang.

82.     This would continue until Nancy met her now-husband. Shortly after, she moved out of Oklahoma and received treatment for her addiction.

83.     Nancy is now sober and happily married, but she continues to suffer the aftereffects of her victimization.  For example, she often can't remember where she ate for lunch, but she can vividly remember the colors of the walls inside many of Defendants' hotels, and the sight of white towels causes her physical illness.

<u>In(n) Calls: Nancy's Trafficking in Oklahoma City</u>

84.     After meeting Domino, Nancy was sex trafficked in a dozen or more hotels in Oklahoma from 2021 through 2022.  The conduct of seven of these hotels was particularly notable: the Plaza, the Extended Stay, the Motel 6 Bricktown, the Super 8 OKC Airport, the Days Inns, the Howard Johnson, and the Super 8 Prospect Ave.

85.     She performed "in calls" at each of the above-mentioned locations. An "in call" is a type of escort service where a customer comes a sex worker's location—usually a hotel room—for commercial sex.

15

86.    At these hotels, Domino required her to meet a daily quota of 10 johns.

87.    There was a regular flow of men who were not guests of the hotel going in and out of Nancy's room every day she was at each of these hotels.

88.    At the time of Nancy's trafficking in 2021 and 2022, Defendants knew and should have known their businesses would be likely venues for sex trafficking.

89.    Hotel staff can, and should, observe and identify the following indicators of in-call escort services and potential human trafficking:

a.    Paying for stays in cash or with pre-paid credit cards

b.    Extended stays with few possessions

c.    Reservations for a single night that are extended day by day

d.    Frequent requests for new towels, washcloths, and/or linens

e.    Excessive condoms in trash cans

f.    Excessive foot traffic in/out of rooms

g.    One person checking in with multiple women in tow

h.    Verbal or physical abuse of women

i.    Restricted or controlled communications

j.    Restricted movement or evidence of constant monitoring

k.    No control of money, cell phone, or identification documents

l.    Women exhibiting fearful, anxious, or submissive behavior

m.    Dresses inappropriate to the setting and/or climate

n.    Lack of knowledge of current or past whereabouts

o.    Signs of poor hygiene, malnourishment, or fatigue

90.    A combination of these indicators was present at every hotel in which Nancy stayed.

91.    On most occasions when Nancy stayed at one of the Defendant Hotels in Oklahoma City, she would:

a. Check in wearing heels and inadequate clothing with little luggage;

b. Initially rent rooms through her own Priceline account or someone else's, often using a fake, paper temporary Oklahoma IDs ;

c. Have rooms put in her name, even if someone else showed their ID to the front desk staff;

d. Extend her stay day-by-day or a few days at a time, paying with cash or even, in some cases, making the john pay at the front desk;

e. Escort johns from the hotel lobby to her room;

f. Ask for new/additional towels and linens frequently; and

g. Dispose of used condoms and condom wrappers in the hotel trash.

92.     Each hotel's front desk staff would have witnessed dozens of instances of Nancy escorting a man, who was not checked into the hotel, through the lobby to her room, and then him heading back downstairs, sometimes within a period of 10 minutes.

93.     Nancy usually met johns in the hotel lobby or by the elevator to ensure they got in, make them feel secure, and walk them up to her room. Each time she did this, she was obviously dressed for sex work.

94.     At the following Defendant Hotels, Nancy reports that johns had to walk through the interior lobby and past the front desk to access her room: the Extended Stay, the Super 8 OKC Airport, and the Super 8 Prospect Ave.

95.     At the Plaza, the Motel 6 Bricktown, the Days Inns, the Howard Johnson, and the Extended Stay, Nancy had conversations and interactions with hotel staff that explicitly referenced Nancy engaging in acts of commercial sex on the premises.

17

### Plaza Inn Hotel

96.     Nancy met Domino at the Plaza Inn Hotel in 2021.

97.     While Domino was Nancy's pimp, he resided at the Plaza.

98.     On one occasion, Nancy had sex with Michael Wiley, one of the owners of the Plaza, in exchange for a room.

99.     Other girls controlled by Domino and his associates also had sex with Michael Wiley in exchange for rooms on multiple occasions.

100.    It was well known among the many sex workers who frequented the Plaza that Michael Wiley liked to trade rooms for sex.

101.    Wiley would also give Nancy a room when she said she had a client coming and then allow her to pay for the room *after* she saw the client.

102.    Wiley met Domino and knew that he was Nancy's pimp and was forcing her to engage in commercial sex acts by threatening her with physical abuse and drug withdrawal.  On information and belief, Ketter—the Plaza's other owner—was aware of the same facts either because Wiley told him or because he encountered Domino during his visits to the Plaza.

103.    The Plaza was known for being a criminal hotspot for drugs, prostitution, and violent crime by locals and Oklahoma news outlets.

104.    In 2022 Oklahoma City officials filed a lawsuit requesting a judge to declare the Plaza a public nuisance.  In the first eight months of that year, police had responded to calls involving at least 10 assaults, two shootings, eight attempted suicides, three stabbings, 13 thefts, four acts of vandalism, and 11 overdoses.

105.    The Plaza was forced to permanently close just months later after failing to address and reduce safety concerns.

106.     By forming a business relationship with Nancy's trafficker, engaging in commercial sex with Nancy, and profiting from related room rentals, the employees and owner of the Plaza effectively facilitated, and benefitted from, Nancy's trafficking.

### Extended Stay America

107.     At the Extend Stay, Nancy saw approximately 350 men over the course of a single 20-day stay.

108.     The staff at the Extended Stay were aware that Nancy and numerous other guests were pimp-controlled prostitutes engaged in commercial sex on the premises, and they actively facilitated such activities.

109.     There was always someone at the front desk, and both Nancy and johns had to pass through the lobby to get to the elevator and hotel rooms.

110.     According to a contemporaneous 2021 Tripadvisor review, even guests with card keys had to be buzzed in by staff to enter the hotel.  The same would logically have been true of each of the approximately 350 johns Domino made Nancy see there.

111.     Pimps and prostitutes frequently loitered in the lobby, either waiting to collect money or waiting for johns to arrive.

112.     The Extended Stay staff allowed johns to get keys to Nancy's room when she was not present and when their names were not on the reservation.

113.     Nancy sometimes waited by the elevator or in the lobby while another girl was seeing a client in their room.

114.     On one occasion, Nancy chased a john through the lobby wearing nothing but a slip dress shouting "give me my money" after he had stolen from her.  Employees at the Extended Stay witnessed this but did not intervene.

115.    Domino regularly visited the Extended Stay, via the lobby, to collect money, deliver drugs, and make sure his girls were not talking to other pimps.

116.    Despite his frequent visits, Domino never stayed at the Extended Stay.

117.    During visits, Domino would count the number of condoms in the hotel room to make sure that enough clients were being seen.

118.    He would get angry, make threats, and even resort to physical violence if he was unsatisfied with the number of clients that Nancy and other girls saw.

119.    During one altercation at the Extended Stay, Domino punched Nancy in the face. The resulting bruise on the side of her face was clearly visible to employees at the Extended Stay, as shown in a photograph taken at the Extended Stay shortly after the altercation.

120.    On at least one occasion, Nancy had a conversation with an Extended Stay hotel employee where she asked, while dressed in unusually revealing attire, for an extra room key because she had "a date coming".

121.    Employees at the Extended Stay clearly realized that she was engaging in commercial sex acts.

122.    Because most prostitutes are victims of coercion, and because staff at the "prostitution-riddled" Extended Stay were more familiar with the sex trade than most, they knew or had constructive knowledge Nancy was being trafficked.

123.    Employees at the Extended Stay also knew that the high prevalence of pimps on their property meant that "renegades" (i.e. prostitutes working for themselves rather than under the control of a pimp) could not safely operate there due to the risk of being "knocked" (forcibly recruited) by a pimp.  They thus knew or had constructive knowledge Nancy was being trafficked.

124.    Moreover, employees at the Extended Stay knew that Nancy was a victim of coercion because they witnessed Domino's frequent visits, his oppressive conduct in public areas during those visits, and Nancy's subsequent bruises.

<u>Motel 6 Bricktown</u>

125.    The Motel 6 Bricktown is located near a Greyhound station and Econo Lodge.

126.    In early 2022, Nancy stayed at the Motel 6 Bricktown on at least six occasions and saw at least sixty johns.

127.    At least 2 front desk employees at the Motel 6 Bricktown were not only aware that Nancy was engaging in commercial sex acts in their hotel rooms, but they were also facilitating it.

128.    The front desk staff, specifically a young Black woman and a man of South Asian descent, would notify Nancy when a john arrived.

129.    Front desk staff would also notify her when people wanted sex or when a bus full of people arrived at the bus stop across the street.

130.    After being informed, Nancy and other sex workers would advertise commercial sex to bus passengers right outside of the hotel office.

131.    Nancy noticed that the room rate would change daily. On information and belief, the rate she was charged was based on the number of johns that employees thought she'd seen on a given day.

132.    In this way, the Defendant hotel was directly, and knowingly, profiting from Nancy's trafficking.

133.    A "homeboy" of Domino's often visited the Motel 6 Bricktown to take all of Nancy's money, give her drugs, and keep her "on a leash."

134.    The man of South Asian descent working the front desk even engaged in commercial sex acts with Nancy and the other women she was forced to work with.

135.    After engaging in commercial sex with them, this man would take girls to the casino in Oklahoma City.

136.    Because the employees of the Motel 6 Bricktown knew that Nancy was engaging in commercial sex acts with high frequency, they should have also deduced that she was being sex trafficked.

137.    Additionally, employees at the Motel 6 knew that Nancy was a victim of coercion because they witnessed Domino's "homeboy"'s frequent monitoring visits and recognized those visits for what they were.

### Super 8 OKC Airport

138.    Nancy stayed at the Super 8 OKC Airport for one week in August 2022.

139.    Nancy reserved the room with a prepaid card and extended it with cash multiple times.

140.    Nancy frequently escorted clients directly from the lobby to the room because they were wary of police stings and being robbed.

141.    She would meet them in the lobby in unusually revealing clothes that clearly indicated she was engaged in sex work.

142.    At this time, Nancy and another girl were forced to engage in sex acts to pay off a drug debt to Mexican traffickers.

143.    Like Domino, they assigned Nancy a daily quota of 10 clients.

144.    While paying of this debt they were assigned a handler who arranged clients for them, collected money, and gave them drugs.

145.    Some clients would enter the hotel lobby, purchase sex from Nancy, and exit through the lobby in a matter of 7 minutes.

146.    Condoms from these johns were left in the trash can of her room.

147.    Because Nancy paid with a prepaid card, wore inadequate clothing, purchased and left an excessive number of condoms at the hotel, had excessive foot traffic in/out of her room in a short period of time, and was monitored at all times by a suspicious-looking male handler, and because each of these is an indicator of potential human trafficking, the Super 8 OKC Airport's employees had both actual and constructive knowledge of Nancy's trafficking.

<u>Days Inns</u>

148.    Nancy often went to the Days Inns to see clients.

149.    Nancy communicated with the front desk employees about her sex work. She would specifically say, "I have a client coming" or "I have a trick coming" to excuse her inability to room deposit immediately, and Days Inns staff would allow her to come back and pay the deposit after seeing the client.

150.    On multiple occasions, clients even told the front desk staff that Nancy would be back out to pay soon.

151.    Hotel staff were satisfied with this arrangement.

152.    Nancy had to ask the front desk staff directly for more towels.

153.    On at least one occasion, Nancy shared a room with 3 other sex workers.

154.    They would frequently move back and forth between rooms when it was their turn to engage in commercial sex with a client.

155.    During this time, maintenance was called to the room because they had clogged the toilet with used condoms.

23

156.    The maintenance worker was upset by this, but the women were not kicked out of the hotel for this incident.

157.    On another occasion at the Days Inns, a client physically assaulted Nancy and dangled her off a balcony.

158.    The Days Inns was also notable for how badly pimps were able to treat "renegades" on the premises. A "renegade" is a sex worker who is not controlled by a pimp or a trafficker.

159.    At the Days Inns, traffickers were permitted to stand outside of renegades' hotel rooms to scare off clients and intimidate and starve the renegades into working for them.

160.    Sex trafficking is still prevalent at this location today.

161.    Because Nancy explicitly discussed her sex work with hotel employees, and because Days Inns employees witnessed firsthand (and permitted) the intimidation pimps used on their premises to prevent sex workers there from working for themselves, the Days Inns knew, and should have known, that Nancy was being trafficked.

<u>Ramada</u>

162.    During her trafficking, Nancy stayed at the Ramada for at least a week.

163.    Nancy saw at least 50 johns at the Ramada.

164.    Domino visited the Ramada on at least one occasion to collect Nancy's earnings.

165.    On one occasion, Nancy had to walk past the front desk and through the front door wearing nothing, but a negligee that was inappropriate attire for the daytime.

166.    Clients entered through the front door of the hotel to get to Nancy's room.

167.    On at least one evening when Nancy was staying at the Ramada, she ran out of condoms and bought more from the store in the lobby.

168.    The store only sold 3-packs of condoms, and Nancy saw many more men that night, so she had to return to the lobby multiple times to purchase additional condoms.

169.    There was no self-checkout, so Nancy bought condoms from the front desk staff.

170.    Because the hotel employees clearly recognized Nancy as a prostitute, because employees at the Ramada (like most people) knew most prostitutes are victims of coercion, because Ramada employees knew Nancy was seeing far more clients than an independent sex worker would, and because Ramada employees would've seen Domino doing the rounds to collect money from Nancy, they knew or should have known Nancy was being trafficked.

<u>Howard Johnson</u>

171.    Nancy stayed at the Howard Johnson on two occasions: once for 3 days and once for a single evening.

172.    Nancy saw approximately 20 johns over the course of these stays.

173.    Once, Domino assaulted Nancy at the hotel when he came to collect money.

174.    Domino was mad because Nancy was below her quota and her prepaid card ran out.

175.    She walked through the hotel with bruises on her arms that the hotel staff she interacted with would have seen. She has pictures of these bruises at the hotel.

176.    Domino then took her money and abandoned her at the hotel without a ride.

177.    Nancy—with visible bruises—asked the front desk if she could wait until her next client came to pay her outstanding deposit.

178.    The front desk staff understood that she meant a sex work client. They refused her offer and asked her to leave.

179.    Instead of calling social services or law enforcement due to the bruises or the nature of her work, hotel staff kicked her out onto the street.

180.    Eventually, Nancy had to leave her suitcase and "turn a trick" off the street to get money for a ride.

181.    Nancy showed clear signs of physical abuse and was easily identifiable as a prostitute, so Howard Johnson employees had actual and constructive knowledge that Nancy was a victim of sex trafficking.

<u>Super 8 Prospect Ave.</u>

182.    Nancy spent a total of 2 weeks at the Super 8 Prospect Ave.

183.    The Super 8 Prospect Ave was full of drug addicts, and the staff were accustomed to criminal activity by guests and were happy to rent rooms to nearly anyone.

184.    The hotel was so rundown that Nancy awoke one morning to mushrooms growing out of the floor under the vent.

185.    Nancy shared a room with other sex workers.

186.    Nancy engaged in commercial sex with multiple men a night, leaving behind an abundance of used condoms and towels.

187.    Rather than viewing the unusually high number of towels that Nancy requested as a potential sign of sex trafficking, the employees at the Super 8 Prospect Ave saw an opportunity for financial gain. If she used too many towels on one visit, they would raise Nancy's deposit by up to $25 the next time she checked in.  In this way, the Super 8 Prospect Ave directly profited from Nancy's trafficking.

188.    Because Nancy exhibited clear signs of providing "in-call" escort services under the control of a pimp and because the Super 8 Prospect Ave's employees knew (as most people know) that most prostitutes are victims of coercion, the Super 8 Prospect Ave had both actual and constructive knowledge that Nancy was a victim of sex trafficking.

<u>Guest Reviews of the Defendant Hotels</u>

189.    We now turn to the story told by public-facing guest reviews of Defendants' properties found on Tripadvisor and Yelp.

26

190.    Relevant reviews of the Extended Stay include:

      a.    One guest awarded 1 out of 5 stars, describing the Extended Stay as the "Worst I've Ever Seen" due to the "Pimps and prostitutes everywhere."

      b.    Another guest awarded 2 out of 5 stars, citing "a condom left beneath one bed."

      c.    Another guest awarded 1 out of 5 stars, claiming there were "strange men hanging around the back door. Creepy!"

      d.    Another guest awarded 2 out of 5 stars on account of the "shady people hanging around the area all the time"

      e.    Another guest awarded 1 out 5 stars, saying, "I found a used condom sticking to the bathroom wall."

      f.    Another guest awarded 2 out of 5 stars, claiming, "Let's just say the pillars of the community don't stay here."

191.    All the Extended Stay reviews quoted above were left before or during Nancy's trafficking.

192.    Relevant reviews of the Motel 6 Bricktown include:

      a.    One guest awarded 1 out of 5 stars, stating, "this place looked like a hookers paradise."

      b.    Another guest awarded 2 out of 5 stars, saying, "if u like to hang out with drug dealers, prostitutes, Your in the right place here at motel 6...This place is the women that like to be prostitutes." The guest then tells a story of one late night when the police had to "break a fight up, between a pimp and his prostitutes."

      c.    Another guest awarded 2 out of 5 stars, stating, "There are vagrants and homeless everywhere...there are, what appears to me, are hookers working out of this motel." A Motel 6 affiliated account even responded to this comment, thanking the reviewer for the feedback and asking for a chance to "improve" in the future.

      d.    Another guest awarded 1 out of 5 stars, claiming, "this is a crack hoe motel. Be warned... Noisey AF due to the line of toothless hookers whacked out."

e.   Another guest awarded 1 out of 5 stars in a review titled "DISGUSTING AND DISGUSTED," where she mentions seeing a chair in her room that had "fresh stains from sexual acts being performed there."

193.   All the Motel 6 Bricktown reviews quoted above were left before or during Nancy's trafficking.

194.   Relevant reviews of the Super 8 OKC Airport include:

a.   One guest awarded 1 out of 5 stars, complaining that "Homeless people, prostitutes, and drug dealers were sitting in front of my room the whole night!" They also noticed that "a new car showed up every few minutes to buy drugs or leave with a prostitute." The General Manager at Super 8 responded to the review and apologized for the negative experience.

b.   Another guest awarded 2 out of 5 stars, mentioning the "hookers loitering around".

c.   Another guest awarded 2 out of 5 stars, saying they "also saw hookers hanging around the area!"

d.   Another guest awarded 1 out of 5 stars, stating "Location awful, prostitute's outside, shady guests."

e.   Another guest awarded 4 out of 5 stars, mentioning "The following morning I woke up to a bra hanging from my door handle. Don't know if the whole motel was unsafe or if I was put in a room where prostitutes normally stay."

195.   All the Super 8 OKC Airport reviews quoted above were left before or during Nancy's trafficking.

196.   A relevant review of the Days Inns awarded 2 out of 5 stars, stating "as we were trying to find a place to park a prostitute came out of a room and walked over to a car parked in a handicapped parking space and left."

197.   The Days Inns review quoted above was left before Nancy's trafficking.

198.   Relevant reviews of the Howard Johnson include:

    a.     One guest awarded 1 out of 5 stars, saying, "Don't stay there... there were prostitutes around the building." Tommy N., the General Manager of this Howard Johnson hotel, responded to the comment and apologized.

    b.     Another guest awarded 1 out of 5 stars, citing, "some very fishy transactions going on in the parking lot, appeared to be drugs or sex."

199.    Each of the Howard Johnson reviews quoted above was left before or during Nancy's trafficking.

200.    Relevant reviews of the Super 8 Prospect Ave include:

    a.     One guest awarded 1 out of 5 stars, stating there were "even saw a few hookers roaming the halls."

    b.     Another guest awarded 3 out of 5 stars, claiming, "The prostitutes behind the building was a bit much."

201.    The Super 8 Prospect Ave reviews quoted above were left before or during Nancy's trafficking.

202.    It is the standard procedure for hotels to check their reviews on third-party websites. Some Franchisor Defendants even exercise the right to charge Franchisee Defendants a fee for not addressing negative reviews on these sites. On information and belief, Defendants are aware of reviews referencing commercial sex on their properties.

203.    Because many sex workers are coerced to engage in commercial sex acts, and because Defendants were aware of the high prevalence of commercial sex acts occurring in their hotels, Defendants were aware that trafficking must be occurring on their properties.

<u>The Hotel Franchisor Defendants' Control over and Knowledge of their Franchisees' Conduct</u>

204.    It is a standard practice in the hospitality industry—followed by Defendants ESH, Super 8, Days Inns, Ramada, Howard Johnson, and Motel 6—for major hotel brands to set exacting brand quality standards reaching everything from the temperature of all coffee served, to the number of pillows on each bed, to where and how to greet guests.

205.    Each Franchisor Defendant provides its franchisees with signage on and in front of the building that is intended to reassure customers that, if they check into the hotel, they can expect an experience consistent with the standards of the franchisor's brand.  The same branding is emblazoned on everything in the hotel, from the pens on the bedside table to the staff's uniforms.

206.    It is standard practice in the hospitality industry for hotel franchisors to require franchisees to obtain prior approval from their franchisors before hiring managers.  Franchisors are generally free to withhold their approval for any reason, and they have the authority to require franchisees to hire hotel management companies preapproved by them. On reference, ESH, Super 8, Days Inns, Ramada, Howard Johnson, and Motel 6 each incorporated this standard practice into their operative franchise agreements with the Franchisee Defendants covering the relevant period.

207.    It is standard practice in the hospitality industry for hotel franchisors to require their franchisees to use their proprietary computerized business systems, which usually:

    a.     Share the franchisee's reservation data with the franchisor;

    b.     Give the franchisee access to the franchisor's central reservation service;

    c.     House the franchisee's property information and streamline its property management tasks;

    d.     House and handle the franchisee's revenue and expenditure management, including payment processing;

e.   House and handle the franchise's rate and inventory management;

f.   House the franchisee's employee training records and connect the franchisee to franchisor-created and/or franchisor-approved training modules for its employees on a franchisor-determined schedule; and

g.   Otherwise house nearly all data and decision-making related to the day-to-day operation of franchisee hotels.

208.   Each relevant franchise agreement between ESH, Super 8, Days Inns, Ramada, Howard Johnson, or Motel 6 and a franchisee Defendant required the franchisee to use the franchisor's proprietary computerized business system.

209.   It is standard practice within the hospitality industry for hotel franchisors to require their franchisees to give them complete and unfettered remote access to all information stored in their proprietary computerized business systems. Thus, on information and belief, anytime a Franchisee Defendant's employee input an electronic note or took any action that affected the hotel's inventory, reservations, revenue, or personnel, the relevant franchisor knew about it.

210.   It is standard practice within the hospitality industry for hotel franchisors to require their franchisees to use specific revenue optimization software to guide them in pricing their rooms and setting compensation for their employees. On information and belief, ESH, Super 8, Days Inns, Ramada, Howard Johnson, and Motel 6 each incorporated this standard practice into their operative franchise agreements with the Franchisee Defendants covering the relevant period.

211.   It is standard practice within the hospitality industry for hotel franchisors to require their franchisees to use the franchisor's preferred vendor to set up and maintain Wi-Fi for hotel guests. Thus, the franchisor typically controls whether guests may access certain sites, and the franchisor—rather than the franchisee—has access to guests' browsing histories. On

information and belief, ESH, Super 8, Days Inns, Ramada, Howard Johnson, and Motel 6 each incorporated this standard practice into their operative franchise agreements with the Franchisee Defendants covering the relevant period.

212.    It is standard practice within the hospitality industry to require franchisees to purchase training for their employees from the franchisor. Such training is often required for all new employees. For management and other senior employees, franchisor-mandated trainings generally cover all aspects of running a hotel that lives up to the franchisor's brand standards. On reference, ESH, Super 8, Days Inns, Ramada, Howard Johnson, and Motel 6 each incorporated this standard practice into their operative franchise agreements with the Franchisee Defendants covering the relevant period.

213.    By mandating particular trainings for particular job titles, franchisors effectively mandate that franchisees employ a standardized set of job titles and job responsibilities for their employees. On information and belief, ESH, Super 8, Days Inns, Ramada, Howard Johnson, and Motel 6 each incorporated this standard practice into their operative franchise agreements with the Franchisee Defendants covering the relevant period.

214.    Generally, all employees who take part in the franchisor-mandated trainings must complete them to the franchisor's satisfaction. Because franchisors generally require all franchisee employees to complete at least one training within weeks after being hired, franchisors generally have an absolute veto over all franchisee employee hires. On information and belief, ESH, Super 8, Days Inns, Ramada, Howard Johnson, and Motel 6 each incorporated this general practice into their operative franchise agreements with the Franchisee Defendants covering the relevant period.

215.    On information and belief, ESH, Super 8, Days Inns, Ramada, Howard Johnson, and Motel 6 each provided their franchisees, including the Franchisee Defendants, with sample

32

employment agreements and lists of job responsibilities, giving them effective control over most aspects of their franchisees' employees' employment.

216.    What is more, several franchisors mandate anti-human trafficking training for *all* franchisee employees. On reference, during Nancy's trafficking, Defendants Motel 6, Howard Johnson, Ramada, and Days Inns all included anti-human trafficking programs as required training for all franchisee employees. On information and belief, these training programs listed behaviors exhibited by Plaintiff as red flags indicating a likelihood of human trafficking.

217.    During the relevant period, ESH, Super 8, Days Inns, Ramada, Howard Johnson, and Motel 6 retained the absolute right to inspect franchisee hotels at any time, and they each had the ability to levy fines or fees for failure to meet brand standards—which standards they had the power to modify.

218.    During the relevant period, ESH, Super 8, Days Inns, Ramada, Howard Johnson, and Motel 6 prevented their franchisees from maintaining their own websites, and they each required that all online bookings be handled through the franchisor's own central booking system.

219.    It is a standard practice in the hospitality industry for franchisors to expressly retain the right to detect criminal activity using the data supplied by its control over franchisees' computer systems, as well as the right to turn over any evidence of criminal activity to law enforcement.  On information and belief, ESH, Super 8, Days Inns, Ramada, Howard Johnson, and Motel 6 each incorporated this general practice into their operative franchise agreements with the Franchisee Defendants covering the relevant period.

220.    It is a standard practice in the hospitality industry for franchisors to monitor all guest reviews and complaints on online platforms, and for franchisors to charge franchisees a fee if they fail to respond promptly to a negative review on third-party travel websites.  On

reference, Days Inn, Super 8, and Howard Johnson each incorporated this general practice, called a "Customer Care Fee" into their operative franchise agreements with the Franchisee Defendants covering the relevant period.

221.    Each of the Franchisor Defendants knew, throughout the relevant period, that their franchise locations played host to at least thousands and likely many tens of thousands of instances of sex trafficking each year.

## COUNT I: 18 U.S.C. § 1595 ("TVPRA")

222.    Plaintiff incorporates each foregoing and subsequent allegation.

223.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

224.    Through their acts and omissions described above, Plaza, Ketter, Wiley, the Franchisee Defendants, and the Franchisor Defendants each trafficked Plaintiff within the meaning of 18 U.S.C. § 1591(a)(1), and they are thus directly liable under 18 U.S.C. § 1595.

225.    Through their acts and omissions described above, Plaza, Ketter, Wiley, the Franchisee Defendants, and the Franchisor Defendants each trafficked Plaintiff within the meaning of 18 U.S.C. § 1591(a)(2), and they are thus directly liable under 18 U.S.C. § 1595.

226.    Through their acts and omissions described above, Plaza, Ketter, Wiley, the Franchisee Defendants and the Franchisor Defendants each benefit[ted] financially from Plaintiff's sex trafficking due to their participation in a venture that they knew or should have known earned money from sex trafficking, and they are thus liable as beneficiaries under 18 U.S.C. § 1595.

227.    Plaintiff has suffered substantial permanent physical and psychological injuries as the result of being trafficked and sexually exploited, and she is therefore entitled to bring an action against each Defendant for damages under 18 U.S.C. § 1595.

### COUNT II: 21 OK STAT § 21-748.2(B) ("OKLAHOMA SEX TRAFFICKING")

228.    Plaintiff incorporates each foregoing and subsequent allegation.

229.    Plaintiff is a "person aggrieved by" trafficking under 21 OK Stat § 21-748(B).

230.    Defendants committed acts of human trafficking under 21 OK Stat § 21-748(B) by variously recruiting, enticing, providing, obtaining, and in all cases harboring Plaintiff for purposes of engaging Plaintiff in a commercial sex act.

231.    Defendants further committed acts of human trafficking under 21 OK Stat § 21-748(B) by benefitting (in the form of room rentals, fees for towels, condom purchases etc...) from participating in ventures that engaged in acts of trafficking for commercial sex.

232.    Plaintiff is therefore entitled to bring an action for damages as a result of her trafficking against Defendants under 21 OK Stat § 21-748.2(B).

### COUNT III: NEGLIGENCE OR PREMISES LIABILITY

233.    Plaintiff incorporates herein each foregoing and subsequent allegation.

234.    Plaintiff was a business invitee of Defendants Plaza, Ketter, Wiley, the Franchisee Defendants, and the Franchisor Defendants at all relevant times, and each Defendant therefore owed Plaintiff a duty of reasonable care under the circumstances.

235.    As described above the Franchisee Defendants and the Franchisor Defendants negligently caused, or allowed to arise, unsafe conditions including, *inter alia*, by allowing sex trafficking to be carried on in their establishments and, specifically, by allowing Plaintiff to be sex trafficked in their establishments.

236.     Plaza, Ketter, Wiley, the Franchisee Defendants, and the Franchisor Defendants failed to exercise reasonable care, and their failures caused Plaintiff to be sex trafficked more than she would otherwise have been trafficked, resulting in lifelong physical and psychological injuries.

### COUNT IV : INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

237.     Plaintiff incorporates each foregoing and subsequent allegation.

238.     Defendants' intentional acts and omissions, as described above, were extreme and outrageous to the point of being intolerable in a civilized society.

239.     Plaintiff suffered severe emotional distress and permanent psychological injuries as a result of Defendants' intentional acts and omissions, and she is therefore entitled to damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.   Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; and all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.   Disgorgement of profits and/or restitution;

c.   Punitive damages, attorneys' fees, and expenses;

d.   The costs of this action;

e.   Pre- and post-judgment interest; and

f.   Any other relief the Court or jury deems appropriate.

DATED this _____ day of March, 2025.

THE HANDLEY LAW CENTER
111 S. Rock Island Ave.
Post Office Box 310
El Reno, OK 73036
Telephone: (405) 295-1924
Facsimile: (405) 262-3531
fdh@handleylaw.com

By: _____
    Fletcher D. Handley, Jr., OBA #3797

GEOFFREY C. PARKER, ESQ.
(*Pro Hac Vice* forthcoming)
Hilton Parker LLC
7658 Slate Ridge Blvd.
Reynoldsburg, OH 43068
Tel: (614) 992-2277
Fax: (614) 927-5980
Email: gparker@hiltonparker.com

MICHAEL C. KANE, ESQ.
(*Pro Hac Vice* forthcoming)
THE702FIRM INJURY ATTORNEYS
400 South 7th Street, Suite 400
Las Vegas, Nevada 89101
Tel: (702) 776-3333
Fax: (702) 505-9787
Email: service@the702firm.com

*Attorneys for Plaintiff Nancy R.*

**ATTORNEYS' LIEN CLAIMED**
**JURY TRIAL DEMANDED**

37