## STATES DISTRICT COURT
## DISTRICT OF OKLAHOMA

| | |
|---|---|
| NANCY R., pseudonymously, | Case No.: 5:25-cv-462 |
| Plaintiff, | |
| vs. | Judge Charles B. Goodwin |
| PLAZA HOTELS, LLC et al., | **PLAINTIFF'S RESPONSE TO THE MOTION TO DISMISS FILED BY ESH STRATEGIES FRANCHISE** |
| Defendants. | |

COMES NOW Plaintiff Nancy R. ("Plaintiff" or "Nancy" herein), by and through her undersigned attorneys, and submits this Response to the Motion to Dismiss filed by Defendant ESH Strategies Franchise, LLC ("ESH"). (Doc. No. 141.)

DATED this 5th day of December, 2025

/s/ Geoffrey C. Parker
GEOFFREY C. PARKER, ESQ.
Ohio Bar No. 0096049
JONATHAN L. HILTON, ESQ.
Ohio Bar No. 0095742
HILTON PARKER LLC
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068

MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
THE702FIRM INJURY
ATTORNEYS
400 South 7th Street, Suite 400
Las Vegas, Nevada 89101

*Attorneys for Nancy R.*

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................. II

II. STATEMENT OF FACTS ..................................................................... 1

   A.  Nancy Was Trafficked by an Abusive Gang Member ................................ 1

   B.  Defendant Knew Hotels Are Prone to Sex Trafficking. ........................... 1

   C.  ESH Witnessed Nancy's Client Volume, Condom Use, and
       Trafficker/John Interactions. ................................................... 3

   D.  ESH Was Equipped to Detect and Track Red Flags of Trafficking. ....... 6

   E.  ESH Controlled Multiple Facets of OKC ES's Operations Through
       its Franchise Disclosure Agreement. ........................................... 7

III. THE COMPLAINT IS NOT A "SHOTGUN" PLEADING ................................... 9

IV. OKC ES IS LIABLE AS A PERPETRATOR. ........................................... 12

   A.  OKC ES Knowingly Harbored Nancy. ............................................. 12

   B.  OKC ES Acted "In Reckless Disregard" of Coercion. ......................... 14

       1.  Perpetrator liability requires "reckless disregard" – not actual
           knowledge. ...................................................................... 14

       2.  OKC ES "recklessly disregarded" Nancy's coercion. ..................... 15

V.  OKC ES IS LIABLE AS A BENEFICIARY. ........................................... 16

   A.  OKC ES Knowingly Benefitted from Participating in a Commercial
       Sex Venture ...................................................................... 16

   B.  OKC ES Knew or Should Have Known that Nancy Was Being
       Coerced by a Trafficker. ......................................................... 18

VI. ESH IS LIABLE IN AGENCY OR AS A JOINT EMPLOYER OF OKC ES'S
    STAFF ............................................................................... 19

VII. NANCY ALSO STATES A DIRECT BENEFICIARY LIABILITY CLAIM
     AGAINST ESH. ..................................................................... 22

   A.  ESH Knowingly Benefitted from Room Rentals for Nancy's
       Trafficking. ...................................................................... 23

   B.  ESH Participated in a Venture .................................................. 23

   C.  ESH Knew or Should Have Known of Nancy's Trafficking .................... 23

VIII. ESH'S STATE LAW ARGUMENTS LACK MERIT ................................... 25

IX. CONCLUSION ..................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Broock v. Nutri/System, Inc.*,
    654 F. Supp. 7 (S.D. Ohio 1986) ........................................................................20

*C.C. v. Rashid*,
    2024 2:23-cv-2056-GMN-BNW; 2024 U.S. Dist. LEXIS 231723 (2024) ......18, 23

*Decker v. Domino's Pizza*,
    644 N.E.2d 515 (Ill. App. Ct. 1994)....................................................................20

*Doe v. Radisson Hosp., Inc., A-23-CV-1456-DII*,
    2025 U.S. Dist. LEXIS 19682 (W.D. Tex. Jan. 21, 2025)........................19, 21, 23

*Doe v. Shera Ton, LLC*,
    No. 23CV00451, *KG/JMR*, 2024 U.S. Dist. LEXIS 58311 (D.N.M. Mar.
    28, 2024) ............................................................................................................21

*Doe v. Wyndham Hotels & Resorts*,
    No. 2:23-cv-01676-DAD-CSK, 2025 U.S. Dist. LEXIS 2988, at *54
    (E.D. Cal. Jan. 6, 2025)......................................................................................13

*E.S. v. Best W. Int'l, Inc.*,
    510 F. Supp. 3d 420 (N.D. Tex. 2021)................................................................17

*F.C. v. Jacob Sols. Inc.*,
    790 F. Supp. 3d 1158 (D. Colo. 2025)................................................................18

*G.M. v. Choice Hotels Int'l, Inc.*,
    No. 2:22-cv-3788, 2024 U.S. Dist. LEXIS 52523 (S.D. Ohio Mar. 25,
    2024) ..................................................................................................................19

*Greenway Nutrients v. Blackburn*,
    33 F. Supp. 3d 1224 (D. Colo. 2014)..................................................................12

*J.M. v. Choice Hotels Int'l, Inc.*,
    2022 No. 2:22-cv-672; 2022 U.S. Dist. LEXIS 190054 (2022)........................9, 10

*Khan v. Shell Oil Co.*,
    71 S.W.3d 890 (Tex. App. Ct. 2002) ..................................................................20

*M.A. v. Wyndham Hotels & Resorts, Inc.*,
    2:19-cv-849, 2025 U.S. Dist. LEXIS 185758 (S.D. Ohio Sep. 22, 2025)..............16

*Magluta v. Samples*,
    256 F.3d 1282 (11th Cir. 2001).............................................................................11

*P.C. v. D Fort Hotel LLC*,
    2025 No. 24-cv-01584-PAB-TPO; 2025 U.S. Dist. LEXIS 20835 (2025)............19

*Parity Networks, LLC v. Moxa Inc.*,
    No. SACV 20-698 ...................................................................................................9

*Ratha v. Phatthana Seafood Co.*,
    35 F.4th 1159 (9th Cir. 2022) ...............................................................................23

*Ray v. L.A. Cnty. Dep't of Pub. Soc. Servs.*,
    52 F.4th 843 (9th Cir. 2022) .................................................................................22

*S.C. v. Hilton Franchise Holding, LLC*,
    2024 U.S. Dist. LEXIS 205682 (D. Nev. Nov. 12, 2024)......................................13

*T.P. v. Wyndham Hotels & Resorts, Inc.*,
    2:21-cv-4933, 2022 U.S. Dist. LEXIS 217315 (S.D. Ohio Dec. 1, 2022) .............21

*United States ex rel. Schutte v. SuperValu Inc.*,
    598 U.S. 739 (2023)..............................................................................................15

*United States v. Duong*,
    848 F.3d 928 (10th Cir. 2017)..............................................................................14

*United States v. Rodriguez*,
    880 F.3d 1151 (9th Cir. 2018)..............................................................................15

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
    792 F.3d 1313 (11th Cir. 2015).......................................................................11, 12

*Whitten v. Ky. Fried Chicken Corp.*,
    570 N.E.2d 1353 (Ind. Ct. App. 1991)..................................................................20

*Wunder v. Mobil Oil Corp.*,
    No. X04CV000120525S, 2002 WL 31500966 (Conn. Super. Ct. Oct.
    24, 2002) ...............................................................................................................20

## **STATUTES**

18 U.S.C.
    § 1591(a)(1) ...................................................................................... 12
    § 1595(a) ........................................................................................... 12
    § 1595(b)(1) ........................................................................................ 9

Oklahoma
    O.S. 21(A)(4) ...................................................................................... 25

## **FEDERAL RULES**

Fed. R. Civ. P.
    Rule 8 ........................................................................................... 12, 13
    Rule 9(b) ............................................................................................ 13

## **OTHER AUTHORITIES**

BLACK'S LAW DICTIONARY 860 (11th Ed. 2019)...................................... 13

## I.    INTRODUCTION

Plaintiff Nancy R. ("Nancy") was trafficked out of Extended Stay America Oklahoma City Airport (the "Extended Stay")—a franchised hotel operated by OKC ES, LLC and overseen by Defendant ESH—for twenty days straight, during which she was forced to have sex with around 350 johns.

Every time Nancy came downstairs to lead a new john up to her room, she had to walk through the lobby, where the Extended Stay's staff saw her freshly bruised face. Staff saw her trafficker's frequent visits to collect money from Nancy and his other victims. The staff knew she was being trafficked.

Defendant ESH is liable for the conduct of the Extended Stay's staff for three reasons: (1) Because their employer was ESH's agent; (2) Because ESH was their joint employer; and (3) Because ESH was independently negligent and knew or should have known of Nancy's trafficking.

## II.    STATEMENT OF FACTS

### A.    <u>Nancy Was Trafficked by an Abusive Gang Member.</u>

The Court is familiar by now with Nancy's history, and the abuse and control of her trafficker, Domino. *See* (FAC Doc. 115 ¶¶ 71–86).

### B.    <u>Defendant Knew Hotels Are Prone to Sex Trafficking.</u>

Hotels provide temporary, anonymous, and private lodgings near airports, highways, and event spaces. (*Id*. at ¶ 51.) These characteristics often attract traffickers to hotels. (*Id*. at ¶ 52.) A 2018 Polaris Project report found

75% of sex trafficking victims surveyed had spent time in a hotel during their trafficking, and 60% had engaged in commercial sex inside one. (*Id*. at ¶ 53.) Since 2015, hundreds of civil sex trafficking lawsuits have been filed against hotel franchisees and franchisors, including the Extended Stay (*Id*. at ¶ 59.)

Because hotels encounter the majority of sex trafficking victims, in 2019 the Polaris Project published a list of indicators to help hospitality employees identify instances of in-call escort services involving trafficking victims on hotel properties. (*Id*. ¶¶ 55-56.) These indicators include:

- Paying for stays in cash or with prepaid credit cards;
- Booking for a single night and extending day by day;
- Excessive condoms in hotel wastebins;
- Excessive foot traffic;
- Inappropriate attire;
- Frequent requests for new towels; and
- One person checking in with multiple people in tow. (*Id*.)

Following the volume of lawsuits against hotels for human trafficking allegations, ESH implemented an anti-trafficking training program for its franchised hotels. (*Id*. at ¶ 60.) This training program was the product of a partnership between the Americal Hotel and Lodging Association (AHLA) and the Polaris Project. (*Id*. at ¶ 61.) The training highlighted the following behaviors as red flags of human trafficking:

- Paying in cash or with a prepaid card one day at a time;
- Wearing heavy makeup, lingerie, and little clothing;

- Carrying little luggage;
- Displaying signs of drug use or sleep deprivation;
- Discarding condoms;
- Use of Backpage.com; and
- Heavy foot traffic to a room by different men.

(*Id*. at ¶¶ 62-64.)

### C. ESH Witnessed Nancy's Client Volume, Condom Use, and Trafficker/John Interactions.

ESH was the franchisor that set—and monitored compliance with—the brand standards for the Extended Stay America Oklahoma City Airport ("the Extended Stay" or "OKC ES") located at 4820 W Reno Avenue, Oklahoma City, OK 73127 during the span of Nancy's trafficking. (*Id*. at ¶ 6.) Nancy stayed at ESH's Extended Stay for roughly 20 days between 2021 and 2022 and saw roughly 350 men during her stay. (*Id*. at ¶ 107.)

Nancy rented rooms with a fake ID—often a flimsy paper "temporary" one—or sometimes didn't show her ID at all, even though she was booking under her own name. (*Id*. at ¶ 91(b)-(c).) She extended her stay day by day, paying in cash. (*Id*. at ¶ 91(d).) She also asked for unusual numbers of towels and linen changes and discarded unusual numbers of used condoms in the wastebin. (*Id*. at ¶¶ 91(f)-(g).)

Nancy showed up to check-in sporting high heels and skimpy clothing. (*Id*. at ¶ 91(a).) She frequently loitered in the lobby and near the elevators wearing minimal clothing. (*Id*. ¶ 91(a), 115.) On one occasion, ESH staff

members witnessed Nancy run across the lobby—wearing only a slip dress—as she chased down a client, yelling at him to return the money he stole from her. (*Id.* ¶ 116.) The Extended Stay staff did nothing to intervene. (*Id.*)

The Extended Stay staff saw hundreds of interactions between Nancy and johns. Each point of entry to the Extended Stay required Nancy and her clients to walk past the front desk to Nancy's room upstairs. (*Id.* at ¶ 109, 111-12.) ESH staff watched as Nancy escorted roughly 350 men to her room during a single 20-day stay, averaging more than 15 clients per day. (*Id.* at ¶ 107.) Heavy foot traffic in and out of rooms was listed as a known red flag in the Extended Stay's anti-trafficking training. (*Id.* at ¶¶ 62-64.)

On some occasions, staff had to interact directly with johns coming to meet with Nancy. For Nancy to meet with clients past dark, the Extended Stay staff had to buzz her and her client into the hotel because all entrances were locked at night. (*Id.* at ¶ 112.) Extended Stay staff also provided johns with keys to Nancy's room on multiple occasions, knowing that she was not present and that their names were not on the reservation. (*Id.* at ¶ 114.) On one occasion, Nancy came to the front desk dressed for sex and explicitly told an Extended Stay staff member that she had a "date coming" and requested an extra key for the client. (*Id.* at ¶ 122.)

Aside from witnessing interactions between Nancy and her clients, ESH staff also observed interactions between Nancy and her trafficker Domino. (*Id.*

at 129.) When Domino visited the Extended Stay, he counted the number of condoms in Nancy's room to ensure she was meeting her daily quota of clients. (*Id.* at ¶¶ 86, 119.) The condoms visible to Domino also would have been visible to housekeeping staff, and the use of such large numbers of condoms is an industry-recognized red flag for trafficking. (*Id.* at ¶ 89(e).) If Domino found Nancy had not met her quota, he used threats and physical violence. (*Id.* at ¶ 120.) On one occasion, Domino punched Nancy in the face, leaving Nancy with a black eye that was visible to staff—and that is shown on a contemporaneous photograph from inside the Extended Stay. (*Id.* at ¶ 121.)

Although Domino never stayed at the Extended Stay, its staff had plenty of opportunities to observe him. (*Id.* at ¶ 118.) During his visits, Domino collected money from Nancy and the other women he was trafficking. (*Id.* at ¶ 117.) He never let his women hold onto money, so his visits to collect their earnings were a regular occurrence, and he always came in through the lobby in full view of staff. (*Id.* at ¶¶ 76, 117.)

Staff were unbothered by his presence—housekeeping even bought drugs from him. (*Id.* at 124.) Indeed, staff were aware that numerous pimps were operating out of its Extended Stay. For example, in March and April of 2022, a group of pimps patrolled the halls of the Extended Stay with AK-47-style rifles to guard their prostitutes, scare off other pimps, and scare freelancers or "renegades"—sex workers not under the control of a pimp—into

leaving or "choosing up" and starting to work for a pimp. (*Id*. at ¶ 125.) This behavior was caught on the Extended Stay's security cameras. (*Id*. at ¶ 126.) Housekeeping bought drugs from these other pimps, too.  (*Id*. at ¶ 124.)

Studies bear out that 80-90% of prostitutes are controlled by pimps, and a majority of pimps use threats and physical violence to maintain control. (*Id*. ¶¶ 27-28.) ESH knew that most prostitutes with pimps are victims of coercion. (*Id*. at ¶ 41, 129.) The way Nancy, Domino, and Domino's other girls operated piled up clue after clue that Nancy was one of the coerced ones.

### D.   ESH Was Equipped to Detect and Track Red Flags of Trafficking.

First, ESH knew sex trafficking was a prevalent issue in the hospitality industry prior to Nancy's trafficking at the Extended Stay. (*Id*. at ¶ 53-54. 58-59.) Second, its staff were trained to recognize and report the very red flags Nancy exhibited. (*Id*. at ¶¶ 60-64, 1309h(iii)).) Third, ESH's franchise agreement with Extended Stay shows it could spot red flags through centralized systems used by Extended Stay which gave ESH right to access all of its franchisee's data. (*Id*. at ¶¶130(c)-(f).)

ESH held the right to review all the Extended Stay's databases, including their property management system which contained guest information, like "stay remarks". (*Id*. at ¶ 130(f).) The Extended Stay was also required to report data on in-cash reservations (*Id*. at ¶ 130(f)(iii)).) This data

was available to ESH which saw the location's unusually high number of cash reservations. (*Id*.) The franchise disclosure document also required the Extended Stay to track and report on what it spent on laundry and maintenance services to ESH. (*Id*.) Nancy frequently requested new linens and towels during her trafficking, and it is likely the many other prostitutes using the hotel did the same, creating a clear signal visible to ESH. (*Id*. at ¶ 91(f).)

Additionally, ESH read third party reviews of the Extended Stay as part of its Quality Assurance Program. ESH read multiple reviews left before or during Nancy's trafficking that mention sightings of pimps, prostitutes, condoms, and "strange men" "everywhere" at the Extended Stay. (*Id*. at ¶ 214-15.) Finally, on at least on occasion, the Extended Stay's staff entered a "stay remark" on Nancy's profile that informed of ESH of the staff's suspicion Nancy was being pimped—trafficked—by Domino. (*Id*. at ¶ 130(f)(ii).)

## E. **ESH Controlled Multiple Facets of OKC ES's Operations Through its Franchise Disclosure Agreement.**

The ESH franchise disclosure agreement with Extended Stay outlined various other regulations. ***First***, OKC ES had to use ESH-approved suppliers for various aspects of the hotel's operations. OKC ES had to purchase signage, linens, interior design elements, and electronic equipment from an ESH-approved supplier. (*Id*. at ¶ 130(a).) It had to either use an ESH-approved third

party management company or have its proposed general manager complete ESH's extensive training program. (*Id*. at ¶ 130(b).)

ESH also retained the right to disapprove or withdraw approval of any manager or management company and require their replacement at any time. (*Id*.) ESH also had a designated Reservation Service which OKC ES had to use for arranging and selling room reservations electronically. (*Id*. at ¶ 130(c).) Finally, OKC ES had to use HotelKey—which directly interfaces with ESH's own computer system—as their property management system, as well as an approved supplier for credit card payment processing. (*Id*. at ¶¶ 130(d), 145(d).)

**Second**, ESH reserved the right to access all of OKC ES's databases. ESH's Quality Assurance Program permitted it to inspect the Extended Stay and its operations, books, records, accounts, and systems without notice to OKC ES. (*Id*. at ¶ 130(e).) As part of the Quality Assurance Program, OCK ES had to pay a "re-inspection fee" if it did not pass ESH's inspections. (*Id*. at ¶ 130(e(i)).) ESH also reviewed and scored unsolicited feedback from OKC ES guests, such as reviews left on third-party websites. (*Id*. at ¶ 130(e(ii)).)

ESH could also access, monitor, and review all of OKC ES's databases through its property management system. (*Id*. at ¶ 130(f).) Within the property management system, ESH could access data on reservations, room charges, records accounts, housekeeping reports, drivers' licenses, and "stay remarks" related to pimping and other crimes at the location (*Id*.) Not only could ESH

access all of OCK ES's data, but they were also the legal owners of all of the location's data and guest data. (*Id.* at ¶ 130(g).) This included operating revenue and reservation data, guests' personally identifiable information, consumer preferences, stay and aggregated information, and more. (*Id.*)

> **Third**, OKC ES had to comply with other ESH brand standards, like:

- Completing sex trafficking awareness training;
- Reporting evidence of criminal activity (including sex trafficking);
- Using ESH's defined pay rates, job titles, and terms of employment; and
- Using an ESH-approved vendor for guest Wi-Fi services. (*Id.* ¶ 130(h).)

## III.    THE COMPLAINT IS NOT A "SHOTGUN" PLEADING.

As explained in other briefs already, this case is not subject to an automatic stay under 18 U.S.C. § 1595(b)(1). ESH's other procedural objection is that Nancy's complaint is supposedly an impermissible shotgun pleading.

As a rule, group pleading for "similarly situated" defendants is permissible under Rule 8. *Parity Networks, LLC v. Moxa Inc.*, No. SACV 20-698 JVS(KESx), 2020 U.S. Dist. LEXIS 192718, at *6 (C.D. Cal. Sep. 11, 2020). A complaint is not a shotgun pleading simply because it contains general allegations regarding defendants who share an industry. *J.M. v. Choice Hotels Int'l, Inc.*, No. 2:22-cv-00672-KJM-JDP, 2022 U.S. Dist. LEXIS 190054, at *18 (E.D. Cal. Oct. 17, 2022). The question is whether the complaint "gives defendants sufficient information to understand the legal claims against each

of them and the allegations supporting those claims." *Id.* Here, ESH has no difficulty understanding the legal claims against it or Nancy's allegations.

Nancy alleges the ESH shared a policy of tolerating and even facilitating sex trafficking that was common to many members of the hotel industry. Pleading that similar businesses in the same industry in same city and facing the same incentives acted similarly is not shotgun pleading.

Nancy also pleads plenty of property-specific conduct. For example, she alleges that, unlike at the other hotels, Domino visited the Extended Stay to count the condoms in her wastebin and physically beat her when the number showed she had not met her quota for the day, leaving bruises visible to ESH staff. (FAC at ¶¶ 119–21.) And in paragraphs 130 and 214, she describes ESH's franchise disclosure document in detail and compiles guest reviews about the prevalence of prostitution at OKC ES.  Missing from ESH's argument is any particularized analysis showing how even one specific paragraph of Nancy's complaint confused ESH or was otherwise difficult to respond to. Instead, ironically, ESH merely gives long lists of paragraphs and labels them "confusing" or "conclusory" without analyzing a single paragraph or explaining why any particular allegation fails under Rule 8.

Nancy's use of different Defendant groupings for different allegations, as well as her extensive defendant-specific allegations, strike a reasonable

compromise between excessive group pleading and restating many identical allegations for Defendants who acted similarly and had similar policies.

ESH's own cases agree.  For example, ESH's leading case, *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015), cuts in Nancy's favor.  In *Weiland*, the Eleventh Circuit found that the defendants had shown no difficulty in determining "what they were alleged to have done" or "why they were liable for doing it," and that "the district court could and did understand the claims," so it reversed the district court's dismissal as an abuse of discretion. *Id.* at 1324. Here, ESH's brief clearly shows that ESH understands the claims against it.

ESH also cites *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) to imply that Nancy's complaint is faulty because "geographic and temporal realities make plain that all of the defendants could not have participated in every act complained of." *Magluta* involved a plaintiff who had been held in four federal prisons in two states over the span of five years. *Id.* at 1282. Here, the hotels were all in Oklahoma, in just two counties, and many were on the same street. More importantly, ESH fails to identify even a single paragraph where Nancy's carefully tailored mix of group and individual allegations is foreclosed by "geographic and temporal realities." *Magluta* is thus inapposite.

ESH also argues that Nancy's complaint is defective because it incorporates preceding factual allegations in each of its two Counts. In support,

[ 11 ]

ESH quotes *Greenway Nutrients v. Blackburn*, 33 F.Supp.3d 1224, 1257 (D. Colo. 2014), where a plaintiff alleged ten total counts, including RICO and claims for breach of contract, fraud, and trademark infringement, all with different elements.  Here, by contrast, Nancy alleges just two counts for which the elements overlap.  Thus, unlike *Greenway*, this is not a case where it is "impossible to tell which facts connect to which claims." *Id.* at 1235.

Because ESH fails to identify any specific allegations that caused it actual confusion, and because ESH and the other Defendants clearly "what they were alleged to have done" and "why they were liable for doing it," Nancy's complaint is not a shotgun pleading. *Weiland*. 792 F.3d at 1323.

## IV.   OKC ES IS LIABLE AS A PERPETRATOR.

The TVPRA creates a cause of action for trafficking victims "against the perpetrator." 18 U.S.C. § 1595(a). Perpetrators are those who—among other things—knowingly "harbor" or "provide" any person in reckless disregard of the fact that force, threats, fraud, or coercion "will be used to cause the person to engage in a <u>commercial sex act</u>." 18 U.S.C. § 1591(a)(1)–(2).

We first show how OKC ES knowingly harbored Nancy, a prostitute. Then, we show how it operated in reckless disregard her coercion by Domino.

### A.   <u>OKC ES Knowingly Harbored Nancy.</u>

The TVPRA does not define "harbors," so the word takes its ordinary meaning. According to Black's Law Dictionary, "harboring" means "[t]he act of

affording lodging or refuge to a person, esp. a criminal or illegal alien."
BLACK'S LAW DICTIONARY 860 (11th Ed. 2019).

Courts overwhelmingly hold that hotels can harbor a victim "through the act of renting rooms to a trafficker." *Doe v. Wyndham Hotels & Resorts*, No. 2:23-cv-01676-DAD- CSK, 2025 U.S. Dist. LEXIS 2988, at *54 (E.D. Cal. Jan. 6, 2025) (collecting cases). The hotel need not have acted with any "intent to commit a crime" itself. *Id.* But, knowingly providing someone with a room to use for commercial sex—a crime—is "harboring" crime under any definition.

Here, Nancy alleged facts showing OKC ES "harbored" her within the ordinary meaning of that word by renting her rooms for sex work. They sheltered her in the literal sense of providing a roof over her head. They also sheltered her in the figurative sense of concealing the crime of prostitution from public view.

Nancy has alleged this was done "knowingly." Under the Rules, she may allege knowledge "generally." *See* Fed. R. Civ. P. 9(b); *see also S.C. v. Hilton Franchise Holding, LLC*, 2024 U.S. Dist. LEXIS 205682 at *8 (D. Nev. Nov. 12, 2024) (accepting allegations "upon information and belief" that a hotel had actual knowledge). Nancy's pleadings go beyond what the Rules require.

OKC ES staff knew that Nancy was a prostitute because she displayed all the signs of sex work. She arrived—bruised and dressed for sex work—in the lobby or by the elevators to meet more than ten johns per day; hotel staff

watched her take over 350 johns to her room and watched as each came back shortly after; she extended her stay day-by-day or a few days at a time; she told staff she had a "date" coming; requested countless towels and linen changes; and discarded of an excessive amount of condoms. (FAC, Doc. 115 at ¶¶ 91(a), 91(d), 91(f)-(g), 107, 109, 111–12, 115, 117, 119-22.) Thus, at the motion to dismiss stage, Nancy's allegations that OKC ES "knowingly …. harbor[ed]" her are plausible.

### B.  OKC ES Acted "In Reckless Disregard" of Coercion.

Next, we explain why § 1591 requires reckless disregard, not actual knowledge, of coercion. We then show that OKC ES acted with reckless disregard of Nancy's coercion because they knew Nancy was a prostitute, and they therefore knew there was an over 50% chance she was being coerced— allegations the Court is obligated to credit at this stage. Finally we show that OKC ES had reason to know Nancy, specifically, was being coerced.

### 1.  Perpetrator liability requires "reckless disregard" – not actual knowledge.

The statute sets out a two-tiered *mens rea*: the defendant must knowingly engage in specified conduct (e.g., harboring) with respect to a trafficking victim, and then it must either know or recklessly disregard the fact that the person is a trafficking victim. *United States v. Duong*, 848 F.3d 928, 933 (10th Cir. 2017) (explaining that the TVPRA was amended in 2008, which

"decreased the prosecution's burden of proving mens rea by permitting it to show reckless disregard in lieu of knowledge.").

A defendant acts in "reckless disregard" of a fact when it was aware of a "substantial and unjustifiable risk" that the fact is true. *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023); *see also United States v. Rodriguez*, 880 F.3d 1151, 1162 (9th Cir. 2018). Nancy has further elaborated on this standard in her other brief. (Doc. 165, pages 18-19.)

### 2. OKC ES "recklessly disregarded" Nancy's coercion.

Here, Nancy has alleged facts showing that OKC ES knew she would engage in commercial sex. What's more, Nancy alleges that the sex trade is an omnipresent part of the hotel industry—and that as a result, OKC ES was more aware than most about the almost universally coercive nature of sex work. (FAC, Doc. 115 at ¶ 27-28, 40, 51-55, 58, 88.) It was thus at least plausibly aware of a "substantial and unjustifiable risk" that Nancy—like most prostitutes—was being coerced. (*Id.* at ¶ 40.)

Moreover, as explained above, Nancy was beaten while at OKC ES and walked past staff members with a fresh bruise on her face. (*Id.* at ¶ 121.) On several hundred occasions, she walked past staff to bring a non-guest man upstairs to her room. (*Id.* at ¶ 111–12.) In between, staff members witnessed Domino's regular rounds to collect money from her and his other girls, and some staff even bought drugs from him. (*Id.* at ¶¶ 76, 117, 124.) Staff also knew

that other pimps patrolled the OKC ES with weapons to force any prostitutes who didn't have pimps to "choose up," so Nancy's continued presence implied she had a pimp. (*Id.* at ¶ 125, 128.)

Nancy plausibly alleges that the staff at the Extended Stay put these clues together and realized she was being coerced into sex. (*Id.* at ¶ 128–29.) At the very least, they disregarded a "substantial unjustifiable risk" Nancy was a victim of coercion.

## V.     OKC ES IS LIABLE AS A BENEFICIARY.

A victim of trafficking can state a cause of action for beneficiary liability against a hotel is by alleging that the hotel "(1) knowingly benefitted, financially or by receiving anything of value; (2) from participation in a venture; (3) which they knew or should have known has engaged in an act in violation of Section 1591." *M.A. v. Wyndham Hotels & Resorts, Inc.*, No. 2:19-cv-00849, 2025 U.S. Dist. LEXIS 185758, at *30 (S.D. Ohio Sep. 22, 2025).

### A.     <u>OKC ES Knowingly Benefitted from Participating in a Commercial Sex Venture.</u>

Across a single stay of 20 days, OKC ES watched Nancy—in her high heels and skimpy clothing—walk around the lobby and elevators, meet with johns, and escort them to her room about 15 times per day. (FAC, Doc. 115 at ¶ 91(a), 107, 109, 111-12, 115.) In addition to simply witnessing Nancy meeting with johns, OKC ES staff buzzed Nancy and her clients into the hotel after-

hours when all entrances were locked. (*Id*. at ¶ 112.) On multiple other occasions, OKC ES staff provided johns with keys to Nancy's room—despite their names not being listed on the reservation—without her consent and while knowing Nancy was not present. (*Id*. at ¶ 114.)

It was no secret to OKC ES that Nancy was using her rooms for commercial sex purposes. In fact, she explicitly told OKC ES staff about having a "date" coming and requested an extra room key for her "date" while wearing revealing clothing. (*Id*. at ¶ 122.) Front desk workers even witnessed as Nancy chased a different john across the lobby—while wearing only a slip dress—as she yelled at him to return the money he stole from her. (*Id*. at ¶ 116.) Not only did staff not intervene, they continued to rent her rooms. (*Id*. at ¶ 107.)

Thanks to Nancy's pattern of behavior—which also included paying in cash, repeatedly requesting new linens and towels, leaving behind copious used condoms, and using a fake, temporary, or no ID—OKC ES knew that she was a prostitute and that the money she paid OKC ES with was were the proceeds of illegal commercial sex. (*Id*. at ¶ 91.) Courts regularly find that this kind of ongoing business relationship involving repeated room rentals qualifies as knowingly benefiting from a venture for TVPRA purposes. *E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 426–27 (N.D. Tex. 2021) (collecting cases).

As will be discussed in the next subsection, OKC ES also knew, or at the very least should have known, Domino was a partner in the same commercial

sex venture. This is all that is required for beneficiary liability. *See F.C. v. Jacob Sols., Inc.*, 790 F. Supp. 3d 1158, 1189 (D. Colo. 2025) (a defendant that "continues offering" services to a TVPRA venture "after becoming aware of [its services'] facilitation of the venture's violations" participates in the venture).

### B. OKC ES Knew or Should Have Known that Nancy Was Being Coerced by a Trafficker.

The phrase "knew or should have known" imposes a "negligence standard" on Defendants. *C.C. v. Rashid*, 2:23-cv-2056-GMN-BNW, 2024 U.S. Dist. LEXIS 231723, at *30 (D. Nev. Dec. 20, 2024). This is "a less culpable state than actual knowledge or recklessness." *Id.* (citation omitted).

Here, OKC ES's conduct satisfies this negligence standard. Its front desk employees watched as Nancy escorted hundreds of johns to her room and saw Domino's regular visits to collect. (FAC at ¶¶ 110–12, 117.) When Nancy did not meet her quota, Domino beat her and left her with a black eye that was visible to staff during the rest of her stay. (*Id.* at ¶ 120.)

OKC ES also sat back as several other pimps roamed the halls of the Extended Stay with AK-47-style rifles to guard their prostitutes, scare off other pimps, and intimidate "renegades" into working for a pimp. (*Id.* at ¶ 125.) OKC ES housekeeping staff even engaged with these pimps and purchased drugs from both them and Domino. (*Id.* at ¶ 124.)

OKC ES knew that Domino was collecting money from and physically assaulting Nancy during her visits. It also knew Nancy was a prostitute with an unusually high quota given the number of johns they watched her take upstairs. And OKC ES knew that prostitutes without pimps could not safely operate at their location due to the number of pimps policing the property. As a result, OKC ES knew, or at the very least should have known, that Nancy was being coerced by a pimp.

Courts have found that far less obvious clues suffice to meet the negligence standard for § 1595 beneficiary liability. *See, e.g.*, *P.C. v. D Fort Hotel LLC*, No. 24-cv-01584-PAB-TPO, 2025 U.S. Dist. LEXIS 20835 (D. Colo. Feb. 5, 2025) (finding the presence of weapons, bruises, and foot traffic to be sufficient, even without allegations staff witnessed the pimp collecting earnings); *Doe v. Radisson Hosp., Inc.*, No. A-23-CV-1456-DII, 2025 U.S. Dist. LEXIS 19682, *33 (W.D. Tex. Jan. 21, 2025) (finding allegations of bruises, fearful demeanor, and condoms in the trash sufficient).

## VI.    ESH IS LIABLE IN AGENCY OR AS A JOINT EMPLOYER OF OKC ES'S STAFF

Courts recognize vicarious liability theories under the TVPRA. *G.M. v. Choice Hotels Int'l, Inc.*, No. 2:22-cv-3788, 2024 U.S. Dist. LEXIS 52523, at *31 (S.D. Ohio Mar. 25, 2024). Because the TVPRA is a federal statute, the Court should apply the federal common law of agency—not state agency law. *Id.*

Whether an agency relationship exists depends on how closely the franchisor controlled the day-to-day-operations of its branded property. *Broock v. Nutri/System, Inc.*, 654 F. Supp. 7, 10–11 (S.D. Ohio 1986) (establishing agency for controlling day-to-day operations).

Courts look to whether the franchisor controls the particular aspect of the business operation at issue. For instance, KFC may be vicariously liable for burn accidents when it controls the type of chicken friers used, or Domino's Pizza or Shell Oil may be responsible for safety at chain locations.[1]

Nancy alleges that ESH controlled the business operations, training management, supervision, administration, and procedures of the hotel where she was trafficked. And she alleges an agency relationship was created between ESH and Extended Stay through standardized training courses, employment policies, use of ESH's branding, reporting procedures, regular

---

[1] *See, e.g.*, *Khan v. Shell Oil Co.*, 71 S.W.3d 890, 893–94 (Tex. App. Ct. 2002) (where a gas station employee was shot during an armed robbery, a triable issue of fact existed as to whether franchisor — Shell — exercised control over security at gas station location) (reversed on evidentiary grounds); *Wunder v. Mobil Oil Corp.*, No. X04CV000120525S, 2002 WL 31500966, at *1 (Conn. Super. Ct. Oct. 24, 2002) (similar); *Decker v. Domino's Pizza*, 644 N.E.2d 515, 517–19 (Ill. App. Ct. 1994) (affirming a verdict for plaintiff against the franchisor when the franchisee's employee was injured during attempted robbery, because franchisor "voluntarily undertook to establish a security program to deter robbery and to protect its employees from harm in the event of a robbery"); *Whitten v. Ky. Fried Chicken Corp.*, 570 N.E.2d 1353, 1354, 1357 (Ind. Ct. App. 1991) (when the plaintiff was burned by a chicken frier, jury could find franchisor liable because it controlled type of chicken friers the restaurant used).

inspections, and other enforcement measures in the franchise agreement. (FAC, Doc. 115 at ¶ 130.)

What is more, Extended Stay managers were subject to ESH's approval and required to complete ESH's designated training to ESH's satisfaction, giving it total discretionary control over management and employment.

Construing the facts and inferences in Nancy's favor here, these allegations lay out ESH's control over the Extended Stay in more detail than those in other trafficking complaints that have also passed muster. *See, e.g.*, *T.P. v. Wyndham Hotels & Resorts, Inc.*, No. 2:21-cv-04933, 2022 U.S. Dist. LEXIS 217315, at *36 (S.D. Ohio Dec. 1, 2022); *Doe v. Radisson Hosp., Inc.*, A-23-CV-1456-DII, 2025 U.S. Dist. LEXIS 19682, at *26 (W.D. Tex. Jan 21, 2025); *Doe v. Shera Ton, LLC*, No. 23CV00451 KG/JMR, 2024 U.S. Dist. LEXIS 58311 at *17 (D.N.M. Mar. 28, 2024).

While ESH might disagree as to the level of control it exercised over its OKC ES location, this is a fact issue to be developed through discovery. If courts hesitate to grant summary judgement on the agency issue (which they do—see the above footnote), then Defendant should not prevail on such a fact-intensive issue on a motion to dismiss.

Nancy also alleges a second way that Franchisor Defendants are vicariously liable: They are joint employers of each staff member on the ground. Whether two employers are "joint" employers depends on how much control

one exercises over the other. *Ray v. L.A. Cnty. Dep't of Pub. Soc. Servs.*, 52 F.4th 843, 849 (9th Cir. 2022) (holding that county's control over health aides' work hours and pay rate sufficed to create joint employment, even where county did not pay some aides directly, did not control the work, and did not have the power to hire or fire).

Here, Plaintiff alleges ESH created and set policies and procedures in relation to employment at OKC ES; controlled the employee's training; controlled employees' job responsibilities; and required OKC ES to report evidence of sex trafficking such as excessive used condoms, excessive requests for linens, and excessive foot traffic to particular rooms. (FAC, Doc. 115 at ¶ 130(h).) In sum, ESH controlled everything: Employment, training, day-to-day actions, policies, and corporate culture. At the pleading stage, Nancy has pled enough facts to make it plausible that ESH is a joint employer.

## VII.  NANCY ALSO STATES A DIRECT BENEFICIARY LIABILITY CLAIM AGAINST ESH.

ESH is subject to direct beneficiary liability because it knowingly benefitted from participating in a franchisee-franchisor relationship venture with OKC ES (which was a perpetrator and beneficiary of Nancy's trafficking).

### A.    ESH Knowingly Benefitted from Room Rentals for Nancy's Trafficking.

Plaintiff alleges that both OKC ES and ESH knowingly benefitted from the room rentals used for her sex trafficking. As previously discussed with regard to OKC ES, this is sufficient at the motion to dismiss stage.

### B.    ESH Participated in a Venture

ESH's relationship with its franchisee OKC ES qualifies as a venture. *See Doe v. Radisson Hosp., Inc.*, A-23-CV-1456-DII, 2025 U.S. Dist. LEXIS 19682, at *23–24 (W.D. Tex. Jan. 21, 2025) ("H.E.W.'s second claimed venture—between the Radisson Defendants and their franchisee operating the Austin Country Inn—suffices . . . to plead a venture under Section 1595.")

### C.    ESH Knew or Should Have Known of Nancy's Trafficking

Finally, on the third prong, the phrase "knew or should have known" imposes a "negligence standard." *C.C. v. Rashid*, 2:23-cv-2056-GMN-BNW, 2024 U.S. Dist. LEXIS 231723, at *30 (D. Nev. Dec. 20, 2024) (citing *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1177 (9th Cir. 2022)).

Here, ESH itself had direct access to enough information that it knew or should have known of Nancy's, or others', trafficking even without attributing to it the knowledge of the Extended Stay's staff. ESH knew the red flags of sex trafficking. (FAC, Doc. 115 at ¶ 60-64.) Indeed, ESH required OKC ES to train its staff on the indicators of sex trafficking and report such signs through its operational systems. (*Id.* at ¶ 60-64, 130(h)(i)).)

Some of these red flags include paying in cash or extending stays day-by-day, excessive discarding of condoms, and heavy foot traffic to a room by different men. (*Id*. at ¶ 62.) Nancy exhibited each of these behaviors during her trafficking at the Extended Stay. (*Id*. at ¶ 91(d), 91(g), 107.) As part of their franchise agreement with OKC Es, ESH has access to all of OKC ES's data and guest data, which include "stay remarks" and reports where OKC ES staff took note of signs of Nancy's trafficking. (*Id*. at ¶ 130(f).)

Additionally, through ESH's access to OKC ES's financial records, it could see suspiciously high expenditures on laundry services due to Nancy's frequent requests for new towels and linens—a red flag recognized in the hospitality industry to which ESH belongs. (*Id*. at ¶ 89, 91(f), 130(f)(iii)).)

In other words, ESH knew, at the very least, that there was a woman renting rooms at the Extended Stay America Oklahoma City Airport using cash and extending her stay day by day, discarding numerous used condoms, and leading numerous men to her room each day for 20 days. (*Id*. at ¶ 91(d), 91(g), 107.) It also would have known anything that the OKC ES's staff wrote down about their unusual—and unusually frequent guests. (*Id*. at ¶ 130(f).) Given the frequency of Nancy's visits and her repeated suspicious behavior during each stay it is a reasonable inference that ESH knew or should have known about Nancy's trafficking due to its direct access to OKC ES's systems.

## VIII. ESH'S STATE LAW ARGUMENTS LACK MERIT

ESH is correct that, unlike beneficiary liability under § 1595 of the TVPRA, civil liability under Oklahoma's sex trafficking statutes requires both participation in a venture and knowledge that the venture—though not necessarily the specific Defendant—engaged in an act of sex trafficking. *See* 21 O.S. § 748(A)(4).

Here, however, Nancy has plausibly pled that staff at the Extended Stay had actual knowledge of extensive sex trafficking on the premises, including of Nancy's own trafficking. They watched as Nancy worked herself to the bone leading fifteen men per day up to her room for commercial sex, and they watched as Domino repeatedly visited her room to collect. (FAC at ¶¶ 110–12, 117.) They also watched as other traffickers roamed their halls carrying AK-47 style rifles to control their own prostitutes and intimidate "renegades" into "choosing up" and working for them, so they knew there was no way Nancy could have avoided coercion. (*Id.* at ¶¶ 125, 128.) OKC benefitted from a venture while having actual knowledge of sex trafficking, and ESH is liable for that knowledge in agency or as a joint employer as previously discussed.

## IX. CONCLUSION

For the reasons above, the Court should deny Defendant's motions to dismiss.

DATED this 5th day of December, 2025

Respectfully submitted,

/s/ Geoffrey C. Parker

Geoffrey C. Parker, Esq. (*pro hac vice*)
HILTON PARKER LLC
7658 Slate Ridge Blvd.
Reynoldsburg, OH 43068
Tel: (614) 992-2277
Fax: (614) 927-5980
gparker@hiltonparker.com
*Attorney for Plaintiff Nancy R.*