# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| NANCY R., pseudonymously, | Case No.: 5:25-cv-462 |
| Plaintiff, | |
| vs. | Judge Charles B. Goodwin |
| PLAZA HOTELS, LLC et al., | **PLAINTIFF'S RESPONSE IN OPPOSITION TO THE WYNDHAM DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | |

COMES NOW Plaintiff Nancy R. ("Plaintiff" or "Nancy" herein), by and through her undersigned attorneys, and submits this Response to the Motion to Dismiss filed by Defendants Super 8 Worldwide, Inc., Days Inns Worldwide, Inc., Ramada Worldwide, Inc., and Howard Johnson International, Inc. (the "Wyndham Defendants"). (Doc. 132.)

DATED this 5th day of December, 2025

*/s/ Geoffrey C. Parker*
GEOFFREY C. PARKER, ESQ.
*Pro hac vice*
JONATHAN L. HILTON, ESQ.
*Pro hac vice*
HILTON PARKER LLC
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068

MICHAEL C. KANE, ESQ.
*Pro hac vice*
THE702FIRM INJURY ATTYS
400 South 7th Street, Suite 400
Las Vegas, Nevada 89101
*Attorneys for Nancy R.*

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ........................................................................ 1

II.   STATEMENT OF FACTS .......................................................... 3

    A.    What the Wyndham Defendants Knew .......................................... 3

    B.    The Super 8 Branded Properties .................................................... 5

    C.    Days Inn Worldwide, Inc. .............................................................. 7

    D.    Ramada Worldwide, Inc. ............................................................... 8

    E.    Howard Johnson International, Inc. .............................................. 10

    F.    Wyndham Franchisor Defendants' Control. .................................. 11

III.  STANDARD FOR FAILURE TO STATE A CLAIM. ............................. 14

IV.  PLAINTIFF STATES AGENCY LIABILITY CLAIMS UNDER
    FEDERAL AND STATE LAW. ................................................... 14

    A.    The Local Defendants are Perpetrators and Beneficiaries. ........ 14

    B.    Wyndham Defendants as Masters and Joint Employers are
        Liable for the Local Defendants Conduct ..................................... 15

V.   NANCY STATES DIRECT (NON-VICARIOUS) BENEFICIARY
    LIABILITY CLAIMS AGAINST THE WYNDHAM DEFENDANS. .... 19

    A.    Wyndham Defendants Benefitted Financially ............................. 19

    B.    Wyndham Defendants Participated in a Franchising Venture. . 19

    C.    Defendants "Should Have Known" That Some of Their
        Franchisees Were Harboring Sex Trafficking. ............................. 20

VI.  NANCY'S STATE LAW CLAIMS TRACK HER TVPRA CLAIMS. ..... 23

VII. CONCLUSION ........................................................................ 23

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Bell Atl. Corp. v. Twombly*,
　　550 U.S. 544 (2007) .................................................................. 14

*Bistline v. Parker*,
　　918 F.3d 849 (10th Cir. 2019) ................................................. 19

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*,
　　757 F.3d 1125 (10th Cir. 2014) ............................................... 14

*Broock v. Nutri/System, Inc.*,
　　654 F. Supp. 7 (S.D. Ohio 1986) ............................................. 15

*Decker v. Domino's Pizza*,
　　644 N.E.2d 515 (Ill. App. Ct. 1994) ....................................... 15

*Doe v. Radisson Hosp., Inc., A-23-CV-1456-DII*,
　　2025 U.S. Dist. LEXIS 19682 (W.D. Tex. Jan. 21, 2025) ................. 17, 20

*Doe v. Shera Ton, LLC*,
　　No. 23CV00451, *KG/JMR*, 2024 U.S. Dist. LEXIS 58311
　　(D.N.M. Mar. 28, 2024) ........................................................... 17

*Enter. Mgmt. Consultants v. State ex rel. Okla. Tax Comm'n*,
　　768 P.2d 359 (Okla. 1988) ...................................................... 17

*Fleites v. MindGeek S.A.R.L.*,
　　2025 No. 2:21-cv-04920-WLH-ADS; 2025 U.S. Dist. LEXIS
　　190592 (2025) ................................................................... 20, 21

*G.G. v. Salesforce.com, Inc.*,
　　76 F.4th 544 (7th Cir. 2023) ...................................... 19, 20, 20

*G.M. v. Choice Hotels Int'l, Inc.*,
　　No. 2:22-cv-3788, 2024 U.S. Dist. LEXIS 52523 (S.D. Ohio
　　Mar. 25, 2024) ........................................................................ 15

*Khan v. Shell Oil Co.*,
    71 S.W.3d 890 (Tex. App. Ct. 2002) ....................................................... 15

*M.A. v. Wyndham Hotels & Resorts, Inc.*,
    No. 2:19-cv-00849, 2025 U.S. Dist. LEXIS 185758 (S.D. Ohio
    Sep. 22, 2025) ..................................................................................... 19

*M.A. v. Wyndham*,
    425 F. Supp. 3d 959 (S. D. Ohio 2019) ............................................ 21, 22

*Ratha v. Phatthana Seafood Co.*,
    35 F.4th 1159 (9th Cir. 2022) .................................................................. 20

*Ray v. L.A. Cnty. Dep't of Pub. Soc. Servs.*,
    52 F.4th 843 (9th Cir. 2022) .................................................................... 18

*S.C. v. Hilton Franchise Holding, LLC*,
    No.: 2:23-cv-02037-APG-DJA, 2024 U.S. Dist. LEXIS 205682,
    at *15 (D. Nev. Nov. 12, 2024) ............................................................... 19

*T.P. v. Wyndham Hotels & Resorts, Inc.*,
    No. 2:21-cv-04933, 2022 U.S. Dist. LEXIS 217315 (S.D. Ohio
    Dec. 1, 2022) ......................................................................................... 17

*Whitten v. Ky. Fried Chicken Corp.*,
    570 N.E.2d 1353 (Ind. Ct. App. 1991) .................................................... 15

*Wunder v. Mobil Oil Corp.*,
    No. X04CV000120525S, 2002 WL 31500966 (Conn. Super. Ct.
    Oct. 24, 2002) ....................................................................................... 15

## **STATUTES**

18 U.S.C.
    § 1595 ................................................................................................ 2, 19

## I.    INTRODUCTION

This case arises out of the sex trafficking of Nancy R., who lived for nearly two years under the control of a violent Bloods-affiliated pimp known as "Domino." During that period, Domino forced Nancy to engage in commercial sex ten men per day across a series of Oklahoma hotels—including the Super 8, Days Inn, Ramada, and Howard Johnson branded locations operated by the Wyndham Defendants' franchisees.

Across these properties, staff observed the classic red flags of trafficking: prepaid cards and daily cash extensions, visible bruises, excessive condom disposal, repeated towel and linen requests, heavy foot-traffic by unregistered adult males, and the presence of an abusive handler who regularly arrived to collect Nancy's earnings. Rather than take action, each property continued renting rooms to Nancy and her trafficker. The local operators of each property are liable for this conduct, but so are the Wyndham Defendants.

***First***, Nancy states viable vicarious liability claims under the TVPRA against each Wyndham Defendant. Under agency principles, a franchisor may be held liable where it exercises detailed control over the specific aspects of operations that facilitated the trafficking.

Here, each Wyndham Defendant dictated the most relevant aspects of franchisee conduct: mandated anti-trafficking training; required use of franchise-controlled reservation systems and property-management systems;

required reporting of criminal-activity indicators; enforced brand standards governing staff conduct; controlled employee training and qualifications; and the right to approve or replace management at will.

Taken as true, these allegations more than plausibly allege that the Wyndham Defendants controlled the aspects of their local franchisees' businesses relevant to Nancy's trafficking. The allegations pertaining to employment also suffice to show that the Wyndham Defendants were joint employers of their local franchisees' staffs.

***Second***, Nancy states direct beneficiary liability claims under 18 U.S.C. § 1595 against each Wyndham Defendant because each knowingly received money, franchise fees, and other value from its commercial franchising ventures with local franchisees. And each Wyndham Defendant knew or "should have known" that its franchised property was engaged "harbor[ing]" trafficking victims in violation of the criminal sex trafficking provision of the TVPRA, § 1591.

The systems the Wyndham Defendants mandated provided them with direct access to trafficking-indicator data: spikes in cash rentals, excess laundry usage, linen over-consumption, guest reviews reporting prostitution, and WiFi records showing Backpage advertisements posted from the properties. Under § 1595's negligence standard, this is enough to establish their direct liability as beneficiaries. The motion to dismiss should be denied.

## II.    STATEMENT OF FACTS

Nancy was trafficked by a violent gang member, "Domino," from 2021 through 2022 out of a series of Oklahoma hotels, where he forced her to have commercial sex with at least 10 johns a day. (FAC ¶¶ 84, 86.)

### A.    <u>What the Wyndham Defendants Knew</u>

Hotels provide temporary, anonymous, and private lodgings near airports, highways, and event spaces. (*Id*. ¶ 51.) These characteristics often attract traffickers to hotels. (*Id*. ¶ 52.) A 2018 Polaris Project report found 75% of sex trafficking victims surveyed had spent time in a hotel during their trafficking, and 60% had engaged in commercial sex inside one. (*Id*. ¶ 53.)

Since 2015, the hotel industry—and Wyndham in particular—was hit with a wave of hundreds of lawsuits by human trafficking victims. (*Id*. ¶ 59.) The 2021 Franchise Disclosure Documents ("FDDs") for Days Inn, Ramada, and Howard Johnson all disclose that Wyndham recorded an accrual of several million dollars for legal contingencies related to human trafficking lawsuits. (*Id*. ¶¶ 185, 198, 212.) The FDDs further explain that Wyndham "records an accrual for legal contingencies when it determines, after consultation with outside counsel, that it is probable that a liability has been incurred." (*Id*.)

In other words, by the time Nancy's trafficking started, the Wyndham Defendant's parent had already determined that it was likely liable for human

trafficking in at least some cases, which determination necessarily included a realization that human trafficking was occurring on its properties. (*Id.*)

A 2018 Polaris Project report found 75% of sex trafficking victims surveyed had spent time in a hotel during their trafficking, and 60% had engaged in commercial sex inside one. (Id. at ¶ 53.)

Because most sex trafficking victims are trafficked through hotels, in 2019 the Polaris Project published a list of indicators to help hospitality employees identify instances of in-call escort services involving trafficking victims on hotel properties. (*Id.* ¶¶ 55-56.) These indicators include:

- Paying for stays in cash or with prepaid credit cards;
- Booking for a single night and extending day by day;
- Excessive condoms in hotel wastebins;
- Excessive foot traffic;
- Inappropriate attire;
- Frequent requests for new towels; and
- One person checking in with multiple people in tow. (*Id.*)

In response to these statistics and lawsuits, Wyndham created training for their branded hotels (like Super 8, Ramada, Days Inn, and Howard Johnson) to teach employees both how to spot and how to report these red flags. (*Id.* ¶¶ 60, 62, 64.)

By the time of Nancy's trafficking, the Wyndham Defendants were on notice of the sex trafficking issue in the hospitality industry, generally, and at their branded-hotel locations, specifically.

### B.   The Super 8 Branded Properties

Defendant Super 8 Worldwide, Inc. ("**Super 8**") is the franchisor that set—and monitored compliance with—the brand standards for the two hotels at issue here:

> (1) The Wyndham Oklahoma Airport Fairgrounds West ("the Super 8 Airport") located at 311 S Meridian Avenue, managed by Defendant Natha, LLC, ("**Natha**"), and
>
> (2) the Super 8 by Wyndham Oklahoma City ("the Super 8 Prospect Ave") located at 3852 S Prospect Avenue—managed by Defendant Jaliyan Hospitality, Inc. ("**Jaliyan**").

(*Id.* at ¶¶ 7–9.)

Let's quickly recap what happened at these hotels.

**The Super 8 Airport.**   Nancy stayed at the Super 8 OKC Airport—owned and operated by Defendant Natha—for one week in August 2022. (*Id.* ¶ 147.) She initially reserved her room with a prepaid card and repeatedly extended her stay with cash. (*Id.* ¶ 148.) During that time, Nancy was being trafficked: she and another woman were forced by Mexican traffickers to perform sex acts to pay off a drug debt and were assigned a handler who arranged clients, collected the proceeds, provided drugs, and imposed a daily quota of ten buyers. (*Id.* ¶¶ 151–153.)

Nancy frequently met buyers in the Super 8 Airport's lobby and escorted them directly to her room because clients were fearful of police stings and robbery. (*Id.* ¶ 149.) She routinely appeared in the lobby wearing highly revealing clothing that openly signaled sex-for-pay. (*Id.* ¶ 150.) Many buyers entered the lobby, purchased sex, and exited the hotel within minutes—some in as little as seven minutes. (*Id.* ¶ 154.) Used condoms from these encounters accumulated in her room's trash can. (*Id.* ¶ 155.)

Across Nancy's stay, the Super 8's staff observed multiple, well-recognized trafficking indicators: payment with a prepaid card, repeated cash extensions of the reservation, unusually revealing attire, excessive condom purchases and disposal on the property, continuous and rapid foot-traffic of unrelated adult males to and from her room, and the presence of a suspicious male handler closely monitoring her movements. (*Id.* ¶ 156.)

**Super 8 Prospect Ave.**  Nancy spent a total of 2 weeks at the Super 8 Prospect Ave. owned and operated by Defendant Jaliyan. (*Id.* ¶ 157.) The Super 8 Prospect Ave. was full of drug addicts, and the staff were accustomed to criminal activity by guests and rented rooms nearly anyone. (*Id.* ¶ 158.)

The hotel was so rundown that Nancy awoke one morning to mushrooms growing out of the floor under the vent. (*Id.* ¶ 159.) Nancy engaged in commercial sex with about ten men a night, leaving behind an abundance of used condoms and towels. (*Id.* ¶ 161.)

Rather than viewing the unusually high number of towels that Nancy requested as a potential sign of sex trafficking, the employees at the Super 8 Prospect Ave saw an opportunity for financial gain. (*Id.* ¶ 162.) If she used too many towels on one visit, they would raise Nancy's deposit by up to $25 the next time she checked in. (*Id.*)

### C.    <u>Days Inn Worldwide, Inc.</u>

Defendant Days Inn Worldwide, Inc. ("**Days Inn**") is the franchisor that set—and monitored compliance with—the brand standards for one of the hotels where Nancy was trafficked: The Days Inn by Wyndham Oklahoma City/Moore ("the Days Inn") located at 8217 S. I-35 Service Road, managed by Defendant Raj Krupa Hotel, LLC. ("**Raj Krupa**"). (*Id.* ¶¶ 10–11.)

Nancy stayed at Raj Krupa's Days Inn for about four weeks between 2021 and 2022. (*Id.* ¶ 166.) Nancy's travails at the Days Inn are more thoroughly chronicled in her response to Raj Krupa's Motion to Dismiss, (Doc. 173, pp. 4–10), but we will hit the highlights here.

Nancy told front desk staff on multiple occasions that she had a "trick" or "client" coming so she would pay for her room after her "date." (*Id.* ¶ 167.) Raj Krupa's desk staff allowed this arrangement multiple times. (*Id.* ¶ 169.) If the situation arose during a shift change, front desk employees left notes on Nancy's guest profile informing the next shift's staff about the delayed payment arrangements. (*Id.* ¶ 170-71.)

[ 7 ]

During a one week stay at the Days Inn, Nancy and other victims staying with her, flushed so many condoms down the toilet that the hotel's septic system became clogged. (*Id.* ¶ 175.) The excessive use of condoms is an industry-recognized red flag for trafficking. (*Id.* ¶ 89(e).)

On a later occasion, as he was moving his victims to another room, Domino left his gun behind in the microwave of the room they had just vacated. (*Id.* ¶ 177.) Days Inn staff called Nancy, who had booked that room, to complain about the gun, but when Domino came to the front desk to get it back, they gave it to him. (*Id.* ¶ 176-177.) Domino was not kicked out of the hotel but instead returned to the new room one of his other girls had reserved. (*Id.*)

Finally, Raj Krupa's Days Inn was known for how traffickers had free reign to threaten freelance sex workers on the property. (*Id.* ¶ 179.) Traffickers often stood outside the rooms of freelancers to scare off their clients and intimidate women into working for them. (*Id.* ¶ 180.)

### D. <u>Ramada Worldwide, Inc.</u>

Defendant Ramada Worldwide, Inc. ("**Ramada**") is the franchisor that set—and monitored compliance with—the brand standards for the following hotel at issue here: The Ramada by Wyndham Oklahoma City Airport North ("the Ramada") located at 2200 S. Meridian Avenue, managed by Defendant Chand & Saaj Hospitality Inc. ("**C&S**"). (*Id.* ¶¶ 12–13.)

[ 8 ]

Nancy stayed at the Ramada—owned and operated by Defendant Chand & Saaj Hospitality, Inc—for at least a week during her trafficking period. (*Id.* ¶ 186.)  Here, Nancy was forced to have sex with at least 50 johns over the course of 7 days. (*Id.* ¶ 187.) These men had to walk through the front door of the hotel to get to Nancy's room. (*Id.* ¶ 190.) One night, Nancy had to pay front desk staff for condoms sold in the lobby multiple times in one evening. (*Id.* ¶ 191–193.) Staff recorded these condom purchases in Ramada's computerized property management system. (*Id.* ¶ 195.)

At the Ramada, Nancy showed up to check-in sporting high heels and skimpy clothing. (*Id.* ¶ 91(a).) During one stay, Nancy had to walk past the front desk and through the front door in daylight wearing nothing but a negligee. (*Id.* ¶ 189.) She extended her stay day by day, paying in cash. (*Id.* ¶ 91(d).) She also asked for countless towels and linen changes. (*Id.* ¶ 91(f).) The Ramada front desk staff would have witnessed dozens of instances of Nancy escorting a man, who had not checked in as a guest, through the lobby to her room, followed by him heading back downstairs, sometimes within a period of 10 minutes. (*Id.* ¶¶ 87, 92.)

Nancy had bruises from Domino's abuse when she was at the Ramada—they would have been visible she checked in, extended stays, and escorted clients through the lobby. (*Id.* ¶ 80.) Domino visited Nancy at the Ramada to collect money made from her trafficking. (*Id.* ¶¶ 188, 194.)

### E.    Howard Johnson International, Inc.

Defendant Howard Johnson International, Inc. ("**Howard Johnson**") is the franchisor that set—and monitored compliance with—the brand standards at the Howard Johnson by Wyndham Oklahoma City Airport/Fairgrounds ("the Howard Johnson") located at 400 S. Meridian Avenue, managed by Defendant Yash Enterprises, LLC ("**Yash**"). (*Id.* ¶¶ 14–15.)

Nancy stayed at the Howard Johnson—owned and operated by Defendant Yash Enterprises, LLC—for a total of 4 days across two stays. (*Id.* ¶ 199.) There, Nancy was trafficked approximately 20 times. (*Id.* ¶ 200.)

Nancy's modus operandi at the Howard Johnson was substantially similar to the other Oklahoma hotels she was trafficked at. At the Howard Johnson, Nancy showed up to check-in sporting high heels and skimpy clothing. (*Id.* ¶ 91(a).) She rented rooms with a fake ID—or sometimes with a flimsy paper "temporary" one—or sometimes didn't show her ID at all, even though she was booking under her own name. (*Id.* ¶ 91(b)-(c).) She extended her stay day by day, paying in cash. (*Id.* ¶ 91(d).) She also asked for countless towels and linen changes. (*Id.* ¶ 91(f).)

The Howard Johnson's front desk staff would have witnessed dozens of instances of Nancy escorting a man, who had not checked in as a guest, through the lobby to her room, followed by him heading back downstairs, sometimes within a period of 10 minutes. (*Id.* ¶ 92.)

On one occasion, Domino beat Nancy at the Howard Johnson because she didn't have sex with enough johns and, therefore, didn't have enough money to pay for the hotel room. (*Id.* ¶¶ 201–202.) Nancy took pictures of these bruises at the Howard Johnson. (*Id.* ¶ 203.)

### F. <u>Wyndham Franchisor Defendants' Control.</u>

The Wyndham Defendants each tightly controlled their branded-properties owned and operated by Natha, Jaliyan, Raj Krupa, C&S, and Yash by (collectively, the "Local Defendants"). This control is outlined in the between the Wyndham Defendants' Franchise Disclosure Documents ("FDDs").

For instance, each Local Defendant could only buy signage, uniforms, linens, and equipment approved by its respective Wyndham Defendant. (FAC, Doc. 115 ¶¶ 164(a), 183(a), 196(a), 210(a).) Each Wyndham Defendant made its respective Local Defendant send proposed general managers to training run and evaluated by the Wyndham Defendant, which gave the Wyndham Defendant effective control over management of its Local Defendant's hotel locations (*Id.* ¶¶ 164(b), 183(b), 196(b), 210(b).)

Days Inn, Ramada, Howard Johnson developed and provided training, including mandatory human-trafficking awareness courses tied to franchisee job titles, and Local Defendants' employees could work only if they passed franchisor evaluations. (*Id.* ¶¶ 183(c), 196(c), 210(c).)

Each Wyndham Defendant required use of its reservation system, granting them access to the Local Defendants' reservations, including Nancy's repeated stays (*Id.* ¶¶ 164(c), 196(d), 183(d), 210(d).) All Wyndham Defendants also required use of an approved property management system which recorded occupancy, reservations, guest services, registrations, check-in and check-out data, and staff notes ("Stay Remarks"), including notes suggesting guests were being trafficked. (*Id.* ¶¶ 164(d), 183(e), 196(e), 210(e).)

Wyndham Defendants independently access the system information obtained by its property management system. (*Id.* ¶¶ 164(f), 183(g-h), 196(g), 210(g).) Through Revenue Management Agreements, Wyndham Defendants conducted monthly performance reviews of each hotel and received detailed metrics, including the ratio of walk-in cash rentals, pricing data, and the volume of linens used. (*Id.* ¶¶ 164(g), 183(i), 196(h), 210(h).)

Wyndham Defendants used system information and monthly metrics to identify trends indicating human trafficking and prostitution at their branded hotels. (*Id.* ¶¶ 164(g)(ii), 183(i)(ii), 196(h)(ii), 210(h)(ii).) Each Wyndham Defendant realized its Local Defendant's locations had a trafficking problem due to the high number of in-cash reservations, money spent on laundry services, and revenue from extra linens at these locations. (*Id.* ¶¶ 164(g)(iii-iv), 183(i)(iii), 196(h)(iii), 210(h)(iii).)

Each Wyndham Defendant also held the right to further monitor the Franchisee's property through its own quality assurance inspections and access to all guest reviews and complaints. (*Id.* ¶¶ 164(i-j), 183(k-l), 196(j-k), 210(j-k).) Multiple guest reviews mention prostitution at the Days Inn, the Howard Johnson, and both the Super8s where Nancy was trafficked and were posted either before or during Nancy's trafficking (*Id.* ¶¶ 218–227.)

Each Wyndham Defendant also had access to guest internet usage records through its approved Wi-Fi vendor. (*Id.* ¶¶ 164(h)(i-ii), 183(j)(i-ii), 196(i)(i-ii), 210(i)(i-ii).) The Wyndham Defendants received a kickback from the approved Wi-Fi services provider each time a guest purchased hotel Wi-Fi, including each time Domino purchased Wi-Fi or forced Nancy to purchase Wi-Fi to be used for the purpose of trafficking Nancy. (*Id.* ¶¶ 164)(h)(iv), 183(j)(9v), 196(i)(iv), 210(i)(iv).)

Thus, Wyndham Defendants knew and chose not to interfere each time Plaintiff and her trafficker posted sex ads on websites like Backpage at their Local Defendant's property. (*Id.* ¶¶ 164(h)(iii), 183(j)(iii), 196(i)(iii), 210(i)(iii).)

Wyndham Defendants' confidential brand standards also required their respective Local Defendant to record and report signs of criminal activity, including evidence of sex trafficking. (*Id.* ¶¶ 164(k)(i), 183(m)(i), 196(l)(i), 210(l)(i).) These standards gave each Wyndham Defendant another direct channel of knowledge about what staff at its Local Defendant's hotel saw. (*Id.*)

## III.   STANDARD FOR FAILURE TO STATE A CLAIM.

At the motion to dismiss stage, the Court accepts well-pled allegations as true and draws all reasonable inferences in Plaintiff's favor. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1136 (10th Cir. 2014). "To withstand a motion to dismiss, a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## IV.   PLAINTIFF STATES AGENCY LIABILITY CLAIMS UNDER FEDERAL AND STATE LAW.

### A.    <u>The Local Defendants are Perpetrators and Beneficiaries.</u>

The Wyndham Defendants' Motion to Dismiss largely declines to dispute the liability of the Local Defendants. *See generally* (Doc. 132.) Nancy has already discussed at length how Raj Krupa (local operator of the Days Inn) and Jaliyan (local operator of the Super 8 Prospect Ave) are liable as both perpetrators and beneficiaries of her trafficking. *See* (Docs. 173 & 174.)

The remaining Local Defendants are liable for largely the same reasons: Natha, C&S, and Yash all watched as hordes of non-guest men trekked through their halls to Nancy's room, and all witnessed the other red flags created by Domino's modus operandi. C&S and Yash both saw Nancy's bruises from Domino's abuse. Despite this, they all kept renting rooms for her trafficking, and C&S even provided Nancy condoms. Thus, at a minimum, all participated in ventures they knew or should have known involved trafficking.

**B.** **Wyndham Defendants as Masters and Joint Employers are Liable for the Local Defendants Conduct**

Courts recognize vicarious liability theories under the TVPRA. *G.M. v. Choice Hotels Int'l, Inc.*, No. 2:22-cv-3788, 2024 U.S. Dist. LEXIS 52523, at *31 (S.D. Ohio Mar. 25, 2024). Because the TVPRA is a federal statute, the Court should apply the federal common law of agency—not state agency law. *Id.*

Here, Nancy alleges two indirect liability theories: (1) Wyndham Defendants are liable under agency law because they controlled the relevant conduct of Local Defendants through their mandated procedures and systems, and (2) Wyndham Defendants are liable as a joint employer of their Local Defendant's hotel staff. Let's look at the "control" theory first.

Whether an agency relationship exists depends on how closely the franchisor controlled the day-to-day-operations of its branded property. *Broock v. Nutri/System, Inc.*, 654 F. Supp. 7, 10–11 (S.D. Ohio 1986) (establishing agency for controlling day-to-day operations).

Courts look to whether the franchisor controls the particular aspect of the business operation at issue. For instance, KFC may be vicariously liable for burn accidents when it controls the type of chicken friers used, or Domino's Pizza or Shell Oil may be responsible for safety at chain locations.[1]

---

[1] *See, e.g.*, *Khan v. Shell Oil Co.*, 71 S.W.3d 890, 893–94 (Tex. App. Ct. 2002) (where a gas station employee was shot during an armed robbery, a triable issue of fact existed as to whether franchisor—Shell—exercised control over security at gas station location) (reversed on evidentiary grounds); *Wunder v. Mobil Oil Corp.*, No. X04CV000120525S, 2002 WL 31500966, at *1 (Conn. Super. Ct. Oct.

Nancy alleges that the Wyndham Defendants controlled the business operations, training, management, supervision, administration, and procedures of the hotel where she was trafficked. And she alleges an agency relationship was created between the Local Defendants and the Wyndham Defendants through standardized training courses, employment policies, use of the Wyndham Defendants' branding, reporting procedures, regular inspections, and other enforcement measures in each's franchise agreement. (FAC., Doc 115, ¶¶ 164, 183, 196, 210.)

All of the Wyndham Defendants retained for themselves a nuclear option—they had the right to approve or disapprove Local Defendant's management teams and had the power to require Local Defendants to hire a third-party management company preapproved by the franchisor. (*Id.* ¶¶ 164(b), 183(b), 196(b), 210(b).) What is more, Defendants Ramada, Days Inn, and Howard Johnson required **all** Local Defendants' employees to complete designated trainings—including anti-trafficking training—to their satisfaction, giving them total discretionary control over management and employment decisions. (*Id.*, ¶¶ 183(c), 196(c), 210(c).)

---

24, 2002) (similar); *Decker v. Domino's Pizza*, 644 N.E.2d 515, 517–19 (Ill. App. Ct. 1994) (affirming a verdict for plaintiff against the franchisor when the franchisee's employee was injured during attempted robbery, because franchisor "voluntarily undertook to establish a security program to deter robbery and to protect its employees from harm in the event of a robbery"); *Whitten v. Ky. Fried Chicken Corp.*, 570 N.E.2d 1353, 1354, 1357 (Ind. Ct. App. 1991) (when the plaintiff was burned by a chicken frier, jury could find franchisor liable because it controlled type of chicken friers the restaurant used).

Construing the facts and inferences in Nancy's favor here, these allegations establish the Wyndham Defendants' control over their branded properties in more detail than those in other trafficking complaints that have also passed muster. *See, e.g.*, *T.P. v. Wyndham Hotels & Resorts, Inc.*, No. 2:21-cv-04933, 2022 U.S. Dist. LEXIS 217315, at *36 (S.D. Ohio Dec. 1, 2022); *Doe v. Radisson Hosp., Inc.*, A-23-CV-1456-DII, 2025 U.S. Dist. LEXIS 19682, at *26 (W.D. Tex. Jan 21, 2025); *Doe v. Shera Ton, LLC*, No. 23CV00451 KG/JMR, 2024 U.S. Dist. LEXIS 58311 at *17 (D.N.M. Mar. 28, 2024).

Even if state agency law applies, the same result obtains because Oklahoma law, like federal law, looks beyond contractual disclaimers to weigh the actual level of control granted by contractual provisions and demonstrated by the parties' conduct. *Enter. Mgmt. Consultants v. State ex rel. Okla. Tax Comm'n*, 768 P.2d 359, 362 (Okla. 1988).

While the Wyndham Defendants might disagree as to the level of control they exercised over their franchised locations, this is a fact issue to be developed through discovery. If courts hesitate to grant summary judgment on the agency issue (which they do—see the above footnote), then Defendants should not prevail on such a fact-intensive issue on a motion to dismiss.

Nancy also alleges a second way that the Wyndham Defendants are vicariously liable: They are joint employers of each staff member on the ground. (FAC ¶ 238) (explicitly invoking "joint employer" theory.)

The Wyndham Defendants do not address this theory, arguing instead that Nancy has failed to adequately allege a "joint venture," a theory she never invoked. *See* (Doc. 132, pp. 20–21.)

Whether an entity is a "joint" employer of another entity's employees comes down to the control it has over their employment. *Ray v. L.A. Cnty. Dep't of Pub. Soc. Servs.*, 52 F.4th 843, 849 (9th Cir. 2022) (holding that county's control over health aides' work hours and pay rate sufficed to create joint employment, even where county did not pay some aides directly, did not control the work, and did not have the power to hire or fire).

Here, Nancy alleges the Wyndham Defendants created and set policies and procedures in relation to employment at the Local Defendants' properties; controlled the employees' training, especially with regard to human trafficking; controlled employees' job responsibilities; and required the employees to report evidence of sex trafficking such as excessive used condoms, excessive requests for linens, and excessive foot traffic to particular rooms. (*Id.* ¶¶ 164(b), 183(b-c), 196(b-c), 210(b-c), 164(k)(i), 183(m)(i), 196(l)(i), 210(l)(i).)

In sum, the Wyndham Defendants controlled everything: Employment, training, day-to-day actions, policies, and corporate culture. Their control was tightest where it was most relevant—the employees' response to human trafficking. At the pleading stage, Nancy has pled enough facts to make it plausible that the Wyndham Defendants are joint employers.

## V.    NANCY STATES DIRECT (NON-VICARIOUS) BENEFICIARY LIABILITY CLAIMS AGAINST THE WYNDHAM DEFENDANS.

"The TVPRA provides a civil cause of action for victims of any crime under chapter 77 of title 18 of the U.S. Code." *Bistline v. Parker*, 918 F.3d 849, 870 (10th Cir. 2019) (citing 18 U.S.C. § 1595). A victim of trafficking can state a cause of action against a hotel is by alleging that the hotel "(1) knowingly benefitted, financially or by receiving anything of value; (2) from participation in a venture; (3) which they knew or should have known has engaged in an act in violation of Section 1591." *M.A. v. Wyndham Hotels & Resorts, Inc.*, No. 2:19-cv-00849, 2025 U.S. Dist. LEXIS 185758, at *30 (S.D. Ohio Sep. 22, 2025).

### A.    Wyndham Defendants Benefitted Financially

On the first prong, plausibly showing a defendant obtained a "financial benefit of [a] franchise agreement" is enough to survive a motion to dismiss. *S.C. v. Hilton Franchise Holding, LLC*, No.: 2:23-cv-02037-APG-DJA, 2024 U.S. Dist. LEXIS 205682, at *15 (D. Nev. Nov. 12, 2024). Wyndham Defendants had such agreements here.

### B.    Wyndham Defendants Participated in a Franchising Venture.

For purposes of § 1595, the venture need not be "specifically a sex trafficking venture." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 554 (7th Cir. 2023) (citation omitted). The alleged venture "can be a 'commercial venture' like running or expanding a business." *Id.* (cleaned up).

[ 19 ]

Here, Wyndham Defendants relationships with their franchisee Local Defendants qualifies as a venture. *See Doe v. Radisson Hosp., Inc.*, A-23-CV-1456-DII, 2025 U.S. Dist. LEXIS 19682, at *23–24 (W.D. Tex. Jan. 21, 2025) ("H.E.W.'s second claimed venture—between the Radisson Defendants and their franchisee operating the Austin Country Inn—suffices . . . to plead a venture under Section 1595.")

### C. Defendants "Should Have Known" That Some of Their Franchisees Were Harboring Sex Trafficking.

On the third prong, the language "knew or should have known" imposes a negligence standard. *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1177 (9th Cir. 2022). This is "a less culpable state than actual knowledge or recklessness." *Id.* (citation omitted).

Under this negligence standard, a civil defendant need not have knowledge of the particular victim—constructive knowledge that the venture violated § 1591 as to *any* victim is enough. *Fleites v. MindGeek S.A.R.L.*, No. 2:21-cv-04920-WLH-ADS, 2025 U.S. Dist. LEXIS 190592, at *51 (C.D. Cal. Sep. 26, 2025); *G.G. v. Salesforce.Com, Inc.*, 76 F.4th 544, 557 (7th Cir. 2023).

In *G.G.*, the Seventh Circuit noted that if Congress had meant to require "actual or constructive knowledge of the specific victim, it could have simply said so. It did not." 76 F.4th at 556. Requiring knowledge of the specific victim "goes two bridges too far." *G.G.,* 76 F.4th at 556.

As the Seventh Circuit has reasoned, "[i]f such specificity were required, Section 1595 would be severely undermined in some of the most egregious cases." *Id.* at 557. A company "could simply bury its head in the sand with respect to individual victims." *Id.* For instance, it could work "only with high-level data" to shield itself from knowledge. *Id.* A taxi service could install a black shield between passengers and drivers so that its drivers would never see any particular human trafficking victims. *Id.*

Or a prostitution ring might hire a construction company to "build a better brothel, one that attracts more customers and is better insulated from the prying eyes of law enforcement." *Id.* The contractor may know that the business is engaged in sex trafficking, but "so long as the contractor does not know of any individual victim, it would be insulated from civil liability." *Id.* The Seventh Circuit refused to countenance such a reading. *Id.*

Similarly, a company's "failure to implement policies sufficient to combat a known problem" in its operations can "rise to the level of" negligence or even willful blindness. *M.A.*, 425 F. Supp. 3d at 968. Because beneficiary liability involves a "*negligence* standard, not a willful blindness or a reckless disregard standard," a failure to implement basic protections breaches the standard of care. *Fleites v. MindGeek S.A.R.L.*, No. 2:21-cv-04920-WLH-ADS, 2025 U.S. Dist. LEXIS 190592, at *51 (C.D. Cal. Sep. 26, 2025) (emphasis in original).

In *M.A. v. Wyndham*, 425 F. Supp. 3d 959 (S. D. Ohio 2019), the court denied Wyndham Hotels & Resorts, Inc.'s motion to dismiss in a nearly identical case. In that case, the same red flags that were visible to Defendants here were visible in the Wyndham hotels:

- The trafficker often requested rooms near exit doors;
- The trash cans contained large numbers of used condoms;
- Rooms were paid for in cash; and
- There was high foot traffic to and from the rooms.

*Id.* at 967.

The Wyndham Defendants saw multiple guest reviews mention prostitution at the Days Inn, the Howard Johnson, and both the Super8s where Nancy was trafficked. (FAC ¶¶ 218–227.) Each had access to its Local Defendants' reservations, including Nancy's repeated stays (Id. ¶¶ 164(c), 196(d), 183(d), 210(d).) Each also required use of an approved property management system which reported occupancy, reservations, guest services, registrations, check-in and check-out data, and staff notes ("Stay Remarks"), including notes suggesting guests were being trafficked. (Id. ¶¶ 164(d), 183(e), 196(e), 210(e).)

Each Wyndham Defendant realized its Local Defendant's location was "harbor[ing]" trafficking victims due to the high number of in-cash reservations, money spent on laundry services, and revenue from extra linens

at these locations. (Id. ¶¶ 164(g)(iii-iv), 183(i)(iii), 196(h)(iii), 210(h)(iii).) And Wyndham Defendant also had access to guest internet usage records through its approved Wi-Fi vendor, including Nancy's and Domino's Backpage ads. (Id. ¶¶ 164(h)(i-ii), 183(j)(i-ii), 196(i)(i-ii), 210(i)(i-ii).) The Wyndham Defendants' confidential brand standards also required their respective Local Defendant to record and report signs of criminal activity, including evidence of sex trafficking. (Id. ¶¶ 164(k)(i), 183(m)(i), 196(l)(i), 210(l)(i).)

In sum, each Wyndham Defendant had direct access to enough information that it knew or should have known, even without attributing to it the knowledge of the staff on the ground, that it was participating in a franchising venture with a franchisee that had violated § 1591 with respect to *someone*, whether or not they knew about Nancy, specifically.

## VI.  NANCY'S STATE LAW CLAIMS TRACK HER TVPRA CLAIMS.

Nancy agrees with the Wyndham Defendants that her State law claims against them should rise or fall with her TVPRA claims.  Because Nancy states viable direct and vicarious liability claims against the Wyndham Defendants under the TVPRA, her state law claims should not be dismissed.

## VII.  CONCLUSION

The Wyndham Defendants controlled the relevant activities of the Local Defendants in minute detail and had direct access to much of what the Local

Defendants knew about trafficking at their properties.  Court should deny their motions to dismiss.

DATED this 5th day of December, 2025

Respectfully submitted,

/s/ Geoffrey C. Parker

Geoffrey C. Parker, Esq. (*pro hac vice)*
HILTON PARKER LLC
7658 Slate Ridge Blvd.
Reynoldsburg, OH 43068
Tel: (614) 992-2277
Fax: (614) 927-5980
gparker@hiltonparker.com
*Attorney for Plaintiff Nancy R.*