## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| NANCY R., pseudonymously, | Case No.: 5:25-cv-462 |
| Plaintiff, | Judge Charles B. Goodwin |
| vs. | |
| PLAZA HOTELS, LLC et al., | **PLAINTIFF'S RESPONSE TO THE MOTION TO DISMISS FILED BY G6 HOSPITALITY FRANCHISING, LLC** |
| Defendants. | |

COMES NOW Plaintiff Nancy R. ("Plaintiff" or "Nancy" herein), by and through her undersigned attorneys, and submits this Response to the Motion to Dismiss filed by Defendant G6 Hospitality Franchising, LLC. (Doc. No. 161.)

DATED this 10th day of December, 2025

                              */s/ Geoffrey C. Parker*
                              GEOFFREY C. PARKER, ESQ.
                              Ohio Bar No. 0096049
                              JONATHAN L. HILTON, ESQ.
                              Ohio Bar No. 0095742
                              HILTON PARKER LLC
                              7658 Slate Ridge Boulevard
                              Reynoldsburg, Ohio 43068

                              MICHAEL C. KANE, ESQ.
                              Nevada Bar No. 10096
                              THE702FIRM INJURY
                              ATTORNEYS
                              400 South 7th Street, Suite 400
                              Las Vegas, Nevada 89101

                              *Attorneys for Nancy R.*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................... iii

I.    INTRODUCTION ........................................................................ 1

II.   STATEMENT OF FACTS ............................................................. 3

      A.    Nancy Was Trafficked by a Violent Gang Member ........................ 4

      B.    Defendant Knew Hotels Are Prone Are to Sex Trafficking. .......... 4

      C.    Motel 6 Staff Saw Nancy's Client Volume, Directed Her to
            Potential Johns, Bought Sex From Her, and Observed Her
            Trafficker. ........................................................................ 5

      D.    G6 Was Able to Detect and Track Red Flags of Trafficking. ......... 8

      E.    G6 Controlled Multiple Facets of the Motel 6 Franchisees'
            Operations Through its Franchise Agreement. ............................ 9

III.  THE MOTEL 6 FRANCHISEE DEFENDANTS ARE Liable As
      PerpetratorS OF NANCY'S TRAFFICKING. ................................... 11

      A.    The Motel 6 Franchisees Knowingly Harbored Nancy ................ 11

      B.    The Motel 6 Franchisees Acted "In Reckless Disregard" of
            Coercion. ......................................................................... 13

            1.   Perpetrator liability requires "reckless disregard" – not actual
                 knowledge. ................................................................. 13

            2.   Motel 6 Franchisees "recklessly disregarded" Nancy's coercion.
                 14

IV.   THE Motel 6 FRANCHISEEs ARE Liable as BeneficiarIES OF
      NANCy'S TRAFFICKING .......................................................... 16

      A.    The Motel 6 Franchisee Defendants Knowingly Benefitted
            from Participating in a Commercial Sex Venture. ...................... 16

      B.    The Motel 6 Franchisee Defendants Knew or Should Have
            Known that Nancy Was Being Coerced by a Trafficker. ............. 18

V.    G6 is Liable For the Motel 6 Franchisees' Conduct in Agency or as a
      Joint Employer of Their Staff. ...................................................... 19

VI.   Nancy Also States A Direct Beneficiary Liability Claim Against G6 ... 21

      A.    G6 Knowingly Benefitted from Room Rentals for Nancy's
            Trafficking. ...................................................................... 22

      B.    G6 Participated in a Franchise Venture. .................................. 22

      C.    G6 Knew or Should Have Known of the Motel 6 Franchisees'

Involvement in Trafficking..............................................................22

VII.   G6's STATE LAW ARGUMENTs LACK MERIT .................................24

VIII.  ANY DISMISSAL SHOULD Come WITH LEAVE TO AMEND..........25

IX.    CONCLUSION.........................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Broock v. Nutri/System, Inc.*,
  654 F. Supp. 7 (S.D. Ohio 1986) ...................................................................... 19

*Brown v. DFS Servs., L.L.C.*,
  434 Fed. Appx. 347 (5th Cir. 2011)................................................................. 25

*C.C. v. Rashid*,
  2:23-cv-2056-GMN, 2024 U.S. Dist. LEXIS 231723 (D. Nev. Dec. 20, 2024)............... 18

*Decker v. Domino's Pizza*,
  644 N.E.2d 515 (Ill. App. Ct. 1994) ................................................................. 19

*Doe v. Radisson Hosp., Inc.*,
  A-23-CV-1456, 2025 U.S. Dist. LEXIS 19682 (W.D. Tex. Jan. 21, 2025) ....... 2, 3, 20, 22

*Doe v. Shera Ton, LLC*,
  23CV00451 KG/JMR, 2024 U.S. Dist. LEXIS 58311 (D.N.M. Mar. 28, 2024)............. 20

*Doe v. Wyndham Hotels & Resorts*,
  2:23-cv-01676, 2025 U.S. Dist. LEXIS 2988, at *54 (E.D. Cal. Jan. 6, 2025) ............... 12

*E.S. v. Best W. Int'l, Inc.*,
  510 F. Supp. 3d 420 (N.D. Tex. 2021) .............................................................. 17

*F.C. v. Jacob Sols., Inc.*,
  790 F. Supp. 3d 1158 (D. Colo. 2025).............................................................. 17

*Fernandez v. Clean House, LLC*,
  883 F.3d 1296 (10th Cir. 2018) ...................................................................... 24

*Fleites v. MindGeek S.A.R.L.*,
  2025 No. 2:21-cv-04920-WLH-ADS, 2025 U.S. Dist. LEXIS 190592 (2025).......... 22, 23

*G.G. v. Salesforce.Com, Inc.*,
  76 F.4th 544 (7th Cir. 2023) .......................................................................... 23, 24

*G.M. v. Choice Hotels Int'l, Inc.*,
  No. 2:22-cv-3788, 2024 U.S. Dist. LEXIS 52523 (S.D. Ohio Mar. 25, 2024)............. 1, 19

*Khan v. Shell Oil Co.*,
  71 S.W.3d 890 (Tex. App. Ct. 2002).............................................................. 19

*M.A. v. Wyndham Hotels & Resorts, Inc.*,
    425 F. Supp. 3d 959 (S.D. Ohio 2019) ............................................................ 2

*M.A. v. Wyndham Hotels & Resorts, Inc.*,
    No. 2:19-cv-00849, 2025 U.S. Dist. LEXIS 185758 (S.D. Ohio Sep. 22, 2025) ............ 16

*P.C. v. D Fort Hotel, LLC, Civil Action*,
    No. 24-cv-01584; 2025 U.S. Dist. LEXIS 20835 (D. Colo. Feb. 5, 2025). 1, 15, 16, 18, 23

*Ratha v. Phatthana Seafood Co.*,
    35 F.4th 1159 (9th Cir. 2022) ...................................................................... 22

*Ray v. L.A. Cnty. Dep't of Pub. Soc. Servs.*,
    52 F.4th 843 (9th Cir. 2022) .................................................................. 2, 21

*S.C. v. Hilton Franchise Holding, LLC*,
    2024 U.S. Dist. LEXIS 205682 (D. Nev. Nov. 12, 2024) ................................. 12

*T.D.P. v. Choice Hotels Int'l, Inc.*,
    725 F. Supp. 3d 784 (S.D. Ohio 2024) ........................................................... 2

*T.P. v. Wyndham Hotels & Resorts, Inc.*,
    No. 2:21-cv-04933, 2022 U.S. Dist. LEXIS 217315 (S.D. Ohio Dec. 1, 2022).......... 2, 20

*United States ex rel. Schutte v. SuperValu Inc.*,
    598 U.S. 739 (2023)................................................................................ 14

*United States v. Duong*,
    848 F.3d 928 (10th Cir. 2017) ................................................................... 13

*United States v. Rodriguez*,
    880 F.3d 1151 (9th Cir. 2018) ................................................................... 14

*Whitten v. Ky. Fried Chicken Corp.*,
    570 N.E.2d 1353 (Ind. Ct. App. 1991)........................................................ 19

*Wunder v. Mobil Oil Corp.*,
    X04CV000120525S, 2002 WL 31500966 (Conn. Super. Ct. Oct. 24, 2002) ................ 19

## **STATUTES**

18 U.S.C.
    § 1591......................................................................................... 1, 3
    § 1591(a)(1) ................................................................................... 11
    § 1591(e)(2) ................................................................................... 15
    § 1591(e)(5) ................................................................................... 15

18 U.S.C. (cont.)
    § 1595 ..................................................................................................... 3
    § 1595(a) .............................................................................................. 11

Oklahoma
    O.S. 21(A)(4) ....................................................................................... 24

## **FEDERAL RULES**

Fed. R. Civ. P.
    Rule 9(b) .............................................................................................. 12

Rule 15 ........................................................................................................ 25

## **OTHER AUTHORITIES**

BLACK'S LAW DICTIONARY 860 (11th Ed. 2019) ............................................ 11

## I.    INTRODUCTION

Plaintiff Nancy R. ("Nancy") was trafficked out of at the Motel 6 located at 1800 E Reno Avenue, Oklahoma City, OK 73117—a franchised hotel operated jointly by Defendants Noor, Ambica, Om, and Indra ("the Motel 6 Franchisees") and overseen by Defendant G6—for six days, during which she was forced to have sex with around 60 johns.

The Complaint's allegations against the Motel 6 Franchisees easily pass muster, given the sheer volume of sex traffic at the Motel 6. *See P.C. v. D Fort Hotel, LLC*, Civil Action No. 24-cv-01584-PAB-TPO, 2025 U.S. Dist. LEXIS 20835, at *15 (D. Colo. Feb. 5, 2025) (explaining that "Courts have also found that allegations of voluminous sex buyers are indicative of the fact that the commercial sex activity was coerced.") (collecting cases).

Defendant G6, however has moved to dismiss on grounds that it was a franchisor—not a franchisee-level hotel operator. But franchisors can be liable under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. 1591 et seq., for three independent reasons. Any one of these would be sufficient, but all three apply to G6 here.

***First***, Courts recognize vicarious liability theories under the TVPRA— including those based on a franchisor's control of a franchisee. *G.M. v. Choice Hotels Int'l, Inc.*, No. 2:22-cv-3788, 2024 U.S. Dist. LEXIS 52523, at *31 (S.D.

[ 1 ]

Ohio Mar. 25, 2024). When a franchisor exerts enough control over a franchisee, the franchisee becomes the franchisor's agent for liability purposes.

Here, Nancy lays out in painstaking detail the parts of the franchise agreement that give G6 control over the Motel 6 Franchisees—and she has done a better job doing so than many other trafficking victims whose complaints against franchisors have summary motions to dismiss. *See, e.g., T.P. v. Wyndham Hotels & Resorts, Inc.,* No. 2:21-cv-04933, 2022 U.S. Dist. LEXIS 217315, at *36 (S.D. Ohio Dec. 1, 2022); *Doe v. Radisson Hosp., Inc.,* A-23-CV-1456-DII, 2025 U.S. Dist. LEXIS 19682, at *26 (W.D. Tex. Jan 21, 2025).

***Second***, along similar lines, G6 has so much control over its franchisees' staff that G6 can be fairly considered a joint employer of them. Whether two employers are "joint" employers depends on how much control one exercises over the other's nominal employees. *Ray v. L.A. Cnty. Dep't of Pub. Soc. Servs.,* 52 F.4th 843, 849 (9th Cir. 2022). Courts apply the joint employer doctrine to hold franchisors liable for the TVPRA violations of franchisee employees. *M.A. v. Wyndham Hotels & Resorts, Inc.,* 425 F. Supp. 3d 959, 972 (S.D. Ohio 2019).

The factors the Court must consider when analyzing both agency and joint employer theories of vicarious liability are "very similar," the key distinction with the joint employer theory is how much control the franchisor exercises "specific to employment policies." *T.D.P. v. Choice Hotels Int'l, Inc.,* 725 F. Supp. 3d 784, 801–02 (S.D. Ohio 2024). Here, G6 dominated hiring,

training, disciplining, promoting, and firing employees, so it qualifies as a joint employer of those who committed TVPRA violations.

**Third**, G6 is liable as a beneficiary of trafficking under 18 U.S.C. 1595. It received room rental fees, so it benefitted financially, and it also participated in a franchising venture with the Franchisee Defendants. *See Doe v. Radisson*, 2025 U.S. Dist. LEXIS 19682, at *23–24 (explaining that a franchisee-franchisor relationship qualifies as a "venture" for TVPRA purposes).

And G6 knew or should have known that the Motel 6 Franchisees were committing criminal violations of 18 U.S.C. 1591—which prohibits knowingly harboring prostitutes in reckless disregard of the fact that those prostitutes are being coerced. Here, as a franchisor, G6 was negligent with respect to how it benefited from being in a relationship with Franchisee Defendants who were perpetrators of trafficking.

G6's relationship with its franchisee Motel 6 qualifies as a venture, and that venture violated the criminal provisions of the TVPRA. The Court should therefore deny the motion to dismiss in its entirety. Let's get started.

## II.    STATEMENT OF FACTS

We first explain how Defendant's industry profits from sex trafficking. We then show that Defendant, and its staff, knew about Nancy's individual trafficking.

### A.    <u>Nancy Was Trafficked by a Violent Gang Member.</u>

The Court is familiar by now with Nancy's history, and the abuse and control of her trafficker, Domino. *See* (FAC Doc. 115 ¶¶ 71–86.)

### B.    <u>Defendant Knew Hotels Are Prone Are to Sex Trafficking.</u>

Hotels provide temporary, anonymous, and private lodgings near airports, highways, and event spaces. (*Id.* ¶ 51.) These characteristics often attract traffickers to hotels. (*Id.* ¶ 52.) A 2018 Polaris Project found 75% of sex trafficking victims surveyed had spent time in a hotel during their trafficking, and 60% had engaged in commercial sex inside one. (*Id.* ¶ 53.) Since 2015, hundreds of civil sex trafficking lawsuits have been filed against hotel franchisees and franchisors, including Motel 6. (*Id.* ¶ 59.)

Because hotels encounter the majority of sex trafficking victims, the Polaris Project published a list of red flags to help hospitality employees identify instances of in-call escort services involving trafficking victims on hotel properties. (*Id.* ¶¶ 55–56.) These indicators include:

- Paying for stays in cash or with prepaid credit cards;
- Booking for a single night and extending day by day;
- Excessive condoms in hotel wastebins;
- Excessive foot traffic;
- Inappropriate attire;
- Frequent requests for new towels; and
- One person checking in with multiple people in tow.

(*Id.*)

[ 4 ]

Following an influx of lawsuits against hotels for human trafficking allegations, G6 implemented an anti-trafficking training program for its franchised hotels. (*Id.* ¶ 60.) This training program was the product of a partnership between the Americal Hotel and Lodging Association (AHLA) and the Polaris Project. (*Id.* ¶ 61.) The training highlights the following behaviors as red flags of human trafficking:

- Paying in cash or with a prepaid card one day at a time;
- Wearing heavy makeup, lingerie, and little clothing;
- Carrying little luggage;
- Displaying signs of drug use or sleep deprivation;
- Discarding condoms;
- Use of Backpage.com; and
- Heavy foot traffic to a room by different men.

(*Id.* ¶¶ 62-64.)

### C.   Motel 6 Staff Saw Nancy's Client Volume, Directed Her to Potential Johns, Bought Sex From Her, and Observed Her Trafficker.

G6 HOSPITALITY FRANCHISING, LLC ("**G6**") was the franchisor that set—and monitored compliance with—the brand standards for the Motel 6 Oklahoma City Bricktown ("the Motel 6") located at 1800 E Reno Avenue, Oklahoma City, OK 73117 during the span of Nancy's trafficking. (*Id.* ¶ 17.) Nancy stayed at the Motel 6 for six days in early 2022 and was forced to have commercial sex with roughly 60 men during her stay. (*Id.* ¶ 132.)

Nancy showed up to check-in sporting high heels and skimpy clothing. (*Id.* ¶ 91(a).) She rented rooms with a fake ID, often a flimsy paper "temporary" one, or sometimes didn't show her ID at all, even though she was booking under her own name. (*Id.* ¶¶ 91(b–c).) She extended her stay day by day, paying in cash or with a prepaid card. (*Id.* ¶ 91(d).) She also asked for unusual numbers of linen changes and discarded unusual numbers of used condoms in the wastebin. (*Id.* ¶¶ 91(f)–(g).)

Two front desk employees at the Motel 6 helped Nancy meet with johns and find clients to solicit. (*Id.* ¶ 133.) When a client of Nancy's arrived at the hotel, front desk staff alerted Nancy and then watched as she escorted him to her room while wearing clothing fitted for sex work. (*Id.* ¶¶ 91(a), 134.) Front desk staff witnessed Nancy take at least ten clients to her room per day. (*Id.* ¶ 86.) Heavy foot traffic in and out of rooms was listed as a known red flag in the Motel 6 Franchisee's anti-trafficking training. (*Id.* ¶¶ 62–64.)

The Motel 6 employees also helped Nancy find clients in three ways. Firstly, if they suspected that a guest was interested in buying sex, staff members informed Nancy of the potential client. (*Id.* ¶ 135.) Secondly, Motel 6 staff kept an eye on the bus stop across the street and notified Nancy when a Greyhound pulled in, then watched as Nancy and other sex workers advertised commercial sex to the passengers. (*Id.* ¶¶ 135–36.)  Thirdly, one of the Motel 6

front desk employees personally purchased sex from Nancy and the other girls she was forced to work with. (*Id.* ¶ 139.)

As described above, Motel 6 front desk staff witnessed Nancy take tens of clients to her room every day and helped her recruit clients. (*Id.* ¶¶ 135–36, 139.) When staff noticed Nancy had met with a large number of clients, they increased Nancy's room rate for her next stay. (*Id.* ¶¶ 137–38.)

Motel 6 employees also observed interactions between Nancy and her trafficker. Although Domino was incarcerated during Nancy's trafficking at the Motel 6, he directed one of his gang associates, or "homeboys," to continue trafficking her—effectively making the affiliate Nancy's trafficker for the duration of her stay. (*Id.* ¶¶ 81, 141, 143.) Domino's homeboy visited the Motel 6 location regularly to take Nancy's money, provide her drugs, and "keep her on a leash"—and the Motel 6's front desk staff saw these visits for what they were. (*Id.* ¶¶ 141–144.)

Studies show 80-90% of prostitutes are controlled by pimps, and a majority of pimps use threats and physical violence for control. (*Id.* ¶¶ 27–28.) Other common means of control used by pimps include taking all money earned by their victims and inducing substance dependence. (*Id.* ¶¶ 32, 35.) Thanks to their intimate familiarity with the sex trade, the Motel 6's front desk staff knew these basic facts about prostitution and would have known Nancy was likely being trafficked even without seeing her trafficker. (*Id.* ¶¶ 142–144.)

The Motel 6 Franchisees knew that most prostitutes with pimps are victims of coercion. (*Id.* ¶ 41, 144.) The way Nancy and her trafficker operated piled up clue after clue that Nancy was one of the coerced ones.

### D.     G6 Was Able to Detect and Track Red Flags of Trafficking.

First, G6 knew sex trafficking was a prevalent issue in the hospitality industry prior to Nancy's trafficking at the Motel 6 location. (*Id.* ¶¶ 53–54, 58–59.) Second, its staff were trained to recognize and report the very red flags Nancy exhibited. (*Id.* ¶¶ 60–64, 145(k)(i)).) Third, G6's franchise agreement with Motel 6 shows it could spot red flags through centralized systems used by the Motel 6 Franchisees, which gave G6 the right to access all of its franchisee's data. (*Id.* ¶¶ 145(c)–(h).)

G6 held the right to review all the Motel 6 Franchisee's databases including their property management system which contained guest information like "stay remarks." (*Id.* ¶ 145(f).) It was also within G6's power to enter the Motel 6 location to conduct inspections and evaluations of the location at any time without warning. (*Id.* ¶ 145(i).)

Additionally, G6 read third party reviews of its Motel 6 franchised location. (*Id.* ¶ 145(j).) G6 read multiple reviews left before and during Nancy's trafficking that mention sightings of prostitutes, pimps, "crack hoe[s]," "whacked out" hookers, and sex stains in the rooms. (*Id.* ¶¶ 216–17.)

Finally, the Motel 6 Franchisees were required to record and inform G6 of evidence of criminal activity, particularly evidence indicative of sex trafficking like excessive used condoms left behind, excessive requests for linens, and excessive foot traffic to particular rooms. (*Id.* 145k(i).) G6 knew that these were signs of trafficking. (*Id.* ¶¶ 60, 62–64, 89, 144.) And Nancy's trafficking exhibited every one of these red flags throughout her trafficking at the Motel 6 location. (*Id.* ¶¶ 57, 63, 87, 90, 91, 92, 93, 134–37.)

### E.    G6 Controlled Multiple Facets of the Motel 6 Franchisees' Operations Through its Franchise Agreement.

The G6 Franchise Disclosure Document ("FDD") for the relevant period outlines various other regulations contained in the full franchise agreement. ***First***, the Motel 6 Franchisees had to use G6 approved suppliers for various aspects of the hotel's operations. The Motel 6 Franchisees had to purchase signage, linens, interior design elements, and electronic equipment from a G6-approved supplier. (*Id.* ¶ 145(a).)

***Second***, the Motel 6 Franchisees also had to have their proposed general manager complete G6's extensive training program to G6's satisfaction. (*Id.* ¶ 145(b).) Because G6 was free to withhold or withdraw its approval, the franchise agreement effectively gave G6 total discretionary control over the management of the Motel 6. (*Id.*)

***Third***, G6 provided a centralized Reservation System which the Motel 6 Franchisees had to use for arranging and selling room reservations. (*Id.* ¶ 145(c).) Similarly, the Motel 6 Franchisees had to use HotelKey—which directly interfaced with G6's own computer system nightly—as their property management system, as well as an approved supplier for credit card payment processing. (*Id.* ¶¶ 145(d)–(e).) G6 also had a proprietary revenue management system which used franchisee data to recommend room rate prices which the Motel 6 Franchisees were required to use. (*Id.* ¶ 145(h).)

G6 also reserved the right to access all the Motel 6 Franchisee's data, including data regarding average daily room rates, occupancy, rooms sold, gross revenue, and other data as reported nightly by the Motel 6 Franchisees, including stay remarks. (*Id.* ¶¶ 145(f)–(g).)

***Fourth***, G6 was permitted to inspect the Motel 6 location. G6 could send inspectors to the property without notice or purpose to ensure alignment with franchise standards. (*Id.* ¶ 145(i).) During these evaluations, inspectors would have witnessed red flags of Nancy's (and other victims') trafficking and the Motel 6 staff's facilitative conduct. (*Id.*) If the Motel 6 Franchisees did not pass an inspection, they had to pay a "re-inspection fee". (*Id.*) G6 also reviewed and scored unsolicited feedback from the Motel 6 location's guests, such as reviews left on third-party websites. (*Id.* ¶ 145(j).)

*Fifth*, the Motel 6 Franchisees had to comply with other G6 brand standards, like:

- Reporting evidence of criminal activity (including sex trafficking);

- Using G6's defined pay rates, job titles, and terms of employment; and

- Using a G6-approved vendor for guest Wi-Fi services.

(*Id.* ¶ 145(k).)

## III.    THE MOTEL 6 FRANCHISEE DEFENDANTS ARE LIABLE AS PERPETRATORS OF NANCY'S TRAFFICKING.

The TVPRA creates a cause of action for trafficking victims "against the perpetrator." 18 U.S.C. § 1595(a). Perpetrators are those who—among other things—knowingly "harbor" or "provide" any person in reckless disregard of the fact that force, threats, fraud, or coercion "will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a)(1)–(2).

We first show how the Motel 6 Franchisees, who together owned and operated the Motel 6, knowingly harbored Nancy. Then, we show how they operated in reckless disregard of her coercion by Domino and his affiliate.

### A.    <u>The Motel 6 Franchisees Knowingly Harbored Nancy</u>

The TVPRA does not define "harbors," so the word takes its ordinary meaning. According to Black's Law Dictionary, "harboring" means "[t]he act of affording lodging or refuge to a person, esp. a criminal or illegal alien." BLACK'S LAW DICTIONARY 860 (11th Ed. 2019).

[ 11 ]

Courts overwhelmingly hold that hotels can harbor a victim "through the act of renting rooms to a trafficker." *Doe v. Wyndham Hotels & Resorts*, No. 2:23-cv-01676-DAD- CSK, 2025 U.S. Dist. LEXIS 2988, at *54 (E.D. Cal. Jan. 6, 2025) (collecting cases). The hotel need not have acted with any "intent to commit a crime" itself. *Id.* But, knowingly providing someone with a room to use for commercial sex—a crime—is "harboring" crime under any definition.

Here, Nancy alleged facts showing the Motel 6 Franchisees "harbored" her within the ordinary meaning of that word by renting her rooms for sex work. They sheltered her in the literal sense of providing a roof over her head. They also sheltered her in the figurative sense of concealing the crime of prostitution from public view.

Nancy has alleged this was done "knowingly." Under the Rules, she may allege knowledge "generally." *See* Fed. R. Civ. P. 9(b); *see also S.C. v. Hilton Franchise Holding, LLC*, 2024 U.S. Dist. LEXIS 205682 at *8 (D. Nev. Nov. 12, 2024) (accepting allegations "upon information and belief" that a hotel had actual knowledge). Nancy's pleadings go beyond what the Rules require.

Motel 6 staff knew that Nancy was a prostitute. She displayed all the signs of sex work: she wore revealing clothing; escorted at least ten johns to her room per day; extended her stay in short increments; requested countless towel and linen changes; and discarded of an excessive amount of condoms. (FAC, Doc. 115 at ¶¶ 91(a), 91(d), 91(f)–(g), 132, 134, 137.)

Beyond recognizing classic indicators of prostitution, the Motel 6 Franchisees' employees actively facilitated her sex work. Employees notified Nancy when johns arrived, pointed out potential clients, and alerted her when Greyhound buses full of potential buyers pulled into the station across the street. (*Id.* ¶¶ 134–35.) One staff member even purchased sex from Nancy and other sex workers. (*Id.* ¶ 139.) Thus, at the motion to dismiss stage, Nancy's allegations that the Motel 6 Franchisees "knowingly …. harbor[ed]" her are plausible.

### B.    The Motel 6 Franchisees Acted "In Reckless Disregard" of Coercion.

Next, we explain why § 1591 requires reckless disregard, not actual knowledge, of coercion. We then show that the Motel 6 Franchisees acted with reckless disregard of Nancy's coercion because they knew Nancy was a prostitute and they therefore knew there was an over 50% chance she was being coerced—allegations the Court is required to credit at this stage. Finally, we show that they had reason to know Nancy, specifically, was being coerced.

1.    Perpetrator liability requires "reckless disregard" – not actual knowledge.

The criminal liability portion of the TVPRA sets out a two-tiered *mens rea*: the defendant must knowingly engage in specified conduct (e.g., harboring) with respect to a trafficking victim, and the defendant must either know or recklessly disregard the fact that the person is a trafficking victim. *United*

*States v. Duong*, 848 F.3d 928, 933 (10th Cir. 2017) (explaining that the TVPRA was amended in 2008, which "decreased the prosecution's burden of proving mens rea by permitting it to show reckless disregard in lieu of knowledge.").

A defendant acts in "reckless disregard" of a fact when it was aware of a "substantial and unjustifiable risk" that the fact is true. *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023); *see also United States v. Rodriguez*, 880 F.3d 1151, 1162 (9th Cir. 2018). Nancy has further elaborated on this standard in her other brief. (Doc. 165, pages 18–19.)

2.    <u>Motel 6 Franchisees "recklessly disregarded" Nancy's coercion.</u>

Here, Nancy has alleged facts showing that the Motel 6 Franchisees knew she would engage in commercial sex and that one staff member even paid for sex with her. What's more, Nancy alleges the sex trade is an omnipresent part of the hotel industry—and that as a result, the Motel 6 Franchisees were more aware of the almost universally coercive nature of sex work. (FAC, Doc. 115 at ¶¶ 27–28, 40, 51-55, 58, 88.) She further alleges that, some of their staff had an even more intimate knowledge of her situation. (*Id.* ¶¶ 133–39.) It is thus plausible the Motel 6 Franchisees knew of a "substantial and unjustifiable risk" that Nancy—like most prostitutes—was being coerced. (*Id.* ¶ 40.)

Moreover, as detailed above, Nancy's interactions with staff were frequent enough—and her prostitution welcome enough—that staff alerted her to arriving clients and potential buyers. (*Id.* ¶¶ 134–135.) In between, staff

members witnessed Domino's homeboy visit regularly to collect money from Nancy, to supply her with drugs to sustain her addiction, and to otherwise keep her "on a leash." (*Id.* ¶¶ 141, 143.)

G6 argues that Nancy showed no signs of coercion because they did not witness physical injuries, verbal altercations, or attempts to flee. But coercion does not require bruises, violence, or dramatic pleas for help. *See* 18 U.S.C. § 1591(e)(2). Under the statute, "coercion" means not just physical harm, but also threats and harm that is "nonphysical, including psychological, financial, or reputational harm." 18 U.S.C. 1591(e)(5). Whether the harm is "sufficiently serious" is a fact-intensive inquiry based on the victim's "background" and "surrounding circumstances." *Id.*

Moreover, the sheer volume of men (ten per night) coming in and out of Nancy's room was by itself evidence of coercion because no "freelance" prostitute is likely to see more than one or two sex buyers per night of her own free will. *See*, *P.C. v. D Fort Hotel, LLC*, Civil Action No. 24-cv-01584-PAB-TPO, 2025 U.S. Dist. LEXIS 20835, at *15 (D. Colo. Feb. 5, 2025) ("explaining that a large number of sex buyers is evidence of coercion.") (collecting cases).

On top of this heavy foot traffic, the same "homeboy" of her trafficker frequently visited her room to collect her earnings and deliver drugs. (*Id.* ¶ 141.) And Nancy's drug dependence and lack of her own money would have been discernible to the Motel 6's staff, especially the staff member who took

Nancy and other prostitutes on trips to the local casino. (*Id.* ¶ 140.) Both financial control and induced substance dependence are recognized forms of coercion, and drug use is specifically addressed in G6's own anti-trafficking training. (Id. ¶¶ 32, 35–37, 56, 62, 75–77.)

Nancy plausibly alleges that the staff at the Motel 6 put the clues together and realized she was being coerced into selling sex. (*Id.* ¶¶ 143–44.) At a minimum, they disregarded a "substantial unjustifiable risk" of coercion.

## IV.    THE MOTEL 6 FRANCHISEES ARE LIABLE AS BENEFICIARIES OF NANCY'S TRAFFICKING

A victim of trafficking can state a cause of action for beneficiary liability against a hotel by alleging that the hotel "(1) knowingly benefitted, financially or by receiving anything of value; (2) from participation in a venture; (3) which they knew or should have known has engaged in an act in violation of Section 1591." *M.A. v. Wyndham Hotels & Resorts, Inc.*, No. 2:19-cv-00849, 2025 U.S. Dist. LEXIS 185758, at *30 (S.D. Ohio Sep. 22, 2025).

### A.    <u>The Motel 6 Franchisee Defendants Knowingly Benefitted from Participating in a Commercial Sex Venture.</u>

Across six stays in early 2022, the Motel 6 Franchisees watched Nancy— in her high heels and skimpy clothing—meet johns in the lobby and escort them to her room about ten times per day. (FAC, Doc. 115 at ¶¶ 91(a), 92–94, 132.)  In addition to witnessing Nancy meeting with johns, Motel 6 staff helped direct clients to her so she would continue booking rooms for commercial sex.

(*Id.* ¶¶ 133-36.) They notified her when clients arrived, pointed her toward guests they believed were interested in buying sex, directed her to solicit bus passengers across the street, and one employee even purchased sex from her himself. (*Id.* ¶¶ 133-36, 139.) Staff's involvement was further underscored by their practice of increasing Nancy's room rate for her next stay when they observed that she had seen a higher volume of clients that day. (*Id.* ¶¶ 137-38.) Staff played an active role in helping Nancy identify potential clients so the hotel could profit from the resulting room rentals.

The Motel 6 Franchisees knew that Nancy was a prostitute and that the money she paid Motel 6 for room rentals was the proceeds of illegal commercial sex. (*Id.* ¶¶ 91, 133–36, 139.) Courts regularly find that this kind of ongoing business relationship involving repeated room rentals qualifies as knowingly benefiting from a venture for TVPRA purposes. *E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 426–27 (N.D. Tex. 2021) (collecting cases).

As will be discussed in the next subsection, the Motel 6 Franchisees also knew, or at the very least should have known, Domino and his homeboy were partners in the same commercial sex venture. This is all that is required for beneficiary liability. *See F.C. v. Jacob Sols., Inc.*, 790 F. Supp. 3d 1158, 1189 (D. Colo. 2025) (a defendant that "continues offering" services to a TVPRA venture "after becoming aware of [its services'] facilitation of the venture's violations" participates in the venture).

**B.** **The Motel 6 Franchisee Defendants Knew or Should Have Known that Nancy Was Being Coerced by a Trafficker.**

The phrase "knew or should have known" imposes a "negligence standard" on Defendants. *C.C. v. Rashid*, 2:23-cv-2056-GMN-BNW, 2024 U.S. Dist. LEXIS 231723, at *30 (D. Nev. Dec. 20, 2024). This is "a less culpable state than actual knowledge or recklessness." *Id.* (citation omitted).

Here, the Motel 6 Franchisee's conduct satisfies this negligence standard. Front desk employees notified Nancy of her client's arrivals, watched as Nancy escorted tens of johns to her room, and saw Domino's homeboy visit regularly to collect. (*Id.* ¶¶ 92–94, 132, 134, 141–43.) When Nancy did not meet her quota, they would have seen the signs of him withholding drugs from her, inducing painful withdrawal symptoms. (*Id.* ¶¶ 37, 77–78, 141.) Most importantly, they watched as Nancy was sold to ten or more men per night, and they actively helped her to keep that number up.  (*Id.* ¶¶ 132–35.)

Courts have found that less obvious clues suffice to meet the negligence standard for § 1595 beneficiary liability at the motion to dismiss stage. *See, e.g.*, *P.C. v. D Fort Hotel, LLC*, Civil Action No. 24-cv-01584-PAB-TPO, 2025 U.S. Dist. LEXIS 20835, at *15 (D. Colo. Feb. 5, 2025) ("Courts have also found that allegations of voluminous sex buyers are indicative of the fact that the commercial sex activity was coerced.") (collecting cases). In sum, the Motel 6 Franchisees knew or should have known that Nancy was being trafficked.

## V.    G6 IS LIABLE FOR THE MOTEL 6 FRANCHISEES' CONDUCT IN AGENCY OR AS A JOINT EMPLOYER OF THEIR STAFF.

Courts recognize vicarious liability theories under the TVPRA. *G.M. v. Choice Hotels Int'l, Inc.*, No. 2:22-cv-3788, 2024 U.S. Dist. LEXIS 52523, at *31 (S.D. Ohio Mar. 25, 2024). Because the TVPRA is a federal statute, the Court should apply the federal common law of agency—not state agency law. *Id.*

Whether an agency relationship exists depends on how closely the franchisor controlled the day-to-day-operations of its branded property. *Broock v. Nutri/System, Inc.*, 654 F. Supp. 7, 10–11 (S.D. Ohio 1986) (establishing agency for controlling day-to-day operations).

Courts look to whether the franchisor controls the particular aspect of the business operation at issue. For instance, KFC may be vicariously liable for burn accidents when it controls the type of chicken friers used, or Domino's Pizza or Shell Oil may be responsible for safety at chain locations.[1]

Nancy alleges that G6 controlled the business operations, training management, supervision, administration, and procedures of the hotel where

---

[1] *See, e.g.*, *Khan v. Shell Oil Co.*, 71 S.W.3d 890, 893–94 (Tex. App. Ct. 2002) (where a gas station employee was shot during an armed robbery, a triable issue of fact existed as to whether franchisor—Shell—exercised control over security at gas station location) (reversed on evidentiary grounds); *Wunder v. Mobil Oil Corp.*, No. X04CV000120525S, 2002 WL 31500966, at *1 (Conn. Super. Ct. Oct. 24, 2002) (similar); *Decker v. Domino's Pizza*, 644 N.E.2d 515, 517–19 (Ill. App. Ct. 1994) (affirming a verdict for plaintiff against the franchisor when the franchisee's employee was injured during attempted robbery, because franchisor "voluntarily undertook to establish a security program to deter robbery and to protect its employees from harm in the event of a robbery"); *Whitten v. Ky. Fried Chicken Corp.*, 570 N.E.2d 1353, 1354, 1357 (Ind. Ct. App. 1991) (when the plaintiff was burned by a chicken frier, jury could find franchisor liable because it controlled type of chicken friers the restaurant used).

she was trafficked. And she alleges an agency relationship was created between G6 and the Motel 6 Franchisees through standardized training courses, employment policies, use of G6's branding, reporting procedures, regular inspections, and other enforcement measures in the franchise agreement. (FAC, Doc. 115 at ¶ 145.) What is more, Motel 6 managers were required to complete G6's vigorous training course to G6's satisfaction, effectively giving G6 total discretionary control over the management of the Motel 6 location. (*Id.* ¶ 145(b).)

Construing the facts and inferences in Nancy's favor here, these allegations lay out G6's control over the Motel 6 Franchisees in more detail than those in other trafficking complaints that have also passed muster. *See, e.g.*, *T.P. v. Wyndham Hotels & Resorts, Inc.*, No. 2:21-cv-04933, 2022 U.S. Dist. LEXIS 217315, at *36 (S.D. Ohio Dec. 1, 2022); *Doe v. Radisson Hosp., Inc.*, A-23-CV-1456-DII, 2025 U.S. Dist. LEXIS 19682, at *26 (W.D. Tex. Jan 21, 2025); *Doe v. Shera Ton, LLC*, No. 23CV00451 KG/JMR, 2024 U.S. Dist. LEXIS 58311 at *17 (D.N.M. Mar. 28, 2024).

While G6 might disagree as to the level of control it exercised over its Motel 6 location, this is a fact issue to be developed through discovery. If courts hesitate to grant summary judgement on the agency issue (which they do—see the above footnote), then Defendant should not prevail on such a fact-intensive issue on a motion to dismiss.

Nancy also alleges a second way G6 is vicariously liable: It was a joint employer of the Motel 6 Franchisees' employees on the ground. Whether two employers are "joint" employers depends on how much control one exercises over the other's nominal employees. *Ray v. L.A. Cnty. Dep't of Pub. Soc. Servs.*, 52 F.4th 843, 849 (9th Cir. 2022) (holding that county's control over health aides' work hours and pay rates created joint employment, even where county did not pay them, did not control work methods, and could not hire or fire).

Here, Plaintiff alleges G6 set policies and procedures for employment at the Motel 6 location; controlled the employee's training; controlled employee's job responsibilities; and required employees to report evidence of sex trafficking such as excessive used condoms, excessive requests for linens, and excessive foot traffic to particular rooms. (FAC, Doc. 115 at ¶ 145.) In sum, G6 controlled everything: Management, training, job responsibilities; policies; and corporate culture. At the pleading stage, Nancy has pled enough facts to make it plausible G6 is a joint employer.

## VI. NANCY ALSO STATES A DIRECT BENEFICIARY LIABILITY CLAIM AGAINST G6.

Even if G6 is not vicariously liable for the conduct of the Motel 6 Franchisees, G6 is subject to direct beneficiary liability because it knowingly benefitted from participating in a franchisee-franchisor relationship venture with the Motel 6 Franchisees (which were perpetrators of Nancy's trafficking).

A.     <u>**G6 Knowingly Benefitted from Room Rentals for Nancy's Trafficking.**</u>

Plaintiff alleges that both the Motel 6 Franchisees and G6 knowingly benefitted from the room rentals used for her sex trafficking. As previously discussed with respect to the Motel 6 Franchisees, this is sufficient at the motion to dismiss stage.

B.     <u>**G6 Participated in a Franchise Venture.**</u>

G6's relationship with its franchisee Motel 6 qualifies as a venture. *See Doe v. Radisson Hosp., Inc.*, A-23-CV-1456-DII, 2025 U.S. Dist. LEXIS 19682, at *23–24 (W.D. Tex. Jan. 21, 2025) ("H.E.W.'s second claimed venture—between the Radisson Defendants and their franchisee operating the Austin Country Inn—suffices . . . to plead a venture under Section 1595.")

C.     <u>**G6 Knew or Should Have Known of the Motel 6 Franchisees' Involvement in Trafficking.**</u>

On the third prong, the language "knew or should have known" imposes a negligence standard. *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1177 (9th Cir. 2022). This is "a less culpable state than actual knowledge or recklessness." *Id.* (citation omitted).

Under this negligence standard, a civil defendant need not have knowledge of the particular victim—constructive knowledge that the venture violated § 1591 as to any victim is enough. *Fleites v. MindGeek S.A.R.L.*, No.

2:21-cv-04920-WLH-ADS, 2025 U.S. Dist. LEXIS 190592, at *51 (C.D. Cal. Sep. 26, 2025); *G.G. v. Salesforce.Com, Inc.*, 76 F.4th 544, 557 (7th Cir. 2023).

G6 itself had direct access to enough information that it knew or should have known of Nancy's—and other women's—trafficking at the Motel 6, even without attributing to it the knowledge of the Motel 6's staff.

G6 knew the red flags of sex trafficking. (FAC, Doc 115. at ¶¶ 60–64.) These red flags included paying in cash or extending stays day-by-day, wearing skimpy clothing, drug use, excessive discarding of condoms, and heavy foot traffic to a room by different men. (*Id.* ¶ 62.) Nancy exhibited each of these behaviors during her trafficking at the Motel 6. (*Id.* ¶¶ 91(a), 91(d)–(e), 91(g), 132, 141.) The heavy foot traffic alone was enough to imply coercion. *See P.C. v. D Fort Hotel, LLC*, 2025 U.S. Dist. LEXIS 20835, at *15 (collecting cases).

G6 required the Motel 6 Franchisees to train the Motel 6's staff on these indicators of the sex trafficking and report such signs through its operational systems, which Nancy alleges they did. (Id. ¶¶ 60–64, 145(k)(i), 146.) G6 had access to all of Motel 6's data and guest data, which included "stay remarks" and reports where Motel 6 staff likely took notes on these signs of trafficking. (*Id.* ¶¶ 145(f), (k), 146.) And through its inspections of the Motel 6, G6 would have noticed the red flags of Nancy's and other women's trafficking—and the front desk employees' facilitation. (*Id.* ¶ 145(i).) G6 also saw the public reviews describing how the Motel 6 regularly harbored prostitutes. (*Id.* ¶¶ 145(j), 216.)

The Motel 6 where Nancy was trafficked was the kind of motel where prostitutes stood just outside the office and openly advertised their services, and where staff were happy to get in on the action.  (*Id.* ¶¶ 132–140.) G6's extensive access to information about the Motel 6's operations makes it more than plausible G6 knew—or was negligent in failing to know—that Motel 6 Franchisees were harboring trafficking victims and thereby violating § 1591 with respect to *someone*.  Nothing more is required to hold G6 liable as a beneficiary. *G.G. v. Salesforce.Com, Inc.*, 76 F.4th 544, 557 (7th Cir. 2023).

## VII.  G6'S STATE LAW ARGUMENTS LACK MERIT

G6 is correct that, unlike beneficiary liability under § 1595 of the TVPRA, Oklahoma's civil sex trafficking statutes requires both participation in a venture and knowledge that the venture—but not necessarily the specific Defendant—engaged in an act of sex trafficking. *See* 21 O.S. § 748(A)(4).

Here, as discussed above, Nancy has plausibly pled that staff at the Motel 6 Franchisees had actual knowledge of sex trafficking on the premises, including of Nancy's own trafficking, and that G6 is vicariously liable for the Motel 6 Franchisees' conduct.

Furthermore, courts should not dismiss a claim as time-barred unless the statute of limitations defense "appears plainly on the face of the complaint." *Fernandez v. Clean House*, 883 F.3d 1296, 1299 (10th Cir. 2018) (quoting case law). Plaintiff filed her complaint in state court on March 19th, 2025. She

alleges that she was trafficked at the Motel 6 in "early 2022." (FAC ¶ 84.) March 20, 2022 would still be "early 2022," so nothing on the face of the complaint shows her complaint is time-barred, and dismissal is not warranted.

## VIII. ANY DISMISSAL SHOULD COME WITH LEAVE TO AMEND

If the Court dismisses Nancy's claims, it should do so without prejudice and with leave to amend. Under Rule 15's liberal amendment policy, it would be inappropriate to foreclose amendment at this early stage. *Brown v. DFS Servs., L.L.C.*, 434 Fed.Appx. 347, 352 (5th Cir. 2011). When Nancy next amends her pleading, she intends to add, among other allegations:

- A clarification that she was also trafficked at the Motel 6 by Domino before his arrest, so the Motel 6's staff saw her bruises;

- Descriptions of interactions between the "homeboy" and hotel staff;

- Descriptions of the physical manifestations of Nancy's drug dependence during her stays at the Motel 6; and

- A list of clues the Motel 6 front desk employee who took Nancy to the casino would have encountered during those trips.

No defendant would be prejudiced by permitting amendment at this early stage of the case, when Nancy has amended only once before. The Court should allow Nancy to amend if it finds her pleading lacking in any respect.

## IX. CONCLUSION

G6 trained the Motel 6's staff to spot signs of trafficking, but they (and it) ignored every red flag Nancy displayed as staff facilitated her prostitution. The Court should deny G6 Hospitality Franchising, LLC's motion to dismiss.

DATED this 10th day of December, 2025.

Respectfully submitted,

/s/ Geoffrey C. Parker

Geoffrey C. Parker, Esq. (*pro hac vice*)
HILTON PARKER LLC
7658 Slate Ridge Blvd.
Reynoldsburg, OH 43068
Tel: (614) 992-2277
Fax: (614) 927-5980
gparker@hiltonparker.com

*Attorney for Plaintiff Nancy R.*