**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

NANCY R., pseudonymously,

Plaintiff,

vs.

PLAZA HOTELS, LLC;
STEVE KETTER;
MICHAEL A. WILEY;
OKC AIRPORT ES, LLC;
ESH STRATEGIES FRANCHISE, LLC;
NATHA, LLC;
CHAND & SAAJ HOSPITALITY, INC;
YASH ENTERPRISES, LLC;
NOOR HOTEL, LLC;
AMBICA, LLC;
OM, LLC;
INDRA, LLC; AND
G6 HOSPITALITY FRANCHISING, LLC,

Defendants.

Case No. : 5:25-cv-462

**Judge Charles Goodwin**

**SECOND AMENDED COMPLAINT**

**Jury Trial Demanded**

Plaintiff Nancy R., by and through her attorneys, Michael C. Kane, Esq., Bradley J. Myers, Esq., and Joel S. Hengstler, Esq. of The702Firm, Geoffrey C. Parker, Esq. and Jonathan Hilton, Esq. of Hilton Parker LLC, and Fletcher D. Handley, Jr. of Handley Law Center states as follows:

## PARTIES

1. Plaintiff Nancy R. ("**Nancy**") is a natural person.

2. Defendant Plaza Hotels, LLC ("**Plaza**") is an Oklahoma limited liability company which, at all relevant times, owned and operated the Plaza Inn Hotel ("the Plaza") located at 3200 S I-35 Service Road, Oklahoma City, OK 73129.

3. Defendant Steve Ketter ("**Ketter**") is a natural person residing, on reference, in Canadian County, Oklahoma. Ketter may be served at his residence at 5101 S. Choctaw Ave, El Reno, OK 73036. On information and belief, Ketter personally managed the day-to-day operation

of the Plaza at all relevant times.

4. Defendant Michael A. Wiley ("**Wiley**") is a natural person residing, on reference, in Oklahoma County, Oklahoma. Wiley may be served at his residence at 11025 N. County Line Rd., Yukon OK 73099. On information and belief, Wiley personally managed the day-to-day operation of the Plaza at all relevant times.

5. Defendant OKC AIRPORT ES, LLC ("**OKC ES**") is a Texas limited liability company that owned and operated the Extended Stay America Oklahoma City Airport ("the Extended Stay") located at 4820 W Reno Avenue, Oklahoma City, OK 73127 at all relevant times.

6. Defendant ESH STRATEGIES FRANCHISE, LLC ("**ESH**") is a Delaware limited liability company which, at all relevant times was the franchisor that set—and monitored compliance with—the brand standards for the Extended Stay America Oklahoma City Airport ("the Extended Stay") located at 4820 W Reno Avenue, Oklahoma City, OK 73127.

7. Defendant NATHA, LLC ("**Natha**") is an Oklahoma limited liability company that owned and operated the Super 8 by Wyndham Oklahoma Airport Fairgrounds West ("the Super 8 OKC Airport") located at 311 S Meridian Avenue, Oklahoma City, OK 73108 at all relevant times.

8. Defendant CHAND & SAAJ HOSPITALITY, INC ("**C&S**") is an Oklahoma corporation that owned and operated the Ramada by Wyndham Oklahoma City Airport North ("the Ramada") located at 2200 S. Meridian Avenue, Oklahoma City, OK 73108 at all relevant times.

9. Defendant YASH ENTERPRISES, LLC ("**Yash**") is an Oklahoma limited liability company that owned and operated the Howard Johnson by Wyndham Oklahoma City Airport/Fairgrounds ("the Howard Johnson") located at 400 S Meridian Ave, Oklahoma City, OK 73108 at all relevant times.

10. Defendants NOOR HOTEL, LLC ("**Noor**"), AMBICA, LLC ("**Ambica**"), OM,

LLC ("**Om**"), and INDRA, LLC ("**Indra**," and collectively, "**the Motel 6 Franchisees**") are Oklahoma limited liability companies. At all relevant times, each owned 25% of the Motel 6 Oklahoma City Bricktown ("the Motel 6") located at 1800 E Reno Avenue, Oklahoma City, OK 73117. On information and belief, Noor, Ambica, Om, and Indra together performed and equally shared in day-to-day management of the Motel 6.

11. Defendant G6 HOSPITALITY FRANCHISING, LLC ("**Motel 6**") is a Delaware limited liability company that was the franchisor that set—and monitored compliance with—the brand standards for the Motel 6 Oklahoma City Bricktown ("the Motel 6") located at 1800 E Reno Avenue, Oklahoma City, OK 73117 at all relevant times.

12. Defendants **ESH** and **Motel 6** are hereinafter sometimes referred to collectively as the "**Franchisor Defendants**." Defendants **OKC ES**, **Natha**, **C&S, Yash**, **Noor**, **Ambica**, **Om**, and **Indra** are hereinafter sometimes referred to collectively as the "**Franchisee Defendants**."

13. Defendants acted through their agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers at all times relevant to this action.

## BACKGROUND

### Nancy's Trafficking Begins

14. After escaping an abusive relationship as a teenager, experiencing homelessness, and briefly being incarcerated, Nancy believed her life was finally on an upward trajectory. She had found a fiancé, a job, a home for her children, and her sobriety.

15. All of that changed when her fiancé committed suicide in 2020. While she was beside herself with grief, she allowed the abusive father of one of her kids to pick her up and take her to a hotel, where he plied her with drugs.

16. By early 2021, Nancy was homeless, penniless, and at risk of losing her children.

It was in that vulnerable state that Nancy met "Domino" at the Plaza Inn in Oklahoma City, and her nightmarish reality of being sex trafficked through a series of Oklahoma hotels began.

17. Domino, a member of the "Bounty Hunters" subset of the Bloods gang, was the main pimp at the Plaza Inn in Oklahoma City. Gang members like Domino are frequent perpetrators of human trafficking.

18. Domino used a variety of coercive methods to force Nancy to engage in commercial sex. He used threats, physical violence, and intimidation against Nancy if she was not having sex with enough clients to fill his pockets.

19. Domino also kept complete financial control over Nancy. After clients left, he would collect all of Nancy's earnings, sometimes leaving her stranded with no money to pay the hotel bill or to call a ride elsewhere.

20. However, he did supply her with one thing – drugs. Traffickers often use induced substance abuse as a coercive method to force their victims to engage in survival sex in order to support their addiction and to keep them in a physical state that makes them unable to leave.

21. Domino controlled Nancy's access to drugs on which she was physically dependent both by controlling her access to the substances themselves and by controlling her access to paraphernalia, which he would maintain in his personal possession.

22. In addition to helping Domino control Nancy, the drugs also served to numb Nancy to the exploitation she suffered.

23. Through these control tactics, he forced her into a state of total dependence on him for shelter, safety, and illicit substances.

24. On several occasions in each Defendant hotel, employees would have been unable to miss signs of Domino's control over, and trafficking of, Nancy.

25. However, hotel employees chose to ignore the bruises Domino left on Nancy and his frequent comings and goings—while never staying long or reserving a room—through the hotel lobbies in line of sight from the front desk.

26. As a result, he continued to traffic Nancy for sex from early 2021 to the beginning of 2022. And even after his arrest in 2022, he continued to exert control over Nancy through members of his affiliated gang.

27. Eventually Nancy escaped, moved out of Oklahoma, and received treatment for her addiction.

28. Nancy continues to suffer the aftereffects of her victimization. For example, she often can't remember where she ate for lunch, but she can vividly remember the colors of the walls inside many of Defendants' hotels, and the sight of white towels causes her physical illness.

Nancy's Trafficking in Oklahoma City

29. After meeting Domino, Nancy was sex trafficked in a dozen or more hotels in Oklahoma from 2021 through 2022. The conduct of six of these hotels was particularly notable: the Plaza, the Extended Stay, the Motel 6, the Super 8 OKC Airport, the Ramada, and the Howard Johnson.

30. Hotel staff can, and should, observe and identify the following indicators of in-call escort services and potential human trafficking:

a. Paying for stays in cash or with pre-paid credit cards
b. Extended stays with few possessions
c. Reservations for a single night that are extended day by day
d. Frequent requests for new towels, washcloths, and/or linens
e. Excessive condoms in trash cans
f. Excessive foot traffic in/out of rooms
g. One person checking in with multiple women in tow

h. Verbal or physical abuse of women

i. Restricted or controlled communications

j. Restricted movement or evidence of constant monitoring

k. No control of money, cell phone, or identification documents

l. Women exhibiting fearful, anxious, or submissive behavior

m. Dresses inappropriate to the setting and/or climate

n. Lack of knowledge of current or past whereabouts

o. Signs of poor hygiene, malnourishment, or fatigue

31. A combination of these indicators was present at every hotel in which Nancy stayed as detailed in the following sections.

Plaza Inn Hotel

32. Nancy met Domino at the Plaza Inn Hotel in 2021.

33. Domino forced Nancy to perform "in calls" at the Plaza. An "in call" is a type of escort service where a customer comes to a sex worker's location—usually a hotel room—for commercial sex.

34. Nancy was forced to meet with at least 10 johns per day. So, there was a regular flow of men who were not guests of the hotel going in and out of Nancy's room during each stay at the Plaza.

35. Nancy followed a similar routine during each of her stays at the Plaza. On most occasions, she checked in wearing heels and inadequate clothing, with little luggage. She rented rooms often using a fake, paper temporary Oklahoma ID, and had the rooms put in her name even if someone else showed their ID to the front desk staff.

36. Nancy then extended her stays day-by-day or a few days at a time, paying with cash or even, in some cases, making the john pay at the front desk.

37. Throughout each stay, Nancy escorted johns from the hotel lobby to her room while

dressed for sex work, asked for new and additional towels and linens frequently, and disposed of used condoms and condom wrappers in the hotel trash.

38. The Plaza's front desk staff would thus have witnessed dozens of instances of Nancy escorting a man who had not checked in as a guest through the lobby to her room, followed by that man heading back downstairs, sometimes within a period of 10 minutes.

39. The front desk staff made sure that Nancy's activities were confined to the northeast corner of the hotel, away from the front entrance and the nicer rooms on the property. Nancy was usually given rooms toward the back of the hotel where criminal activity was most common.

40. The Plaza also had ample opportunity to observe Domino. While Domino was Nancy's pimp, he resided at the Plaza. He stayed there significantly more often than he stayed anywhere else, and it functioned as his homebase. During Nancy's trafficking, Domino stayed at the Plaza Inn for several months during 2021 and 2022.

41. The Plaza was known for being a criminal hotspot for drugs, prostitution, and violent crime by locals and Oklahoma news outlets. Criminal activity and drug deals were especially concentrated in its courtyard.

42. Whenever Domino was at the Plaza, he "held court" in its courtyard at the center of the hotel by the pool. At the Plaza, the highest-ranking criminal present at any given time controlled the courtyard and conducted his business there. The Plaza's management, particularly co-owner Michael Wiley, approved of this arrangement because the criminal holding court helped keep the other criminals on the property in line.

43. Domino frequently hung out in the courtyard and conducted drug deals. On multiple occasions, Nancy met up with Domino in the courtyard after meeting with a john to surrender the money she earned to Domino.

44. The Plaza had a security camera pointing at the courtyard, giving its staff dozens of opportunities to witness Domino's criminal activity and his money exchanges with Nancy.

45. Michael Wiley resided at the Plaza and was constantly present on the property, where he personally supervised its operations.

46. A security guard who worked at the Plaza during Nancy's trafficking there has informed Nancy's counsel that Wiley "knew everything" that happened at the Plaza, including because he frequently monitored the property's security cameras, to the point that Wiley watched more camera footage than the guard did.

47. Wiley could not have missed Domino's criminal behavior or Nancy's repeated visits to Domino in the courtyard to hand over her earnings. Nor could he have missed the heavy foot traffic to Nancy's room or the many times she, dressed for sex work, met johns in the lobby.

48. Wiley's familiarity with Nancy went beyond what he saw on the Plaza's security cameras. On one occasion, Nancy had sex with Wiley in exchange for the promise of a room, but Wiley reneged on the deal afterward.

49. Other girls controlled by Domino and his associates also had sex with Wiley in exchange for rooms on multiple occasions.

50. It was well known among the many sex workers who frequented the Plaza that Wiley liked to trade rooms for sex.

51. Wiley knew Nancy was selling commercial sex. Sometimes Nancy told Wiley she had a john coming, and he would allow her to pay for the room after meeting with the client.

52. Wiley met Domino and knew that he was Nancy's pimp and was forcing her to engage in commercial sex acts by threatening her with physical abuse and drug withdrawal. When asked if Wiley knew that Nancy had a pimp, the previously-mentioned security guard said of

Wiley, "he knew everything," and that he would have known Nancy had a pimp on the property.

53. On information and belief, Ketter—the Plaza's other owner—was aware of the same facts either because Wiley told him or because he encountered Domino during his visits to the Plaza.

54. At the time of Nancy's trafficking in 2021 and 2022, Plaza, Ketter, and Wiley knew and should have known that the Plaza was a conducive venue for sex trafficking and that sex trafficking regularly occurred on its premises.

55. By forming a business relationship with Nancy's trafficker, engaging in commercial sex with Nancy, and profiting from related room rentals, the employees and owner of the Plaza effectively facilitated, and benefitted from, Nancy's trafficking.

Criminal Activity at the Plaza

56. From 2019 through 2022, the Oklahoma City Police Department's ("OCPD") computer-aided dispatch ("CAD") system logged over 2,800 calls for service at the Plaza, more than double the number of calls from any other Defendant hotel. Officers were dispatched to the Plaza on 79% of the days. OCPD assigned a case number to less than 20% of the Plaza's calls.

57. The Plaza had 6 sex-offense calls—more than any of the other hotels. It also had 17 morals-violation calls, but OCPD did not produce a report for any of them.

58. The Plaza was the most violent location. OCPD coded roughly 160 of the Plaza's calls for service as domestics. It also coded over 100 calls of other types of violence—more than the other five hotels combined (a total of 72 non-domestic violent calls). The Plaza's other violent calls included: 60 assaults with a dangerous weapon, 25 assaults, 23 robberies (14 of them armed), and 4 kidnappings.

59. OCPD logged over 200 theft calls at the Plaza: 69 burglaries, 20 auto burglaries, 65

stolen vehicles, and 67 larcenies. It assigned case numbers to 80 of them. Officers were also dispatched to the Plaza 84 times to recover stolen vehicles abandoned there—more than at the other five hotels combined.

60. These are conservative numbers. OCPD's CAD production omits an entire month of the Plaza's results (from January 5 through February 3, 2020) and at least 28 more rows across the six logs are cut off at page breaks in the scanned printouts. [1]

61. OCPD has produced 176 incident reports from 2019-2022 thus far, which include: 3 murders, 19 aggravated assaults, 16 assaults, and 13 robberies. (*See, e.g.*, Ex. 1, No. 2022-0022257-1; Ex. 2, No. 2022-0046586-1; Ex. 3, No. 2022-0073584-1 (murders).)

62. The CAD logs understate the violence at the Plaza. Some of the most violent calls—and all three murders—were classified as a "Disturbance," "Other Type Call," or "Trouble Unknown." Less than half of the aggravated assaults were dispatched as assaults with a dangerous weapon; the rest came in as disturbances, domestics, and assaults.

63. None of this was hidden from the people running the hotel. The Plaza's owner worked the property personally, and some of its clerks and security guards lived in its rooms.

64. The most logical explanation for how the Plaza's violence and sex-related crimes went on, year after year—and the explanation Plaintiff alleges—is that Plaza, Ketter, and Wiley chose to keep operating it that way.

65. In March 2019, the Plaza's staff called police after video showed a man breaking into a room. (Ex. 4, No. 2019-0018935-1.) Once arrested, he told officers that the owner, "Mike"—Defendant Michael Wiley—"is aiding in prostitution at the hotel," and that "Mike knew the renter left early and allows the girls to stay in the room." (*Id.*) A woman with the arrestee had been living

1 Plaintiff has requested these missing and cut off CAD logs, but her requests remain outstanding.

at the Plaza for months; she told police the renter had "'thought' she was a prostitute and invited her to stay the night." (*Id.*)

66. Just two days later, a 70-year-old man told police he had come "looking for women," and was punched and robbed. (Ex. 5, No. 2019-0019406-1.)

67. In June 2022, staff told police that the woman who regularly rented Room 242 "normally has a [man] in her room but the subjects change frequently." (Ex. 6, No. 2022-0045947-1.)

68. Four months later, a man who answered a Listcrawler escort ad paid $300 for sex in Room 242. When he returned an hour later, two men beat and robbed him at knifepoint. (Ex. 7, No. 2022-0080888-1.)

69. The OCPD reports show another signature of commercial sex at these hotels: the "trick roll," in which a woman—or a team using her—draws a man into a guest room with the promise of sex, and then robs him. In March 2019, a man met a woman at the Plaza, and she and a second woman drove off in his car. (Ex. 8, No. 2019-0023745-1.) Three people were arrested: a 22-year-old man, a 19-year-old woman, and a 17-year-old girl. (*Id.*) On information and belief, this theft was a trick roll.

70. Trick rolls even got the Plaza's own staff. In November 2021, the Plaza's security guard—who lived on site—was robbed in his room by three men with handguns. (Ex. 9, No. 2021-0084974-1.) The guard told officers he had "allowed [a woman] to have access to his room and he believes she is the one who allowed the suspects to make entry." (*Id.*)

71. Of the 17 calls OCPD dispatched as morals violations at the Plaza, not one produced a police report, so the prostitution described above is what appears in reports OCPD wrote about other crimes.

72. The Plaza had notice of trafficking before Nancy's trafficking period. On October 9, 2018, OCPD Vice and the Oklahoma Bureau of Narcotics and Dangerous Drugs Human Trafficking Unit ("OBNDD HTU") investigated the trafficking of three juvenile victims at the Plaza (room #162), and three juvenile offenders were arrested for human trafficking of a minor. (Ex. 10, No. 2018-0081677-1.) Plaza, Ketter, and Wiley did not need Plaintiff to tell them what their rooms were being used for. The police had been telling them for years—nearly every day.

73. On October 29, 2018, OCPD's nuisance coordinator met with Wiley and Ketter at the Plaza. (Ex. 11, Nuisance Action Mot. for Partial Summ. Adjudication ("MSA") at Ex. 18, ¶ 7.) He told them that "prostitutes were soliciting at the motel in plain sight and juvenile prostitutes had also been found at the motel." (*Id.*)

74. Two days later, the City's Notice to Abate Public Nuisance, addressed to "Michael Wiley/Steve Ketter," gave one directive: "To stop any and all prostitution related criminal activity." (*Id.*, MSA Ex. 4.) The incident summary attached to the notice read: "Vice Detectives assisted OBNDD HTU Unit in making a case for prostitution involving 3 juvenile females and arrested 3 juvenile males for acting as their pimp. The juveniles were using rented room # 162." (*Id.*; *see* Ex. 10, Report No. 2018-0081677-1.)

75. That was the second of ten written nuisance notices the City sent the Plaza's owners between October 2018 and April 2023. (Ex. 11, ¶¶ 7–21, MSA Exs. 3–4, 7–14.) Each warned that the City could seek closure of the business or demolition of the buildings. (*Id.*)

76. The owners were also prosecuted. After violent incidents in early and mid-2019, OCPD cited Wiley and Ketter under the City's nuisance abatement ordinance—twice each. (*Id.*, ¶ 11, MSA Ex. 18 ¶¶ 10–11.) Both pleaded no contest, paid fines, and were convicted each time. (*Id.*, MSA Exs. 5, 6, 19, 20.)

77. In July 2019, when OCPD asked Wiley whether his security guard was capable of doing the job, Wiley answered "no." (*Id.*, ¶ 12, MSA Ex. 18 ¶ 12.) In October 2022, the City wrote that the owners had "refused or otherwise ha[d] not put in place any of the suggested solutions," including round-the-clock armed security. (*Id.*, MSA Ex. 13.)

78. In May 2023, the City sued the Plaza. It alleged that its notices to the owners had "essentially been ignored, making the Plaza Inn one of the most dangerous places in Oklahoma County for the community and the travelling public, to include extreme violence, drug distribution and prostitution activity." (Ex. 12, Nuisance Action Am. Pet. ¶ 7.) Ketter's public response was that the owners were "trying to get the bad element out of there because it's hurt our rooms," but "it's been that way forever." (Ex. 13, Nuisance Action Second MSA Ex. 23.)

79. On October 13, 2023, with the owners' consent, the court found the Plaza "a public nuisance due to the violent criminal activity on the property that continues unabated." (Ex. 14, Nuisance Consent Decree at 2.) It ordered the hotel "immediately be closed to the public as a place of business" unless the owners kept two armed, licensed security guards on the property at all times and installed twenty-two more surveillance cameras. (*Id.* at 3–5.) It also ordered the guards to report anyone "soliciting for prostitution." (*Id.* at 4–5.)

80. The owners did not keep the Plaza open. They contracted to sell the property in February 2024, and the buildings were demolished by December 3, 2024. (Ex. 15, Nuisance Action Joint Mot. to Dissolve Consent Decree ¶¶ 2–5 (Dec. 13, 2024).) By then, the City had warned the owners about the prostitution at the Plaza for more than six years.

<u>Extended Stay America</u>

81. Domino required Nancy to meet a daily quota of at least 10 johns at the Extended Stay—a quota she regularly exceeded there given that she saw approximately 350 men in 20 days.

82. Domino forced Nancy to perform "in calls" at the Extended Stay. As a result, there was a constant flow of men who were not guests of the hotel going in and out of Nancy's room every day of her stay.

83. Nancy's stay at the Extended Stay followed her usual routine. She checked in wearing heels and inadequate clothing, with little luggage. As was her practice, she initially rented the room through her own Priceline account or someone else's, using a fake, paper temporary Oklahoma ID, and had the room put in her name even if someone else showed their ID to the front desk staff.

84. She then extended the stay day-by-day or a few days at a time over the course of the 20 days, paying with cash or, in some cases, making the john pay at the front desk.

85. Throughout the stay, Nancy escorted johns from the hotel lobby to her room while dressed for sex work, asked for new and additional towels and linens frequently, and disposed of used condoms and condom wrappers in the hotel trash.

86. The staff at the Extended Stay were aware that Nancy and numerous other guests were pimp-controlled prostitutes engaged in commercial sex on the premises, and they actively facilitated such activities.

87. There was always someone at the front desk, and both Nancy and johns had to pass through the lobby to get to the elevator and hotel rooms.

88. According to a contemporaneous 2021 Tripadvisor review, even guests with key cards had to be buzzed in by staff to enter the hotel after dark. The same would logically have been true of many of the approximately 350 johns Domino made Nancy see there.

89. The Extended Stay's back door was usually locked because the locking system was consistently broken, so entry was usually only possible through the front past the front desk. There

were side doors, but because the stairs and elevator were both located in the middle of the hotel, it was necessary to walk past the front desk to go upstairs from any entrance.

90. Because Nancy's johns had to walk through the interior lobby and past the front desk to reach her room, the Extended Stay's front desk staff witnessed dozens of instances of Nancy escorting a man who had not checked in as a guest through the lobby to her room, followed by that man heading back downstairs, sometimes within a period of 10 minutes.

91. Nancy could never get a room on the "nicer" first floor. She usually worked on the second floor, and sometimes on the third floor.

92. Pimps and prostitutes frequently loitered in the lobby, either waiting to collect money or waiting for johns to arrive.

93. Nancy sometimes waited by the elevator or in the lobby while another girl was seeing a client in their room.

94. The Extended Stay staff allowed johns to get keys to Nancy's room when she was not present and when their names were not on the reservation.

95. On one occasion, Nancy chased a john through the lobby wearing nothing but a slip dress shouting "give me my money" after he had stolen from her. Employees at the Extended Stay witnessed this but did not intervene.

96. Domino regularly visited the Extended Stay, via the lobby, to collect money, deliver drugs, and make sure his girls were not talking to other pimps.

97. Despite his frequent visits, Domino never stayed at the Extended Stay.

98. During visits, Domino would count the number of condoms in the hotel room to make sure that enough clients were being seen.

99. He would get angry, make threats, and even resort to physical violence if he was

unsatisfied with the number of clients that Nancy and other girls saw.

100. During one altercation at the Extended Stay, Domino punched Nancy in the face. The resulting bruise on the side of her face was clearly visible to employees at the Extended Stay, as shown in a photograph taken at the Extended Stay shortly after the altercation.

101. On at least one occasion, Nancy had a conversation with an Extended Stay hotel employee where she asked, while dressed in unusually revealing attire, for an extra room key because she had "a date coming".

102. Employees at the Extended Stay clearly understood that she was engaging in commercial sex acts.

103. Housekeeping at the Extended Stay lived on site and sometimes purchased drugs from Domino and the many other pimps working in the Extended Stay.

104. Sex trafficking was so common at the Extended Stay that during March and April of 2022, several traffickers repeatedly patrolled the second and third floor corridors with an AK-47-style rifle to guard the women they kept prisoner, to scare off other pimps, and to frighten women trying to operate as "renegades" into leaving or "choosing up" with the patrollers.

105. These patrolling men were captured on OKC ES security cameras walking the halls with the AK-47 on multiple occasions.

106. Relevant reviews of the Extended Stay include:

a. One guest awarded 1 out of 5 stars, describing the Extended Stay as the "Worst I've Ever Seen" due to the "Pimps and prostitutes everywhere."

b. Another guest awarded 2 out of 5 stars, citing "a condom left beneath one bed."

c. Another guest awarded 1 out of 5 stars, claiming there were "strange men hanging around the back door. Creepy!"

d. Another guest awarded 2 out of 5 stars on account of the "shady people hanging around the area all the time"

e. Another guest awarded 1 out of 5 stars, saying, "I found a used condom sticking to the bathroom wall."

f. Another guest awarded 2 out of 5 stars, claiming, "Let's just say the pillars of the community don't stay here."

107. Those six reviews were not the only ones. From 2016 through the spring of 2022, guests posted review after review on the Extended Stay's listings on TripAdvisor, Google, Expedia, Priceline, and Booking.com describing the same thing: prostitutes in the halls, pimps in the lobby, and a front desk that did nothing.

108. In October 2016, a TripAdvisor reviewer gave the Extended Stay one star and wrote that the hotel was "surrounded by hookers."

109. In 2019, a Google reviewer wrote that he had "seen (and heard) multiple hookers come and go," along with "a few very loud domestic disputes" through "paper thin" walls. He had asked the front desk three times to clean his room; two weeks passed without service. His advice to future guests was to "bring a firearm if you plan on staying here."

110. On August 4, 2019, an Expedia reviewer reported "Fighting in the parking lot," and "prostitutes banging at the exit doors." He "[t]ried calling the front desk several times but got no answer." Two days later, "Hotel Management" answered him publicly: "We take these matters very seriously and will take the necessary actions to ensure this is properly addressed."

111. On May 20, 2020, a verified guest gave the Extended Stay the lowest rating the review site allows. She "had to keep calling and complaining" about other guests. The hotel, she wrote, "definitely ha[s] people prostituting out of this hotel & they let anyone stay here."

112. On June 25, 2020, another verified guest reported "[b]lood on the curtains," "yelling and cussing all times of day/night," and "Prostitutes and drug dealers EVERYWHERE."

There was also no point in calling "the hotel corporate" because "you won't get a call back or if you do they act like they don't care."

113. In August 2020, the "Pimps and prostitutes everywhere" review quoted above drew a response. The response was posted under the name of a guest-review management service for "Extended Stay America – Oklahoma City – Airport" and was signed "Hotel Management." It promised to "investigate your comments" and to "relay the message to our management team." So by August 2020 at the latest, a guest's public report of pimps and prostitutes "everywhere" at the Extended Stay had been read and answered by someone speaking for the hotel.

114. On April 15, 2022, a verified guest called her stay "a nightmare," with "drugs all over" and "people having intercourse in parking lot." She posted that review the same day OCPD searched two of the Extended Stay's rooms in connection with the sex-trafficking operation described below.

115. Every one of these reviews was public. Every one was posted on a site on which the Extended Stay was listed, and at least two of them were answered by someone speaking for the Extended Stay.

116. All the Extended Stay reviews quoted above were left before or during Nancy's trafficking. On information and belief these reviews were truthful and accurate.

117. Additionally, Nancy incorporates by reference the reviews contained in ¶¶ 138–143 of the complaint in *Doe v. OKC ES Airport, LLC, et al.*, DC-24-01786, in the District Court of Dallas County, Texas, attached hereto as Exhibit 29, as if fully set forth herein. On information and belief these reviews were also truthful and accurate.

118. It is the standard procedure for hotels to check their reviews on third-party websites, and, as explained below, ESH expressly considers unsolicited guest feedback—including reviews

on third-party websites like Tripadvisor—in scoring OKC ES under its Quality Assurance Program. On information and belief, both OKC ES and ESH were aware of the multiple negative reviews referencing prevalent prostitution and pimping (trafficking) at the Extended Stay before Nancy was trafficked there.

119. Because most sex workers are coerced to engage in commercial sex acts, and because OKC ES and ESH were aware of the high prevalence of commercial sex acts occurring at the Extended Stay, OKC ES and ESH were aware that trafficking must be occurring on the premises.

120. At the time of Nancy's stay, OKC ES and ESH knew and should have known that the Extended Stay was a conducive venue for sex trafficking and that sex trafficking regularly occurred on its premises.

121. Because most prostitutes are victims of coercion, and because staff at the "prostitution-riddled" Extended Stay were more familiar with the sex trade than most, they knew or had constructive knowledge Nancy was being trafficked.

122. Employees at the Extended Stay also knew that the high prevalence of pimps on their property meant that "renegades" (i.e. prostitutes working for themselves rather than under the control of a pimp) could not safely operate there due to the risk of being "knocked" (forcibly recruited) by a pimp. They thus knew or had constructive knowledge Nancy was being trafficked.

123. Moreover, employees at the Extended Stay knew that Nancy was a victim of coercion because they witnessed Domino's frequent visits, his oppressive conduct in public areas during those visits, and Nancy's subsequent bruises.

124. Based on the ESH Strategies Franchise, LLC ("ESH") Franchise Disclosure Document ("FDD") for the year 2021, the operative franchise agreement between ESH and OKC

ES provided:

g. OKC ES must purchase all signage, linens, interior design elements, and electronic equipment from a limited selection of Approved Suppliers selling a limited selection of Extended Stay-designed and/or -approved products.

h. OKC ES must either use an ESH-approved third-party management company or else put its proposed general manager(s) through a lengthy ESH-run and ESH-evaluated manager training program, which the general manager(s) must complete to ESH's satisfaction. Moreover, OKC ES's management of the Hotel is subject to ESH's approval. ESH can withdraw their approval of a Manager or Management Company and require OKC ES to hire a different Management Company at any time.

i. OKC ES must participate in and use ESH's designated Reservation Service as its method for arranging/selling room reservations electronically. This Reservation Service "means the voice, internet, and other systems and related services that [ESH] uses to book reservations for System Hotels on a centralized basis."

j. OKC ES must use an ESH-approved supplier for their property management system (HotelKey) and revenue management software, their centralized reservation system, and their credit card payment processing services. ESH only approves one supplier for each of these systems/services.

k. ESH has the right to physically and/or electronically enter and inspect the Hotel and operations, books, records, accounts, and systems without notice to OKC ES as a part of ESH's Quality Assurance Program

   i. If the result of any inspection is not satisfactory, then OKC ES will pay a "Re-inspection Fee" to cover the next surprise inspection and may be required to send its employees for remedial training by ESH.

   ii. ESH considers "unsolicited feedback received from [OKC ES]'s guests in ESH's final quality assurance score. Upon information and belief, this unsolicited feedback includes reviews made by guests on third-party websites including Tripadvisor.

l. OKC ES "acknowledges that [ESH] or a third-party provider may monitor and review stored data and other files without restriction." ESH has the ultimate right to independently access OKC ES's databases, particularly the property management system, which takes reservations, assigns rooms at check-in, tracks room charges and activity, records accounts receivable, prints housekeeping and financial reports, and scans drivers' licenses, as well as recording notes about guests as "Stay Remarks."

   i. As a result, ESH had access to detailed information about OKC ES's

operations, including the ratio of rooms rented online versus in-person at the hotel's front desk and the amounts expended on additional linens and other cleaning and maintenance services likely to be linked to human trafficking.

ii. Given the lawless nature of the OKC ES's clientele, ESH certainly also had access to innumerable Stay Remarks recording instances of pimping (i.e. trafficking) and other crimes at the Extended Stay. On information and belief, it had access to at least one Stay Remark recording suspicions that Nancy was being pimped (trafficked) by Domino or his affiliates.

iii. The OKC ES location was (and still is) home to an unusual amount of human trafficking even for a low-budget hotel. On information and belief, ESH realized this because it consistently encountered an unusually high number of in-person cash reservations and an unusually high expenditure on laundry services when inspecting OKC ES's books.

m. ESH exclusively owns all of OKC ES's "Data" and "Guest Data."

i. Data includes, but is not limited to, Operating Revenue and reservation data.

ii. Guest Data refers to the following information: guests' personally identifiable information (their name, birthdate, mailing addresses, phone numbers, and email addresses); information about their consumer preferences; stay and aggregated information; and other similar or related information

n. OKC ES must additionally comply with the much more detailed brand standards laid out in the (confidential) Brand Standards document. These requirements are in OKC ES and ESH's exclusive knowledge, but upon information and belief they include:

i. Specific requirements that OKC ES record and inform ESH of evidence of criminal activity, particularly evidence indicative of sex trafficking like excessive used condoms left behind, excessive requests for linens, and excessive foot traffic to particular rooms.

ii. Sex trafficking awareness training requirements.

iii. Suggested pay rates and terms of employment for each job title defined by ESH in its training program.

iv. A requirement that OKC ES use a specified vendor for guest wireless internet access services, thereby giving ESH unfettered access to all guest

> internet usage records, including the full list of websites visited by persons associated with each individual reservation.

125. On information and belief, OKC ES performed its above-specified duties under the operative franchise agreement in full, and ESH exercised its above-specified rights to access information and to direct the operations of OKC ES's location in full.

<u>Criminal Activity at the Extended Stay</u>

126. From 2019 through 2022, OCPD logged 1,234 calls for service at the Extended Stay and assigned case numbers to 206 of them. These calls include nine morals-violation calls, none of which produced a police report, and three sex-offense calls. Another 126 calls were violence- or domestic-related, and generated 20 case numbers. Police were dispatched to the Extended Stay on half of all days in the period.

127. OCPD also logged 124 theft calls at the Extended Stay: 20 burglaries, 38 auto burglaries, 33 stolen vehicles, and 33 larcenies. It assigned case numbers to 71 of them.

128. The sex-related police activity at the Extended Stay predates the 2019–2022 period covered by those figures. On October 18, 2018, OCPD arrested a woman at the Extended Stay for offering to engage in prostitution and for using a computer to violate state law—the charge Oklahoma uses for prostitution arranged online.

129. On August 5, 2021, OCPD was dispatched to the Extended Stay for a sex offense.

130. In October 2021, OCPD answered a rape call at the Extended Stay. A woman had stepped outside her room to smoke and a man she knew only as "Repeat"—identified in the report as Montie Washington—dragged her into his room and raped her. (Ex. 16, No. 2021-0078900-1.) The woman knew who Washington was because he "often stayed at the hotel." (*Id.*) Washington was also seen at the Plaza: in April 2020, OCPD responded to the Plaza after a caller reported two men with handguns "looking for a female." (Ex. 17, No. 2020-0030702-1.) Officers stopped the

men's truck, and Washington was a passenger.

131. On October 31, 2021, OCPD arrested an Extended Stay employee for aggravated assault. She had stabbed a hotel guest with a knife—multiple times—at the Extended Stay. The people working the Extended Stay's front desk were not bystanders to the violence on the property.

132. OCPD ran prostitution operations at the Extended Stay. In April 2022, Vice set up a date through an online prostitution ad. (Ex. 18, Report No. 2022-0026615-1.) The woman met the undercover detective at the hotel's front door, walked him through the hotel to a room, and agreed to sex acts for a specified price. (*Id.*) She was charged with solicitation. (*Id.*)

133. On information and belief, OCPD ran additional operations at the Extended Stay that were logged under "Other Type Calls" and produced reports.[2]

<u>Other Victims at the Extended Stay</u>

134. Nancy was not the only trafficking victim at the Extended Stay in the spring of 2022. In March and April of that year, a pimp named Kenneth Levan Nelson—a convicted rapist and registered sex offender—ran a trafficking operation out of four Extended Stay rooms. Nelson paid for two of those rooms one night at a time, usually in cash, and he registered Room 333 of the Extended Stay with the State of Oklahoma as his home address.

135. One of the people Nelson sold for sex was a 15-year-old girl, N.C., who was taken from a Dallas Mavericks game and driven to Oklahoma City. Over the next week, Nelson sold her to men in the Extended Stay's rooms, in cars in its parking lot, and in the vacant lot next door. The Extended Stay's cameras recorded her entering Nelson's rooms and staggering down its hallways, and Nelson's men walked the hall outside rooms he used with an AK-47-style rifle in plain sight. On April 14, 2022, N.C. came back through the front door crying, after being forced into a sex act

---

2 Plaintiff's record requests for Other Type Calls at the Extended Stay are outstanding.

in the lot beside the hotel, with two of Nelson's men behind her. An Extended Stay employee watched them walk her back to a room and returned to the front desk.

136. OCPD found N.C. through Nelson's online ads, and an undercover officer was sent to the Extended Stay. OCPD executed search warrants on Rooms 318 and 333 and made multiple arrests. Nelson and his associate fled with N.C. and were arrested the next day; OCPD recovered N.C. on April 18. Both pleaded guilty in Oklahoma County to human trafficking and child pornography offenses. (*State v. Nelson*, No. CF-2022-2029 (Okla. Cnty. Dist. Ct.).) N.C. sued OKC ES and ESH in 2024 for trafficking, negligence, and negligent security. (*Jane Doe v. Extended Stay America, Inc.*, No. DC-24-01786 (160th Dist. Ct., Dallas Cnty., Tex.).)

137. While Nancy was being sold out of the Extended Stay, the same hotel was renting rooms, every day and for cash, to a registered sex offender who had listed it as his home and was selling a child out of them—and it kept renting to him until the police came.

<u>Motel 6</u>

138. In early 2022, Nancy stayed at the Motel 6—owned and operated jointly by Defendants Noor, Ambica, Om, and Indra (collectively "the Motel 6 Franchisees")—on at least six occasions and conducted in-calls there.

139. Domino's daily quota of 10 johns applied at the Motel 6, where it was enforced by Domino's homeboy, as described below. There was accordingly a regular flow of men who were not guests of the motel going in and out of Nancy's room every day she stayed at the Motel 6.

140. Nancy's stays at the Motel 6 followed her usual routine. On most occasions, she checked in wearing heels and inadequate clothing, with little luggage; rented the room often using a fake, paper temporary Oklahoma ID; and had the room put in her name even if someone else showed their ID to the front desk staff.

141. She then extended each stay day-by-day or a few days at a time, paying with cash or, in some cases, having the john pay at the front desk.

142. During each stay, Nancy escorted johns from the lobby to her room while dressed for sex work, asked for new and additional towels and linens frequently, and disposed of used condoms and condom wrappers in the motel trash.

143. The Motel 6's front desk staff witnessed dozens of instances of Nancy escorting a man who had not checked in as a guest to her room, followed by that man leaving, sometimes within a period of 10 minutes.

144. At least 2 front desk employees at the Motel 6 were not only aware that Nancy was engaging in commercial sex in its hotel rooms, they also facilitated it.

145. The front desk staff, specifically a young Black woman and a man of South Asian descent, would notify Nancy when a john arrived.

146. Front desk staff would also notify her when they suspected guests wanted to buy sex or when a bus full of people arrived at the Greyhound station across the street.

147. After being informed, Nancy and other sex workers would advertise commercial sex to bus passengers right outside of the hotel office.

148. In these and other conversations and interactions, Nancy and the Motel 6's front desk staff explicitly referenced Nancy engaging in acts of commercial sex on the premises.

149. Nancy noticed that the room rate for the same room would change daily. On information and belief, employees of the Motel 6 changed the rate she was charged based on the number of johns the employees thought she'd seen on a given day.

150. In this way, the Motel 6 was directly, and knowingly, profiting from Nancy's trafficking.

151. The man of South Asian descent working the front desk also purchased commercial sex acts with Nancy and the other women she was forced to work with.

152. After engaging in commercial sex with them, this man would take girls to the casino in Oklahoma City.

153. A homeboy of Domino's often visited the Motel 6 to take all of Nancy's money, give her drugs, and keep her "on a leash."

154. Relevant reviews of the Motel 6 include:

a. One guest awarded 1 out of 5 stars, stating, "this place looked like a hookers paradise."

b. Another guest awarded 2 out of 5 stars, saying, "if u like to hang out with drug dealers, prostitutes, Your in the right place here at motel 6…This place is the women that like to be prostitutes." The guest then tells a story of one late night when the police had to "break a fight up, between a pimp and his prostitutes."

c. Another guest awarded 2 out of 5 stars, stating, "There are vagrants and homeless everywhere…there are, what appears to me, are hookers working out of this motel." A Motel 6 affiliated account even responded to this comment, thanking the reviewer for the feedback and asking for a chance to "improve" in the future.

d. Another guest awarded 1 out of 5 stars, claiming, "this is a crack hoe motel. Be warned… Noisey AF due to the line of toothless hookers whacked out."

e. Another guest awarded 1 out of 5 stars in a review titled "DISGUSTING AND DISGUSTED," where she mentions seeing a chair in her room that had "fresh stains from sexual acts being performed there."

155. All the Motel 6 reviews quoted above were left before or during Nancy's trafficking. On information and belief these reviews were truthful and accurate.

156. It is the standard procedure for hotels to check their reviews on third-party websites, and, as explained below, Motel 6 demanded the right to monitor third-party review websites, to refer negative reviews to the Motel 6 Franchisees for handling, and to charge the Motel 6

Franchisees a fee for failing to address them. On information and belief, both the Motel 6 Franchisees and Motel 6 were aware of the multiple negative reviews referencing prevalent prostitution and pimping (trafficking) at the Motel 6 before Nancy was trafficked there.

157. Because most sex workers are coerced to engage in commercial sex acts, and because the Motel 6 Franchisees and Motel 6 were aware of the high prevalence of commercial sex acts occurring at the Motel 6, the Motel 6 Franchisees and Motel 6 were aware that trafficking must be occurring on the premises.

158. At the time of Nancy's stays in early 2022, the Motel 6 Franchisees and Motel 6 knew and should have known that the Motel 6 was a conducive venue for sex trafficking and that sex trafficking regularly occurred on its premises.

159. Because the employees of the Motel 6 knew that Nancy was engaging in commercial sex acts with high frequency, they should have also deduced that she was being sex trafficked.

160. Additionally, employees at the Motel 6 knew that Nancy was a victim of coercion because they witnessed Domino's homeboy's frequent monitoring visits and recognized those visits for what they were—a manifestation of coercive control.

161. Additionally, given their direct involvement with illegal sex work, it is likely that employees at the Motel 6 knew that the great majority of prostitutes, especially at locations like the Motel 6, are under the coercive control of pimps. They therefore rented Nancy rooms while knowing, or at least recklessly disregarding, the fact Nancy would be coerced into commercial sex.

<u>Motel 6's Control Over the Motel 6 Franchisees</u>

162. Many of the allegations in this section are drawn from Motel 6's own documents and from the sworn testimony of its officers and corporate representatives, which were filed on the

public docket on September 17 and 23, 2026, in *A.W. v. Red Roof Inns, Inc.*, No. 2:21-cv-04934 (S.D. Ohio) (the "A.W. Action"), a sex-trafficking case in which G6 Hospitality, LLC and Motel 6 (G6 Hospitality Franchising, LLC) are defendants. Those filings are cited herein as "A.W. Doc. [docket number], PageID [page]."

163. Plaintiff also relies on the public G6 Hospitality Franchising, LLC ("Motel 6") Franchise Disclosure Document ("FDD") for the year 2021. Based on the 2021 FDD, the operative franchise agreement between Motel 6 and the Motel 6 Franchisees provided:

a. The Motel 6 Franchisees must purchase all signage, uniforms, furniture, linens, interior design elements, and electronic equipment from a limited selection of Approved Vendors selling a limited selection of Motel 6-designed and/or -approved products.

b. The Motel 6 Franchisees must put their proposed general manager(s) through a lengthy Motel 6-run and Motel 6-evaluated manager training program, which the general manager(s) must complete to Motel 6's satisfaction—effectively giving Motel 6 total discretionary control over the management of the Motel 6 Franchisees' hotel location.

c. The Motel 6 Franchisees must use Motel 6's proprietary Reservation System as its sole method for arranging/selling room reservations.

d. The Motel 6 Franchisees must use Motel 6's sole approved Property Management Software (HotelKey) which: interfaces with the Reservation System; records room reservation traffic, occupancy rate information, and pricing information; and transmits this information to Motel 6 nightly.

e. The Motel 6 Franchisees must use Motel 6's exclusive credit card processing system.

f. The Motel 6 Franchisees acknowledge and agree that Motel 6 "is the sole owner of all customer or guest data and information that is entered, compiled by and or used in conjunction with" any part of the above-mandated computer system and software.

i. The Motel 6 FDD also purports to prohibit franchisees from recording guests' personally identifiable information and payment information, whether in the HotelKey system "or otherwise." However, this term cannot be read literally.

ii. Despite the FDD's contrary representation, the HotelKey software is, according to its website, intended to record guests' personal and payment information and to permit employees to take notes on guest interactions and preferences called "Stay Remarks."

iii. It would be absurd to require each franchisee to use a wholly separate, likely idiosyncratic property management system to record guests' identifiable information while simultaneously recording all non-identifiable information about their reservations in Hotel Key.

iv. On information and belief, the Motel 6 Franchisees did, in fact, record all guest personal and payment information and notes in the Hotel Key system or in software integrated with the Hotel Key system, and Motel 6 intended them to do this.

v. Motel 6 thus had nightly access to all information obtained by the Motel 6 Franchisees regarding every guest at the Motel 6.

g. The Motel 6 Franchisees must "make such arrangements" as Motel 6 may require in order to permit it "to access each night during the Initial Term, from Franchisee's Computer System, information on the occupancy, average daily room rate, rooms sold, Gross Room Revenues, and such other data and information attributable to the Motel as Franchisor may require."

h. The Motel 6 Franchisees must use Motel 6's proprietary Revenue Management System, G6ROW, which provides real-time rate and inventory management and uses the data submitted by the Motel 6 Franchisees to recommend what prices the Motel 6 Franchisees should charge for each room to achieve the optimum mix of price and occupancy rate.

i. The Motel 6 Franchisees "acknowledge that [Motel 6], its affiliates, and their agents shall have the right, in their reasonable discretion, to enter upon the premises of the Motel at any time for the purpose of conducting inspections or evaluations based under the Standards." If the result of any inspection is not satisfactory, then the Motel 6 Franchisees must pay a "Re-inspection Fee" to cover the next inspection.

i. Given the cavalier attitude of the Motel 6's staff toward sex trafficking and the regularity with which they helped likely trafficking victims to find johns so they could pay for their rooms, it is likely that Motel 6-affiliated inspectors witnessed such behavior on multiple occasions and Motel 6 nevertheless chose to continue its venture with the Motel 6 Franchisees.

ii. On information and belief, Motel 6-affiliated inspectors saw such behavior on multiple occasions and reported it to Motel 6.

j. Motel 6 may—and, on information and belief, did—monitor third-party review websites for negative reviews of the Motel 6 Franchisees' location and refer such reviews to the Motel 6 Franchisees for handling. If the Motel 6 Franchisees fail to handle any such referred negative review within the specified time, Motel 6 may negotiate with the guest itself and charge the Motel 6 Franchisees a "Research and Response Fee" in addition to requiring indemnification for payments to the guest.

k. The Motel 6 Franchisees must additionally comply with the much more detailed brand standards laid out in the (confidential) operating and Brand Standards Manual. These requirements are in the Motel 6 Franchisees and Motel 6's exclusive knowledge, but upon information and belief they include:

i. Specific requirements that the Motel 6 Franchisees record and inform Motel 6 of evidence of criminal activity, particularly evidence indicative of sex trafficking like excessive used condoms left behind, excessive requests for linens, and excessive foot traffic to particular rooms.

ii. Suggested pay rates and terms of employment for each job title defined by Motel 6 in its training program.

iii. A requirement that the Motel 6 Franchisees use a specified vendor for guest wireless internet access services, thereby giving Motel 6 unfettered access to all guest internet usage records, including the full list of websites visited by persons associated with each individual reservation,

164. On information and belief, the Motel 6 Franchisees jointly performed their above-specified duties under the operative franchise agreement in full, and Motel 6 exercised its above-specified rights to access information and to direct the operations of the Motel 6 Franchisees' hotel location in full.

165. Motel 6 enforces its Standards through inspections and audits conducted by its own employees. Those employees review matters as detailed as the size, channel, and volume of the lobby television, the number of hangers in the closets, and the fold of the toilet paper, and they advise franchisees that failure to comply can result in default. (A.W. Doc. 361-2, PageID 7700, 7713, 7715; A.W. Doc. 362-5, PageID 7864–65 (McCaffrey Dep. 23:9–24:5); A.W. Doc. 362-7,

PageID 7875 (Bolt 2025 Dep. 51:6–10).)

166. Motel 6 has terminated franchisees for failing quality audits and, in one instance, for not having working telephones in the guest rooms. (A.W. Doc. 362-6, PageID 7870–71 (Bolt 2024 Dep. 140:11–141:2).) Motel 6 has never terminated, fined, or otherwise penalized a franchisee because human trafficking or prostitution occurred on its property. (A.W. Doc. 362-6, PageID 7871 (Bolt 2024 Dep. 141:15–23).)

167. Motel 6 uses the nightly access to franchisee data described above. Each Motel 6 property's total room revenue is transmitted to Motel 6 electronically every day, Motel 6's accounting department tabulates it at the end of each month, and Motel 6 charges the property its royalty percentage on its monthly invoice. (A.W. Doc. 362-2, PageID 7843 (Boose Dep. 71:13–19).)

168. Motel 6 also maintains a performance dashboard, called the Information Station, on which a property's occupancy, financials, cleanliness, and guest-satisfaction data are reviewed daily and to which Motel 6's corporate support team has access. (A.W. Doc. 362-3, PageID 7852, 7854 (Younger Dep. 18:19–24, 24:3–23).)

169. Each room the Motel 6 Franchisees rented to Nancy for commercial sex generated room revenue on which Motel 6 collected its royalty percentage. Motel 6 collected its percentage of each of Nancy's at least six stays at the Motel 6 in early 2022, and of each day-by-day extension of those stays.

170. Motel 6's central reservation system contains guest names and reservation records for its franchised motels. (A.W. Doc. 362-2, PageID 7846 (Boose Dep. 122:2–25).) Under Motel 6's Reservations Call Transfer Program, a "Brand Standard program," a caller who telephones a franchised Motel 6 and presses the prompt for reservations is routed, bypassing the

property, to Motel 6's contact center, where Motel 6's own reservation agents book the room. (A.W. Doc. 360-1, PageID 7426 (§ 3.2); A.W. Doc. 362-2, PageID 7848 (Boose Dep. 177:11–18).)

171. Because the Motel 6 Franchisees had to use Motel 6's reservation and property management systems, Motel 6's own systems recorded, as it happened, that the same woman was renting a room at the Motel 6 on at least six occasions in early 2022, paying with cash, and extending her stay one day or a few days at a time.

172. Motel 6 also directs what the Motel 6 Franchisees charge. Motel 6 employs franchise revenue managers who make pricing recommendations to its franchised locations. (A.W. Doc. 362-5, PageID 7865 (McCaffrey Dep. 24:8–19).) Motel 6's Operations Manual prohibits franchisees from charging day rates or "any charge other than the standard Motel 6 rates," so that a room used for a few hours is sold, and generates royalties for Motel 6, as a full night. (A.W. Doc. 360-1, PageID 7428 (§ 3.3).)

173. Motel 6 also controls whether its franchisees may deter cash-paying guests. In December 2014, the owner of a franchised Motel 6 in Columbus, Ohio, told Motel 6 that local police—"very active and alert against drug and human trafficking, and prostitution in the hotel/motel industry"—had suggested that he take a $300 cash deposit or a credit card from cash-paying guests, and he asked Motel 6 for approval because "it is against the Motel 6 policy." (A.W. Doc. 358-1, PageID 7115–16.) Motel 6's Vice President of Safety and Security ruled: "Franchisee cannot make this decision and corporate would not support it." (A.W. Doc. 358-1, PageID 7113–14.) He later testified that Motel 6 would not change the policy "as a result of a request at one motel" because "[y]ou're talking about trying to do that for 11- or 1200 motels." (A.W. Doc. 353-5, PageID 6753 n.78.) On information and belief, that policy remained in force in early 2022, when

Nancy paid for her rooms at the Motel 6 with cash, one day or a few days at a time.

174. Motel 6 decides what the Motel 6's staff are trained to recognize. Motel 6 delivers its training through its own online learning platform; Motel 6's eLearning staff publish each course and assign it to the specific employees Motel 6 directs, and Motel 6 keeps the completion records. (A.W. Doc. 363-1, PageID 7950 (§§ M6.9.04.2.3–M6.9.04.4); A.W. Doc. 362-4, PageID 7859 (Ascenzo Dep. 75:16–25); A.W. Doc. 358-2, PageID 7134–36.)

175. When Motel 6 built its human trafficking course in 2015, it required its own employees at corporate-operated properties to complete that course. For franchised properties like the Motel 6, it "highly recommended" the course but never required the front-line staff—the guest service representatives and housekeepers who, as Motel 6's Director of Operations agreed, are "in a much better position on a day-to-day basis to encounter these signs than a GM"—to take it. (A.W. Doc. 353-5, PageID 6772; A.W. Doc. 362-7, PageID 7877 (Bolt 2025 Dep. 88:5–19).)

176. In December 2018, Motel 6's own completion report showed that no region of the company had reached full completion of the course, and some areas were below thirty percent. (A.W. Doc. 358-2, PageID 7134–35.) In May 2019, Motel 6 wrote to its franchisees that "Human Trafficking is a rampant issue among the hospitality industry as a whole." (A.W. Doc. 353-5, PageID 6771.)

177. Motel 6's own policies define what the Motel 6's staff saw as sex trafficking. Motel 6's Safety & Security Resource Guide states that "most prostitution is Human Trafficking" because a pimp or madam is involved. Chris Bolt, a Motel 6 Director of Operations since 2007, testified under oath that a "pimp" is "synonymous with human trafficker," and agreed that "most prostitution is trafficking. When a pimp is involved, it's trafficking." (A.W. Doc. 362-7, PageID 7876 (Bolt 2025 Dep. 80:5–17); A.W. Doc. 362-6, PageID 7869 (Bolt 2024 Dep. 117:12–18);

A.W. Doc. 353-5, PageID 6724.)

178. Motel 6's April 2014 newsletter to franchisees listed the behaviors by which a trafficker can be recognized, including escorting men into a room and lingering or watching the door, not leaving the victim alone, and "controlling all money and identification." (A.W. Doc. 353-5, PageID 6777.) The Motel 6's staff watched Nancy escort men to her room, and watched Domino's homeboy come to collect her money, during each of her stays.

179. Motel 6 requires its franchisees to report safety and security incidents to it. Motel 6 "sets forth all the policies and the ways for which these types of incidents must be reported," tells franchisees when to report, what information to include, and when to follow up with the police, and requires a critical incident report whenever the police respond to a property, including "in the event someone is arrested for prostitution or sex trafficking." (A.W. Doc. 362-9, PageID 7885 (Maltby Dep. 197:8–23); A.W. Doc. 362-2, PageID 7847 (Boose Dep. 162:14–25).) Suspected trafficking must be reported to Motel 6 whether or not the police are called. (A.W. Doc. 362-8, PageID 7881 (Snyder Dep. 129:9–17).)

180. Motel 6 collects those reports in a corporate risk-management and incident-reporting system known as Riskonnect, whose records date from January 2008. (A.W. Doc. 353-5, PageID 6742.) Motel 6's stated policy, in place by 2010, was that franchise employees were to "be the eyes and ears of [Motel 6]" and to "see something, say something." (A.W. Doc. 362-2, PageID 7845 (Boose Dep. 118:4–19).) That system records 3,369 reported incidents at Motel 6 properties between January 2008 and April 2022. More than 2,900 of those reports refer to prostitution, prostitutes, or hookers, and 230 refer to a "pimp." (A.W. Doc. 353-5, PageID 6742.)

181. As alleged below, OCPD was dispatched to the Motel 6 on half of all days from 2019 through 2022, including on 26 morals-violation calls. Under Motel 6's own reporting policy,

each of those police responses was an incident the Motel 6 Franchisees were required to report to Motel 6. On information and belief, Motel 6's Riskonnect records include reports of prostitution and police responses at the Motel 6 before and during Nancy's trafficking; those records are in Motel 6's exclusive possession.

182. Motel 6 also controls who may be excluded from the Motel 6. Motel 6 operates a company-wide "Do Not Rent" program that runs through its property management system. A franchisee may bar a guest from its own property only temporarily; a permanent, brand-wide bar must be requested from, and approved by, Motel 6, and "[m]isuse or abuse" of the program is grounds for default and termination of the franchise. Motel 6's guide lists "Trafficking: Sexual trafficking, prostitution, child, drug, or forced labor trafficking" as a category of permanent, national Do Not Rent placement. (A.W. Doc. 362-1, PageID 7829–32; A.W. Doc. 362-10, PageID 7890 (Walker 2025 Dep. 90:4–10).) On information and belief, neither the Motel 6 Franchisees nor Motel 6 ever placed Domino or his homeboy on a Do Not Rent list, reported the activity in Nancy's rooms to law enforcement, or refused to rent to Nancy.

183. Motel 6 also tracks guest complaints. Complaints made to Motel 6's guest contact center are transcribed by Motel 6's agents, distributed to the franchisee with a copy to Motel 6's director of brand performance, and must be answered within 48 hours. (A.W. Doc. 362-2, PageID 7841 (Boose Dep. 43:3–15).)

184. Motel 6 knew, throughout the relevant period, that its franchise locations played host to at least thousands and likely many tens of thousands of instances of sex trafficking each year.

<u>Criminal Activity at the Motel 6</u>

185. From 2019 through 2022, OCPD logged 1,350 calls for service at the Motel 6 and

assigned case numbers to 120 of them. These calls include 26 morals-violation calls—the most of any Defendant hotel—and not one of them produced a police report. Another 62 calls were violence- or domestic-related, and generated 11 case numbers. Police were dispatched to the Motel 6 on half of all days in the period.

186. The Motel 6's CAD log records two calls dispatched as rapes, one of which produced a report.

187. OCPD also logged 53 theft calls at the Motel 6: three burglaries, four auto burglaries, 15 stolen vehicles, and 31 larcenies. It assigned case numbers to 25 of them.

Super 8 OKC Airport

188. Nancy stayed at the Super 8 OKC Airport—owned and operated by Defendant Natha—for one week in August 2022 where she performed in-calls.

189. Nancy initially reserved the room through her Priceline account, or someone else's, with a prepaid card and extended it multiple times, generally with cash. She often used a fake, paper temporary Oklahoma ID, and had the room put in her name even if someone else showed their ID to the front desk staff.

190. She checked in wearing heels and inadequate clothing, with little luggage; had the room put in her name; asked for new and additional towels and linens frequently; and disposed of used condoms and condom wrappers in the hotel trash.

191. Nancy frequently escorted clients directly from the lobby to the room because they were wary of police stings and being robbed.

192. She would meet them in the lobby in unusually revealing clothes that clearly indicated she was engaged in sex work.

193. At this time, Nancy and another girl were forced to engage in sex acts to pay off a

drug debt to Mexican traffickers.

194. Like Domino, they assigned Nancy a daily quota of 10 clients.

195. With a quota of 10 clients per day, there was a regular flow of men who were not guests of the hotel going in and out of Nancy's room every day of her week-long stay.

196. While paying off this debt they were assigned a handler who arranged clients for them, collected money, and gave them drugs.

197. Some clients would enter the hotel lobby, purchase sex from Nancy, and exit through the lobby in a matter of 7 minutes.

198. Over the course of Nancy's stay, the Super 8 OKC Airport's front desk staff witnessed dozens of instances of Nancy escorting a man who had not checked in as a guest through the lobby to her room, followed by that man heading back out through the lobby, sometimes within a period of 10 minutes or less.

199. Condoms from these johns were left in the trash can of her room.

200. Relevant reviews of the Super 8 OKC Airport include:

a. One guest awarded 1 out of 5 stars, complaining that "Homeless people, prostitutes, and drug dealers were sitting in front of my room the whole night!" They also noticed that "a new car showed up every few minutes to buy drugs or leave with a prostitute." The General Manager at Super 8 responded to the review and apologized for the negative experience.

b. Another guest awarded 2 out of 5 stars, mentioning the "hookers loitering around".

c. Another guest awarded 2 out of 5 stars, saying they "also saw hookers hanging around the area!"

d. Another guest awarded 1 out of 5 stars, stating "Location awful, prostitute's outside, shady guests."

e. Another guest awarded 4 out of 5 stars, mentioning "The following morning I woke up to a bra hanging from my door handle. Don't

> know if the whole motel was unsafe or if I was put in a room where prostitutes normally stay."

201. All the Super 8 OKC Airport reviews quoted above were left before or during Nancy's trafficking. On information and belief these reviews were truthful and accurate.

202. It is the standard procedure for hotels to check their reviews on third-party websites, and the Super 8 OKC Airport's own General Manager responded to at least one of the reviews quoted above. On information and belief, Natha was aware of the multiple negative reviews referencing prevalent prostitution at the Super 8 OKC Airport before Nancy was trafficked there.

203. Because most sex workers are coerced to engage in commercial sex acts, and because Natha was aware of the high prevalence of commercial sex acts occurring at the Super 8 OKC Airport, Natha was aware that trafficking must be occurring on the premises.

204. At the time of Nancy's stay in August 2022, Natha knew and should have known that the Super 8 OKC Airport was a conducive venue for sex trafficking and that sex trafficking regularly occurred on its premises.

205. Because Nancy paid with a prepaid card, wore inadequate clothing, purchased and left an excessive number of condoms at the hotel, had excessive foot traffic in/out of her room in a short period of time, and was monitored at all times by a suspicious-looking male handler, and because each of these is an indicator of potential human trafficking, the Super 8 OKC Airport's employees had both actual and constructive knowledge of Nancy's trafficking.

Criminal Activity at the Super 8

206. From 2019 through 2022, OCPD logged 905 calls for service at the Super 8 and assigned case numbers to 135 of them. These calls include nine morals-violation calls, only two of which produced a police report, and four sex-offense calls. Another 83 calls were violence- or domestic-related, and generated 18 reports.

207. OCPD also logged 62 theft calls at the Super 8: nine burglaries, 14 auto burglaries, 21 stolen vehicles, and 18 larcenies. It assigned case numbers to 35 of them.

208. The Super 8 had notice of prostitution on its property well before Nancy's trafficking. In February 2019, an officer wrote that its lot "IS KNOWN AS A HIGH CRIME AREA WHERE FINDING STOLEN CARS, NARCOTICS AND PROSTITUTION ACTIVITY ARE PREVELANT [*sic*]." (Ex. 19, No. 2019-0014233-1.)

209. The Super 8's desk clerk rented rooms off the books. In March 2019, a man took cash from a woman, telling her he could get her a room for $40. (Ex. 20, No. 2019-0023884-1.) Hotel video showed him and the desk clerk coming out of the kitchen together, and the clerk programming a key card for the man. (*Id.*) The rental was never entered into the hotel's system. (*Id.*) The woman told police that the man then "pushed her for sex," and that the clerk "regularly provided his friends with discounted rooms and kept the money for himself." (*Id.*)

210. In October 2019, OCPD Vice and the OBNDD HTU answered an online escort ad and were sent to a room, where a woman agreed to a sex act for $200. (Ex. 21, No. 2019-0081924-1.) She was charged with offering to engage in prostitution, and with using a computer to violate state law. (*Id.*)

211. In September 2021, Vice answered another online ad that directed the undercover officer to a room, where a woman from New York agreed to intercourse for $300—while a man and a woman watched the room from a parked car. (Ex. 22, No. 2021-0067831-1.) When an officer looked their way, the pair fled; they were charged with aiding and abetting prostitution for "providing security through observation," they shared a New York home address, and officers seized cash from the man's pockets and wallet. (*Id.*) On information and belief, they were watching the woman, not protecting her.

212. On information and belief, the Super 8 had at least one prostitution-related theft. Late on June 10, 2021, a man staying at the Super 8 met a woman outside his door who asked him for a cigarette. (Ex. 23, No. 2021-0042353-1.) They "started 'hanging out,'" and he invited her into his room. (*Id.*) When he stepped out an hour later and came back, she was gone—and so were his laptop, two cell phones, a speaker, his chargers, and his checkbook. (*Id.*) She had told him "she hangs out around the Motel 6[3] and Biltmore Hotel on S Meridian." (*Id.*) On information and belief, the woman was selling sex along the South Meridian motel strip, and the theft from the Super 8 was a trick roll—the robbing of a man who had just taken a woman to his room.

<u>Ramada</u>

213. During her trafficking, Nancy stayed at the Ramada—owned and operated by Defendant C&S—for at least a week.

214. Domino forced Nancy to perform "in calls" at the Ramada, meaning that her johns came to her hotel room for commercial sex. Nancy saw at least 50 johns at the Ramada.

215. Domino required Nancy to meet a daily quota of 10 johns at the Ramada. There was accordingly a regular flow of men who were not guests of the hotel going in and out of Nancy's room every day of her stay.

216. Nancy's stay at the Ramada followed her usual routine. She checked in wearing heels and inadequate clothing, with little luggage. As was her practice, she rented the room often using a fake, paper temporary Oklahoma ID, and had the room put in her name even if someone else showed their ID to the front desk staff.

217. She then extended the stay day-by-day or a few days at a time, paying with cash or, in some cases, making the john pay at the front desk.

3 The Motel 6 referenced in this incident report is not Defendant Motel 6.

218. Throughout the stay, Nancy escorted johns from the hotel lobby to her room, asked for new and additional towels and linens frequently, and disposed of used condoms and condom wrappers in the hotel trash.

219. Nancy's johns entered through the front door of the hotel to get to her room. Nancy usually met them in the lobby to ensure they got in, make them feel secure, and walk them to her room. Each time she did this, she was obviously dressed for sex work.

220. The Ramada's front desk staff thus witnessed dozens of instances of Nancy escorting a man who had not checked in as a guest through the lobby to her room, followed by that man leaving, sometimes within a period of 10 minutes.

221. On one occasion, Nancy walked past the front desk and out through the front door wearing nothing but a negligee—attire that was plainly inappropriate for the daytime.

222. On at least one evening during her stay, Nancy ran out of condoms and bought more from the store in the Ramada's lobby.

223. The store only sold 3-packs of condoms, and Nancy saw many more men than that over the course of the night, so she had to return to the lobby multiple times to purchase additional condoms.

224. There was no self-checkout. Each time, Nancy bought the condoms directly from the front desk staff.

225. Domino visited the Ramada on at least one occasion to collect Nancy's earnings. As at the other hotels, he came and went through the lobby, in line of sight of the front desk, without reserving a room or staying long.

226. At the time of Nancy's stay, C&S knew and should have known that the Ramada was a conducive venue for sex trafficking and that sex trafficking regularly occurred on its

premises.

227. Because the Ramada's employees clearly recognized Nancy as a prostitute, because they (like most people) knew that most prostitutes are victims of coercion, because they knew Nancy was seeing far more clients than an independent sex worker would, and because they would have seen Domino doing the rounds to collect money from Nancy, they knew or should have known that Nancy was being trafficked.

228. On information and belief, the front desk staff recorded Nancy's condom purchases and the other information leading to their suspicion that Nancy was being trafficked as notes on her profile in the Ramada's computerized property management system.

Criminal Activity at the Ramada

229. From 2019 through 2022, OCPD logged 384 calls for service at the Ramada and assigned case numbers to 80 of them. These calls include 6 morals-violation calls, none of which produced a police report, and 5 sex-offense calls. Another 41 calls were violence- or domestic-related, and generated 11 case numbers.

230. OCPD also logged 63 theft calls at the Ramada: eight burglaries, 16 auto burglaries, 14 stolen vehicles, and 25 larcenies. OCPD assigned case numbers to 33 of them.

231. The Ramada drew fewer calls than most of the other hotels, but measured against its total calls, it had the highest share of sex-offense and violent calls of all the Defendant hotels. Four of its calls were dispatched as rapes.

232. The Ramada hosted more Vice prostitution operations than any other hotel. In September 2020, after OCPD Vice "received information that criminal acts were being performed" at the Ramada, an undercover detective entered a room and paid a woman $180 for intercourse. (Ex. 24, No. 2020-0073402-1.) She was charged with solicitation, and officers found suspected

prostitution proceeds hidden in a false-bottom canister in the room. (*Id.*)

233. In March 2021, Vice answered an online prostitution ad and met a woman in a room, where she agreed to a sex act for $150. (Ex. 25, No. 2021-0020467-1.) She was charged with solicitation. (*Id.*) A second person, who shared her home address, was arrested in the room and charged with aiding and abetting prostitution. (*Id.*)

234. In March 2022, Vice ran its own buyer-side operation out of a Ramada room. (Ex. 26, No. 2022-0014750-1; Ex. 27, No. 2022-0014751-1.) Two men answered the ad, agreed to pay $150 and $160 for sex acts, and were charged with solicitation. (*Id.*)

235. Vice ran a third buyer operation at the Ramada in June 2022. (Ex. 28, No. 2022-0044043-1.) A man answered the online ad, agreed to pay $140 for sex, and was arrested when he arrived at the Ramada to meet the undercover officer. (*Id.*)

<u>Howard Johnson</u>

236. Nancy stayed at the Howard Johnson—owned and operated by Defendant Yash—on two occasions: once for 3 days and once for a single evening.

237. Nancy saw approximately 20 johns over the course of these stays via arranged in-calls.

238. Domino required Nancy to meet a daily quota of 10 johns at the Howard Johnson, so there was a regular flow of men who were not guests of the hotel going in and out of Nancy's room during each of her stays.

239. She checked in wearing heels and inadequate clothing, with little luggage. As was her practice, she initially rented the room through her own Priceline account or someone else's, using a fake, paper temporary Oklahoma ID, and had the room put in her name even if someone else showed their ID to the front desk staff.

240. She extended her stay day-by-day, paying with cash or, in some cases, having the john pay at the front desk; asked for new and additional towels and linens frequently; and disposed of used condoms and condom wrappers in the hotel trash.

241. Nancy usually met her johns in the hotel lobby to ensure they got in, make them feel secure, and walk them to her room. Each time she did this, she was obviously dressed for sex work.

242. The Howard Johnson's front desk staff thus witnessed repeated instances of Nancy escorting a man who had not checked in as a guest through the lobby to her room, followed by that man leaving, sometimes within a period of 10 minutes.

243. Once, Domino assaulted Nancy at the hotel when he came to collect money.

244. Domino was mad because Nancy was below her quota and her prepaid card ran out.

245. She walked through the hotel with bruises on her arms that the hotel staff she interacted with would have seen. She has pictures of these bruises at the hotel.

246. Domino then took her money and abandoned her at the hotel without a ride.

247. Nancy—with visible bruises—asked the front desk if she could wait until her next client came to pay her outstanding deposit.

248. The front desk staff understood that she meant a sex work client. They refused her offer and asked her to leave.

249. This was one of several conversations and interactions in which Nancy and the Howard Johnson's staff explicitly referenced Nancy engaging in acts of commercial sex on the premises.

250. Instead of calling social services or law enforcement due to the bruises or the nature of her work, hotel staff kicked her out onto the street.

251. Eventually, Nancy had to leave her suitcase and "turn a trick" off the street to get money for a ride.

252. Relevant reviews of the Howard Johnson include:

a. One guest awarded 1 out of 5 stars, saying, "Don't stay there… there were prostitutes around the building." Tommy N., the General Manager of this Howard Johnson hotel, responded to the comment and apologized.

b. Another guest awarded 1 out of 5 stars, citing, "some very fishy transactions going on in the parking lot, appeared to be drugs or sex."

253. Each of the Howard Johnson reviews quoted above was left before or during Nancy's trafficking. On information and belief these reviews were truthful and accurate.

254. It is the standard procedure for hotels to check their reviews on third-party websites, and the Howard Johnson's own General Manager responded to at least one of the reviews quoted above. On information and belief, Yash was aware of the negative reviews referencing prostitution and drug and sex transactions at the Howard Johnson before Nancy was trafficked there.

255. Because most sex workers are coerced to engage in commercial sex acts, and because Yash was aware of the high prevalence of commercial sex acts occurring at the Howard Johnson, Yash was aware that trafficking must be occurring on the premises.

256. At the time of Nancy's stays, Yash knew and should have known that the Howard Johnson was a conducive venue for sex trafficking and that sex trafficking regularly occurred on its premises.

257. Nancy showed clear signs of physical abuse and was easily identifiable as a prostitute, so Howard Johnson employees had actual and constructive knowledge that Nancy was a victim of sex trafficking.

<u>Criminal Activity at the Howard Johnson</u>

258. From 2019 through 2022, OCPD logged 335 calls for service at the Howard

Johnson and assigned case numbers to 69 of them. These calls include two morals-violation calls, neither of which produced a police report, and two sex-offense calls. Another 24 calls were violence- or domestic-related, and generated three case numbers.

259. OCPD also logged 64 theft calls at the Howard Johnson: three burglaries, 26 auto burglaries, 11 stolen vehicles, and 24 larcenies. OCPD assigned case numbers to 39 of them.

The Public Records Underlying Criminal Activity Allegations

260. Plaintiff obtained the OCPD CAD logs for each of the six hotels from January 1, 2019 through December 31, 2022. The CAD logs include: the date and time, the incident number, the OCPD case number (if a report was made), the responding units, the dispatch priority, and the problem (as the dispatcher classified it) for every call for service. Based on these CAD logs, Plaintiff requested over 700 incident reports.

261. The criminal activity described in each hotel's section above is drawn from the public records described in this section: the OCPD CAD logs and incident reports for the six hotels.

Police dispatch records document vice and sex crimes at all six hotels.

262. The OCPD CAD logs show 7,036 calls for service at the six hotels between 2019 and 2022, averaging roughly five calls per day.

263. During the requested period, the breakdown for violent or sex-related calls inside the six Defendant hotels was:

| **Hotel** | **Calls for service** | **Morals-violation (vice) calls** | **Sex-offense calls (incl. rape)** | **Violent-crime calls** (ADW, assault, robbery, kidnapping, domestic) |
|---|---|---|---|---|
| Plaza | 2,828 | 17 | 6 | 271 |
| Motel 6 | 1,350 | 26 | 3 | 62 |
| Extended Stay | 1,234 | 9 | 3 | 126 |
| Super 8 | 905 | 9 | 4 | 83 |
| Ramada | 384 | 6 | 5 | 41 |

| | | | | |
|---|---|---|---|---|
| Howard Johnson | 335 | 2 | 2 | 24 |
| **Total** | **7,036** | **69** | **23** | **607** |

264. Vice presence at the Defendant hotels was routine, and it was rarely recorded. Only 2 of the 69 morals-violation calls produced an OCPD case number. The Motel 6 drew 26 morals-violation calls—the most of any Defendant hotel—but OCPD did not generate a report for any of them. For sex-offense calls, just 9 of the 23 calls produced a case number.

<u>OCPD's incident reports confirm—and exceed—what the dispatch logs show.</u>

265. The CAD logs show how a dispatcher classified each call when it came in, but OCPD's incident reports show what officers determined had actually happened. OCPD assigned a case number—meaning an officer wrote a report—to 1,071 of the hotels' calls. Plaintiff has obtained 356 of OCPD's 2019–2022 incident reports thus far, covering five of the hotels. The violent offenses OCPD recorded in them include:

| Hotel | Incident reports obtained | Aggravated assault / ADW | Assault | Domestic violence | Robbery |
|---|---|---|---|---|---|
| Plaza | 176 | 19 | 16 | 8 | 13 |
| Extended Stay | 50 | 7 | 8 | 2 | 3 |
| Super 8 | 83 | 4 | 6 | 6 | 2 |
| Ramada | 43 | 2 | 5 | 2 | 1 |
| Howard Johnson | 4 | 0 | 0 | 0 | 0 |
| **Total (five hotels)** | **356** | **32** | **35** | **18** | **19** |

266. The reports also record three murders at the Plaza, two forcible rapes—one at the Extended Stay and one reported at the Ramada—and eleven prostitution arrests at the Super 8 OKC Airport, the Ramada, and the Extended Stay.

267. Theft calls were followed by reports as well. Plaintiff has obtained reports of 28 burglaries and 57 thefts—from guest rooms, from parked cars, and from the guests themselves.

268. OCPD did not log its prostitution stings under a consistent call type. Of eight Vice reports, four appear in the CAD logs as "Other Type Calls," OCPD's catch-all category; two appear as "Officer Assist-Nonpriority"; one appears as a "morals violation"; and one appears as a "sex offense." (Ex. 21, No. 2019-0081924-1; Ex. 24, No. 2020-0073402-1; Ex. 22, No. 2021-0067831-1; Ex. 25, No. 2021-0020467-1; Ex. 26, No. 2022-0014750-1; Ex. 27, No. 2022-0014751-1; Ex. 18, No. 2022-0026615-1; Ex. 28, No. 2022-0044043-1.) The morals-violation and sex-offense counts above therefore do not capture every prostitution sting at these hotels.

269. OCPD logged 491 "Other Type Calls" at the Plaza and 82 at the Extended Stay from 2019 through 2022. Plaintiff's records requests for the reports behind those calls remain outstanding. On information and belief, those reports include prostitution stings at the Plaza and the Extended Stay.

**<u>COUNT I: 18 U.S.C. § 1595 ("TVPRA")</u>**

270. Plaintiff incorporates each foregoing and subsequent allegation.

271. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. § 1595.

272. Through their acts and omissions described above, Plaza, Ketter, Wiley, the Franchisee Defendants, and the Franchisor Defendants each trafficked Plaintiff within the meaning of 18 U.S.C. § 1591(a)(1), and they are thus directly liable under 18 U.S.C. § 1595.

273. For example, each Defendant "harbor[ed]," "provide[d]," and—in Wiley's case—"patronize[d]" Nancy while knowing or in reckless disregard of the fact that she would be coerced into commercial sex.

274. Through their acts and omissions described above, Plaza, Ketter, Wiley, the Franchisee Defendants, and the Franchisor Defendants each trafficked Plaintiff within the meaning

of 18 U.S.C. § 1591(a)(2), and they are thus directly liable under 18 U.S.C. § 1595.

275. Through their acts and omissions described above, Plaza, Ketter, Wiley, the Franchisee Defendants and the Franchisor Defendants each benefit[ted] financially from Plaintiff's sex trafficking due to their participation in a venture that they knew or should have known earned money from sex trafficking, and they are thus liable as beneficiaries under 18 U.S.C. § 1595.

276. Specifically, Nancy's allegations above establish that the Plaza, Ketter, and Wiley participated in a venture together, in the form of the commercial venture known as the Plaza Inn, which each knew had engaged in acts of human trafficking, both generally and with respect to Nancy.

277. Nancy's allegations above also establish that the Plaza, Ketter, and Wiley participated in a venture with Domino, in the form of room rentals to Domino, which each knew had engaged in acts of human trafficking, both generally and with respect to Nancy.

278. Nancy's allegations above also establish that the Franchisee Defendants and their respective Franchisor Defendants, where applicable, each participated in ventures together, in the forms of the franchisee-franchisor relationships for each defendant hotel, which each participant knew had engaged in acts of human trafficking, both generally and with respect to Nancy.

279. Finally, Nancy's allegations above establish that the Franchisee Defendants and their respective Franchisor Defendants, where applicable, each participated in ventures together with Domino, in the form of room rentals and WiFi sales to Domino, which each participant knew had engaged in acts of human trafficking, both generally and with respect to Nancy.

280. In addition to their direct liability, under the facts described above, the Franchisor Defendants are liable for the acts of their respective Franchisee Defendants because, in the alternative: (1) Each Franchisee Defendant was acting as the agent of its respective Franchisor

Defendant with respect to all relevant employment, training, and operational decisions; and (2) Each Franchisor Defendant is a joint employer of the employees of its respective Franchisee Defendants.

281. Plaintiff has suffered substantial permanent physical and psychological injuries as the result of being trafficked and sexually exploited, and she is therefore entitled to bring an action against each Defendant for damages under 18 U.S.C. § 1595.

**COUNT II: 21 OK STAT § 21-748.2(B) ("OKLAHOMA SEX TRAFFICKING")**

282. Plaintiff incorporates each foregoing and subsequent allegation.

283. Plaintiff is a "person aggrieved by" trafficking under 21 OK Stat § 21-748(B).

284. Defendants committed acts of human trafficking under 21 OK Stat § 21-748(B) by variously recruiting, enticing, providing, obtaining, and in all cases harboring Plaintiff for purposes of engaging Plaintiff in a commercial sex act.

285. Defendants further committed acts of human trafficking under 21 OK Stat § 21-748(B) by benefitting (in the form of room rentals, fees for towels, condom purchases etc…) from participating in ventures that engaged in acts of trafficking for commercial sex.

286. Plaintiff is therefore entitled to bring an action for damages as a result of her trafficking against Defendants under 21 OK Stat § 21-748.2(B).

287. Plaintiff's claim is timely because it was filed within three years of accrual as permitted by 12 OK Stat § 12-95(A)(2) for any "action upon a liability created by statute other than a forfeiture or penalty."

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

**a.** Awarding Plaintiff all available compensatory damages for each cause of action,

including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; and all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

**b.** Disgorgement of profits and/or restitution;

**c.** Punitive damages, attorneys' fees, and expenses;

**d.** The costs of this action;

**e.** Pre- and post-judgment interest; and

**f.** Any other relief the Court or jury deems appropriate.

DATED October 28, 2026

/s/ *Geoffrey C. Parker, Esq.*

GEOFFREY C. PARKER, ESQ.
*Pro Hac Vice* – OH #0096049
Hilton Parker LLC
7620 Farmsbury Dr.
Reynoldsburg, OH 43068
Tel: (614) 992-2277
Fax: (614) 927-5980
Email: gparker@hiltonparker.com

MICHAEL C. KANE, ESQ.
*Pro Hac Vice* – NV #10096
THE702FIRM INJURY ATTORNEYS
8335 West Flamingo Road
Las Vegas, Nevada 89147
Tel: (702) 776-3333
Fax: (702) 505-9787
Email: service@the702firm.com

FLETCHER D. HANDLEY, JR.
OBA #3797
Handley Law Center
PO Box 310
El Reno, OK 73036
Tel: (405) 295-1924

Email: fdh@handleylaw.com

*Attorneys for Plaintiff Nancy R.*

**DEMAND FOR JURY TRIAL**

Plaintiff Nancy R., by and through her attorneys of record, hereby demands a jury trial of all issues in the above matter.

DATED October 28, 2026

/s/ *Geoffrey C. Parker, Esq.*

GEOFFREY C. PARKER, ESQ.
*Pro Hac Vice* – OH #0096049
Hilton Parker LLC
7620 Farmsbury Dr.
Reynoldsburg, OH 43068
Tel: (614) 992-2277
Fax: (614) 927-5980
Email: gparker@hiltonparker.com

MICHAEL C. KANE, ESQ.
*Pro Hac Vice* – NV #10096
THE702FIRM INJURY ATTORNEYS
8335 West Flamingo Road
Las Vegas, Nevada 89147
Tel: (702) 776-3333
Fax: (702) 505-9787
Email: service@the702firm.com

FLETCHER D. HANDLEY, JR.
OBA #3797
Handley Law Center
PO Box 310
El Reno, OK 73036
Tel: (405) 295-1924
Email: fdh@handleylaw.com

*Attorneys for Plaintiff Nancy R.*